United States District Court
Southern District of Texas

**ENTERED**

September 08, 2020

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| DOUGLAS TYRONE ARMSTRONG, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 7:18-CV-356 |
| | § | |
| BOBBY LUMPKIN,[1] | § | |
| | § | |
| Respondent. | § | |

## REPORT AND RECOMMENDATION

Petitioner Douglas Tyrone Armstrong, a state prisoner proceeding with counsel, initiated this action by filing a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Docket No. 1.) A jury found Petitioner guilty of capital murder, and he was sentenced to death. The evidence against Petitioner included the testimony of two eyewitnesses. In ruling on Petitioner's state habeas application, the Texas Court of Criminal Appeals (CCA) rejected his claims alleging that his trial lawyers rendered ineffective assistance during the guilt/innocence phase of trial, but the CCA found that counsel were deficient during the punishment phase in failing to investigate and present additional mitigating evidence. On remand, the state trial court sentenced Petitioner to life imprisonment.

In seeking federal habeas relief, Petitioner asserts that the state court erred in denying three of his constitutional claims challenging his murder conviction. Two of those claims allege ineffective assistance of trial counsel: 1) his attorneys were statutorily unqualified to represent him

---

[1] Petitioner initially named Lorie Davis as the Respondent. Pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases, the proper respondent in a § 2254 action is the "state officer who has custody" of the petitioner. Because Petitioner Armstrong is in custody of the Texas Department of Criminal Justice-Correctional Institutions Division, the proper respondent is Bobby Lumpkin, who is now the current Director of the Correctional Institutions Division. FED. R. CIV. P. 25(d).

in a capital case; and 2) trial counsel failed to adequately investigate alibi witnesses and forensic evidence.  In support of his failure-to-investigate claim, Petitioner submits new evidence consisting of multiple affidavits from lay witnesses and reports by forensic experts.  According to Petitioner, this new evidence also proves he is actually innocent, which is his third claim.  The parties have filed and fully briefed cross-motions for summary judgment.  (Docket Nos. 8, 11.)

The nature and quantity of Petitioner's new evidence warrants a deep dive into the state court record, which spans about 10,000 pages.  Having taken that plunge, and having considered Petitioner's § 2254 habeas claims through the lens of the highly deferential standard of review that applies, the undersigned concludes that Petitioner has failed to show he is entitled to federal habeas relief.  Petitioner's claim that trial counsel did not meet state law requirements for appointment in a capital case does not state a federal constitutional claim and is otherwise meritless.  But his failure-to-investigate claim presents a much closer question in view of the new evidence.  Ultimately, however, Petitioner fails to show the state habeas court unreasonably applied *Strickland* in ruling he has not shown prejudice resulting from counsel's alleged deficiency.  There is support in the record for the state court's determination.  Petitioner's freestanding actual innocence claim is not recognized in the Fifth Circuit, and, even if it were, Petitioner has fallen far short of proving that he is factually innocent.

Accordingly, for the reasons explained below, it is recommended that Respondent's summary judgment motion be granted, that Petitioner's summary judgment motion and habeas petition be denied, and that this action be dismissed.  It is further recommended that a certificate of appealability be granted as to Petitioner's ineffective assistance claim alleging failure to investigate and denied as to his other claims.

# I.  BACKGROUND[2]

## A.  Petitioner's Capital Murder Conviction

On April 21, 2006, 61-year-old Raphael Castellan, called "Rafa" by his friends, was brutally murdered near his apartment in Donna, Texas.  Mr. Castellan's neck was cut multiple times, and he bled to death.  His back pockets had been torn off his shorts, and his empty wallet and other personal belongings were found scattered on the ground.  Two eyewitnesses identified Petitioner Armstrong as Mr. Castelan's attacker.

A grand jury in Hidalgo County, Texas, returned an indictment charging Petitioner with capital murder.  The indictment was filed in the 370th Judicial District Court, Hidalgo County, Texas, Cause No. CR-2095-06-G, with the Honorable Noe Gonzalez presiding.  Because it was a capital case, Judge Gonzalez appointed two attorneys to represent Petitioner: Rogelio Garza and Nereyda Morales-Martinez.[3]  Petitioner pleaded not guilty and proceeded to trial.

The trial began on January 3, 2007.  After hearing evidence and argument over the course of seven days, the jury found Petitioner guilty of capital murder.  The punishment phase began the next day.  On January 17, 2007, the jury found "beyond a reasonable doubt that there is a probability that [Petitioner] would commit criminal acts of violence that would constitute a continuing threat to society" and that there was not "sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death

---

[2] The facts and procedural history set out in the next two sections are taken from the State Court Record filed in this case, the documents submitted by Petitioner and Respondent, and the CCA's decision addressing Petitioner's direct appeal, *Armstrong v. State*, No. AP-75,706, 2010 WL 359020, at *1-2 (Tex. Crim. App. Jan. 27, 2010).  (*See* Docket Nos. 6-8, 11.)

[3] The court initially appointed Ms. Morales-Martinez and Librado ("Keno") Vasquez, but Mr. Vasquez later moved to withdraw and was replaced by Mr. Garza.  The court later appointed Oscar Rene Flores to represent Petitioner on his direct appeal.

sentence be imposed." (Docket No. 6-21, at 327.) Based on the jury's answers to the punishment

issues, the state trial court sentenced Petitioner to death.

### 1.    The Evidence Presented at Trial

In addressing Petitioner's direct appeal, the CCA summarized the facts of his case as

follows:

> On April 21, 2006, around 9:30 p.m., Laura Patricia Corona and Pilar Reyes
> witnessed a man attacking Rafael Castelan. Corona and Reyes were in a mini-van,
> and Reyes drove toward the attacker in an attempt to scare him away from Castelan.
> The attacker did not flee, but Castelan tried to escape by getting into the rear door
> of the mini-van. The attacker grabbed Castelan by the head and threw him to the
> ground; Corona heard Castelan's head hit the pavement. Corona then saw the
> attacker cut Castelan's neck and go through his pockets before he ran north through
> an alley. Corona called 911 and checked on Castelan. Castelan died at the scene.
> Forensic pathologist Dr. Fulgencio Salinas later determined that Castelan suffered
> multiple incised cuts to the neck and died from the resulting blood loss.

> Officer Norma de la Rosa arrived at the scene first, followed by Sergeant
> Sebastian Guerrero. Both observed Castelan covered with blood and with a
> lacerated neck. Castelan's rear pocket had been ripped from his shorts, and his
> belongings were scattered on the ground. Detective Jose Elizondo, who was
> responsible for collecting evidence, found a bag of items from an H.E.B. grocery
> store, a cell phone, and a wallet on the ground near Castelan's body. There was
> blood inside the wallet, and its contents were strewn around the area.

> Corona and Reyes described Castelan's attacker as a large black man,
> wearing a white T-shirt and blue jeans. The couple told the officers the direction in
> which the attacker had run. As other officers secured the scene, Guerrero went to
> search for the attacker.

> The Sunshine Bar was located about three blocks north from where Castelan
> had been attacked. The back door of the bar was located in the same alley through
> which the attacker had fled. Bartender Cinthia Berenice Alanis Olvera told police
> that Armstrong had been at the bar for quite some time that day, playing pool and
> purchasing drinks for waitresses and female patrons. Castelan arrived at the bar
> later in the day and spoke with Armstrong for about half an hour. Castelan told
> Olvera that he was going to a nearby H.E.B. [grocery store] to get something for
> Armstrong. Olvera never saw Castelan again.

> Armstrong told Olvera and another patron that he had run out of money and
> showed them his empty wallet. He then left the bar and returned later through the
> back door. When Armstrong returned, he was shaking, sweating, and acting

nervous. Bar patron Darin Douglas watched Armstrong stand at the bar and count out paper currency "under the bar" before buying a beer. Olvera remembered that Armstrong used a five-dollar bill. Armstrong went into the men's restroom where Mr. Douglas saw Armstrong take off his white T-shirt and pour beer over his fingers. Mr. Douglas believed that this odd because there was a sink right outside the door of the men's restroom. Mr. Douglas then returned to the bar and began playing pool. According to Olvera, the police arrived almost immediately thereafter.

When Sergeant Guerrero entered the bar through the back door, he looked around and saw Mr. Douglas, who matched the description given by Corona and Reyes. He asked a patron sitting near the back door whether anyone had entered it recently. Upon learning that two men had, Guerrero called for backup. Officers Ortega, Peña, and Salinas then came to the bar.

While Ortega stood at the door, Salinas detained Mr. Douglas at the pool table. Guerrero and Peña went into the men's restroom where they found Armstrong and a Hispanic man. Armstrong was sweating and putting on a dark colored T-shirt when the officers entered the restroom. Armstrong also matched the description of the attacker. Guerrero and Peña detained both men. According to Olvera, when Armstrong entered the restroom, he had been wearing a white T-shirt. Guerrero observed a white T-shirt covered with blood on the floor near the urinal just a few feet from Armstrong. Officers also noticed dark stains that appeared to be blood on Armstrong's blue jeans. Crystal Dawn Anderson from the Texas Department of Public Safety Crime Lab later positively identified the stains as blood. She also determined that the DNA profiles developed from the blood on the T-shirt and jeans were consistent with Castelan's DNA profile. A DNA profile developed from scrapings taken from the neck of the white T-shirt matched Armstrong's DNA profile.

Officers placed Douglas, Armstrong, and the Hispanic male in separate patrol cars outside the bar. De la Rosa escorted Corona and Reyes to the Sunshine Bar so that they could view the three men. Both Corona and Reyes identified Armstrong as Castelan's attacker. Officer Salinas then checked Armstrong's pockets for identification. He found a driver's license, "paperwork and some money." Officer Salinas noted that the paperwork was folded, but he did not know what kind of paperwork it was. Sergeant Guerrero then took Armstrong to the county jail for booking.

While booking Armstrong, Jailer Joshua Edwards found Castelan's Medicaid form in Armstrong's possession. Though the item is referred to as a Medicaid card or receipt by both parties and in the record, it is an 8 ½″ by 11″ paper with Castelan's name, Medicaid identification number, date of birth, and eligibility dates typewritten on it. Edwards removed the form from Armstrong's left-rear pocket along with Armstrong's pay stub. The two items were folded together. The Medicaid form, as well as forty-one dollars in paper currency, were blood-stained.

Anderson later determined that the DNA profiles obtained from the blood were consistent with Castelan's DNA profile. Edwards did not list the Medicaid form on the booking sheet because it would not be returned to Armstrong when he was released from the jail.

Three days after the offense, on April 24, 2006, while conducting a further search of the area surrounding the crime scene, officers found a blue box-cutter knife in a grassy area near the rear entrance of the Sunshine Bar. The knife was fashioned like a pocket knife, and officers observed blood on the blade. Anderson later determined that the DNA profile obtained from the blood was consistent with Castelan's DNA profile. Armstrong's girlfriend, Cynthia Losoya, told police that Armstrong "always" carried a blue box-cutter knife.

*Armstrong v. State*, No. AP-75,706, 2010 WL 359020, at *1-2 (Tex. Crim. App. Jan. 27, 2010).

## 2. Petitioner's Trial Defense: "Helping" the Victim

During the guilt/innocence phase of trial, Petitioner's attorneys employed what was essentially a two-pronged defense strategy. First, Petitioner's counsel vigorously cross-examined the State's witnesses to try to persuade the jury that the State had failed to prove its case beyond a reasonable doubt. They attempted to highlight apparent inconsistencies in witnesses' statements and possible misconduct (or incompetence) by police in handling certain evidence, including Mr. Castelan's Medicaid document.

As the second prong of Petitioner's defense strategy, trial counsel relied on Petitioner's own explanation of what happened. About three hours after Petitioner was arrested at the Sunshine Bar, he waived his Miranda rights and agreed to make a statement. At trial, the State played Petitioner's video-recorded statement for the jury. (Docket No. 6-56, at 21-22 (Trial Day 2 Tr. 68-71).)[4] Petitioner's trial counsel did not object. This made it possible for the jury to hear

---

[4] Due to the variety of page, exhibit, and Bates numbers found in the parties' briefing and throughout the record, in this report the primary cites for both the state court record and the parties' briefing and exhibits will refer to the docket and page numbers electronically assigned by the Court's Case Management/Electronic Case Files (ECF) system. Page numbers for docket entries refer to the ECF-assigned pagination at the top of each page. In some instances, parenthetical parallel cites may be added (for example, cites to trial exhibit numbers or transcript pages).

Petitioner's version of events without subjecting him to cross-examination about his actions or his troubling criminal history.[5]

In his statement to police, Petitioner began by explaining that he had been at the Sunshine Bar "since I got off from work at three o'clock." (Docket No. 1-3, at 118 (transcribed Interview of Douglas Tyrone Armstrong, April 22, 2006 ("Armstrong Tr.") at 5).)[6]  He left the bar "walking home" at around 8:30 or 9:00 p.m.  (*Id.* at 119 (Tr. 6).)  Although Petitioner admitted encountering Mr. Castelan on his way home, he repeatedly denied murdering Mr. Castelan.  Rather, Petitioner stated that he found Mr. Castelan on the ground bleeding and tried to "help" him.  He said that he became scared when he saw a van approaching and ran off.

Petitioner's post-arrest statement began with the following explanation:

> I'm walking home and different stuff. You know, I was walking down the street. I was walking home and I seen a guy, I seen a guy over there. I seen the guy over there, there's stuff right there.  You know, he scared me, I'm telling you the guy scared me because he was bleeding.  And I got scared and I ran back to the bar. I ran back to the bar.  I seen a guy over there bleeding.

(*Id.* at 119-20 (Tr. 6-7).)

---

[5] In seeking habeas relief, Petitioner does not challenge trial counsel's strategy in allowing the jury to hear Petitioner's post-arrest statement.  To the contrary, Petitioner's failure-to-investigate claim assumes that the jury should have heard his explanation of what happened.  He contends that counsel was deficient in failing to discover and present additional facts that would have supported his explanation.

[6] The transcript of Mr. Armstrong's post-arrest statement is attached to his Petition as exhibit 25 to the Schultz affidavit. (Docket No. 1-3, at 113-206.)  The statement was admitted into evidence at trial in video format as State's exhibits 28 and 29.  (Docket No. 6-56, at 21-22 (Trial Day 2 Tr. 68-71).)  Initially, the video itself was not filed as part of the record.  At the Court's request, Petitioner's counsel has now supplemented the record by filing (in electronic format) Mr. Armstrong's videotaped statement.  (*See* Docket Nos. 14, 18.)  The Clerk is maintaining the media containing the video recording as well as other supplements to the record submitted in electronic format.

While this sounds like Petitioner immediately fled upon seeing a bleeding man, he went on to clarify that he attempted to help the man, who he remembered seeing at the bar that day and on one previous occasion (about two weeks before):

> Yeah, I remember seeing him at the bar. I'm talking, you know, I was helping him, I was walking with him and then I got scared and I let him go and I ran back to the bar. I was scared. I got scared and ran back to the bar. I seen the guy over there right down the street from where I stay. . . .
>
> I seen the guy over there. And I was trying to help the guy, but then I got scared because I was drunk.

(*Id*. at 120 (Tr. 7).)  When asked how he was trying to help, Petitioner replied:

> You know, I had the guy, you know, up on my shoulder. You know, I was walking him out. You know, I offered to walk with him because I know the police station right up here. I was going to walk up here. You know, and I got scared, man, I'm telling you I got scared and I ran.

(*Id*. at 120-21 (Tr. 7-8).)  Petitioner later further clarified that he was not carrying Mr. Castelan on his shoulder, rather:

> I was going home, walking down the street. I was going down the street and I seen that man laying down and I looked over there, I walked over there and picked the man up. And the man was talking. I couldn't understand. I said man, just be quiet. And I had the man in my arm and I walked with the man right up there. And I seen a van or something pull up, pull out, and I got scared and I left the man and I took off running.

(*Id*. at 147-48 (Tr. 34-35).)  When accused of changing his story, Petitioner replied: "No, sir. What I'm telling you, I saw a guy laying down. I went over there to help the guy up. I helped the guy up."  (*Id*. at 124 (Tr. 11).)

When the police investigator asked why he was scared, given that he was being a good citizen and trying to help someone, Petitioner responded:

> I've been in trouble before. I've been in trouble with the law before. If I'm trying to help somebody right there, the first thing they're going to tell me, they're going to say it was me, man. They're going to say it was me, man.

OFFICER SUAREZ: Why?

[MR. ARMSTRONG]: Cause I got a criminal record, Officer.

(*Id*. at 121-22 (Tr. 8-9).)  Petitioner later added that he got scared and ran when "it started to dawn"

on him that he had also "snorted cocaine" at the bar.  (*Id*. at 124 (Tr. 11).)

Petitioner's version of events was completely inconsistent with the testimony of the two

eyewitnesses who were in the van, Ms. Corona and Mr. Reyes.  They both testified that they saw

what appeared to be a fight, with an already-bloody Mr. Castelan attempting to get away from

Petitioner (who was also covered with blood).  According to their account, Petitioner (among other

things) struck the much-smaller and much-older Mr. Castelan, threw him against a fence, and

violently threw him to the ground when he attempted to open the rear door of the van.[7]  The jury

observed Petitioner's statement to police and heard the testimony of Ms. Corona and Mr. Reyes.

Their guilty verdict reflects that they did not believe Petitioner's explanation that he had merely

tried to "help" Mr. Castelan.

### 3.    The Punishment Phase of Trial

During the punishment phase, the State introduced court records reflecting Petitioner's

criminal history.[8]  The State also called Mr. Castelan's brother, Raul Castelan, as a witness.

---

[7] During Petitioner's booking, he gave his height as 5' 10" and weight as 225 pounds; he was 36 years old at the time.  (Docket No. 6-73, at 14 (State's Ex. 194).)  Mr. Castelan's Texas ID card listed his height at 5' 3"; he was 61 years old when he died.  (*See* Docket 6-71 at 14 (State's Ex. 100).)  The autopsy report listed Mr. Castelan's weight at 160-170 pounds.  (*See* Docket No. 6-73 at 36 (State's Ex. 213).)

[8] Petitioner's criminal history included the following convictions:

- Robbery, first degree felony (Alabama 1987), sentenced to 10 years' imprisonment (Docket No. 6-73, at 55 (State's Ex. 218));

- Arson, second degree felony (Alabama 1990), sentenced to 10 years' imprisonment, habitual offender designation (*id*. at 56);

Petitioner's counsel called three witnesses: 1) David Ray, a pastor in Donna, Texas, who had met Petitioner and seen him in church with his girlfriend in the months before the murder; 2) Petitioner's girlfriend, Cynthia Losoya; and 3) Petitioner's sister, Sheila Armstrong. Through Ms. Armstrong, trial "counsel presented cursory evidence that [Petitioner] suffered from poverty and abuse as a child." *Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *1 (Tex. Crim. App. Nov. 18, 2015).

### 4.        The Direct Appeal

On direct appeal, Petitioner argued that the evidence presented at trial was legally and factually insufficient to support his conviction for capital murder. (Docket No. 6-16, at 14.) In addition, Petitioner argued that the trial court erred in numerous ways and that his trial attorneys rendered constitutionally deficient performance in various ways. (*Id.* at 14-17.) On January 27, 2010, the CCA rejected all of Petitioner's claims and affirmed his conviction. *Armstrong v. State*, No. AP-75,706, 2010 WL 359020 (Tex. Crim. App. Jan. 27, 2010).

## B.        State Habeas Applications

On February 27, 2009, Petitioner filed his initial state application for writ of habeas corpus.[9] (Docket No. 7-35, at 21.) Petitioner challenged his conviction on numerous grounds,

---

- Terroristic threats, felony (Georgia 1998), sentenced to one year imprisonment (*id.* at 71-72 (State's Ex. 220); and

- Theft of property, first degree felony (Alabama 2001), sentenced to 3 years' confinement (12 years suspended), habitual offender designation (Docket No. 6-73, at 57 (State's Ex. 218).

[9] Petitioner later filed second, third, and fourth state habeas applications. *See Ex Parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *1 (Tex. Crim. App. Nov. 18, 2015) (noting Petitioner's four state applications but addressing only the first). Only the first state habeas application is relevant to Petitioner's federal habeas petition. The CCA dismissed the other three applications on procedural grounds. *See infra* n.11. For simplicity, this report will refer to Petitioner's first application as his "state habeas application" or "state writ."

including the same claims that he is now asserting in his federal habeas petition. (*Id.* at 23.) In addition, Petitioner asserted that his trial counsel rendered ineffective assistance of counsel by failing to "conduct a constitutionally adequate investigation of mitigation evidence that should have been introduced in the penalty phase of [Petitioner's] trial." (*Id.* (Claim I.C.).)

In support of his failure-to-investigate claim relating to Mr. Castelan's murder, Petitioner presented new evidence consisting of witness statements and reports by forensic experts. Petitioner argued that this new evidence also showed that he is actually innocent of the murder. In support of his claim alleging that trial counsel failed to conduct a constitutionally adequate investigation of mitigation evidence for the punishment phase, Petitioner submitted additional evidence from lay witnesses regarding the abuse and neglect he suffered as a child, together with reports by mental health experts who had conducted post-conviction evaluations of his cognitive abilities and mental health.

On August 4-5, 2014, Judge Gonzalez, who had presided over Petitioner's trial, held an evidentiary hearing addressing Petitioner's state habeas application. (Docket Nos. 7-22, 7-23, 7-24.) Judge Gonzalez later entered extensive findings of fact and conclusions of law—totaling 631 pages—in recommending that Petitioner's state habeas claims be denied.[10] (Docket No. 7-41, 23-660.)

---

[10] In objecting to these findings and conclusions, Petitioner noted to the CCA that the trial court had simply signed without change the proposed findings and conclusions submitted by the State. (*See* Docket No. 7-5, at 3.) Petitioner had also submitted detailed proposed findings and conclusions. (Docket No. 7-41, at 661.) Presumably, Petitioner would not have complained if the trial court had signed his proposed findings and conclusions. In any event, the Fifth Circuit has rejected the argument that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *See Basso v. Stephens*, 555 F. App'x 335, 342, 343 (5th Cir. 2014); *Green v. Thaler*, 699 F.3d 404, 416 n. 8 (5th Cir. 2012).

The CCA issued an opinion addressing Petitioner's claim that trial counsel conducted a constitutionally inadequate investigation for the penalty phase of trial.  The court described and summarized the two categories of new mitigation evidence developed by habeas counsel.  First, statements from various lay witnesses further developed and amplified the nightmarish environment Petitioner experienced as a child, showing that he:

> Grew up with abusive, neglectful parents, who spent any money the family had on alcohol; was so poor that he and his siblings often went hungry; lived in dangerous neighborhoods and was exposed to strangers coming and going from the house where his parents sold alcohol "after hours"; witnessed extreme violence between his parents; was subjected to physical and sexual abuse; was subjected to his father's attempt to kill the whole family by burning down the house; and witnessed his father being shot in the doorway of their home.

*Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *1 (Tex. Crim. App. Nov. 18, 2015).

Second, based on post-conviction testing and evaluations, mental health experts found that Petitioner:

> suffers from dysthymia, substance dependence, personality disorder-not otherwise specified, and brain damage. They have also determined that [Petitioner's] history of an abusive home environment, failure and teasing in school, and experience as a juvenile in prison, led to applicant being traumatized, frightened, guarded, and at risk for responding to situations in a violent manner. They note that [Petitioner's] limited cognitive abilities and coping skills prevented him from responding well to stressful situations, and his reactions were those that his family had modeled for him.

*Id*.

Based on the new evidence that had been adduced, the CCA found that "trial counsel's mitigation investigation was deficient."  *Id*. at *2.  However, being unable to resolve whether counsel's deficient performance prejudiced Petitioner, the CCA remanded the case back to the trial court to resolve certain fact issues.  *Id.* at *4-5.

12

Judge Gonzalez held another evidentiary hearing on February 23-26, 2016.  (Docket Nos. 7-26, 7-27, 7-28, 7-29.)  In supplemental findings of fact and conclusions of law, Judge Gonzalez concluded that Petitioner was not prejudiced by trial counsel's deficient mitigation investigation and recommended that state habeas relief be denied.  (*See* Docket No. 7-30, at 177.)

The CCA disagreed.  After thoroughly discussing the new evidence and analyzing its likely impact on the jury, the CCA held that Petitioner "was prejudiced by a constitutionally inadequate mitigation investigation."  *Ex Parte Armstrong*, No. WR-78,106-01, 2017 WL 5483404, at *3-16 (Tex. Crim. App. Nov. 15, 2017).  The CCA thus vacated Petitioner's death sentence and remanded the case back to the district court for a new punishment hearing.  *Id.* at *1, 16.  In doing so, the court also summarily denied the other claims in Petitioner's state habeas application, including his claims challenging his capital murder conviction (which he is now asserting in his federal petition).[11]  *Id.* at *16.

On remand, the State did not seek to re-try the death penalty special issues, and the state trial court sentenced Petitioner to life imprisonment.  Petitioner later filed the instant action seeking federal habeas relief pursuant to 28 U.S.C. § 2254.  Respondent does not contend that Petitioner has failed to exhaust his state court remedies or that his federal petition is untimely.

**C.    Federal Habeas Claims**

Petitioner's federal habeas petition asserts three claims, the first two of which allege ineffective assistance of counsel:

1.   Trial counsel were not qualified to represent Petitioner in a capital case;

---

[11] In addition, the CCA denied Petitioner's other three state habeas applications, *see supra* n.9, finding that they were "subsequent applications" and therefore constituted an "abuse of the writ."  *Ex Parte Armstrong*, WR-78,106-02, WR-78,106-03, WR-78,106-04, 2016 WL 10567625, at *1 (Tex. Crim. App. Nov. 15, 2016).

2. Trial counsel failed to conduct a constitutionally adequate investigation of Petitioner's claim that he was innocent of Mr. Castelan's murder; and

3. Petitioner "is actually innocent."

(Docket No. 1, at 34 (Br. at 31).)  In support of his second and third claims, Petitioner relies on new evidence developed by habeas counsel, including affidavits from fact witnesses and reports by forensic experts.  (*See, e.g.*, Docket No. 1-4, Ex. 1, 13-14, 32-38.)

In moving for summary judgment, Respondent contends that all of Petitioner's claims lack merit.  (Docket No. 8.)  Petitioner filed an opposition and cross-motion for summary judgment. (Docket No. 11.)  He seeks summary judgment in his favor based on the evidence filed with his federal Petition (and previously submitted in state court).[12]  Petitioner's claims will be analyzed in light of the standard of review for petitions seeking federal habeas corpus relief pursuant to § 2254.

## II.  STANDARD OF REVIEW

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence.  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens."  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  The States "possess primary authority for defining and enforcing the criminal law.  In criminal trials they also hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

---

[12] As Petitioner points out, Respondent has not objected on procedural grounds to the evidence filed in support of his federal Petition.  (Docket No. 11, at 9 n.5.)  All that evidence appears to have been presented to, and considered by, the state habeas court and will be considered in deciding Petitioner's federal habeas claims.

Since 1996, federal courts have given effect to the traditional limits on habeas review through the deferential standard mandated by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254.  AEDPA's "design is to 'further the principles of comity, finality, and federalism.'"  *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003)).

If a petitioner has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review.  "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'"  *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (quoting *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013)).  As mandated by AEDPA, a federal habeas petitioner may secure relief only after showing that the state court's rejection of his claim was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

Petitioners arguing legal error in state court decisions must comply with § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts."  *Gray v. Epps,* 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor,* 529 U.S. 362, 404–08 (2002)).  To constitute an "unreasonable application of" clearly established federal law, a state court's holding "must be

objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)).

In contrast to "ordinary error correction through appeal," AEDPA review exists only to "guard against extreme malfunctions in the state criminal justice systems." *Woods*, 135 S. Ct. at 1376 (quotation omitted). A petitioner must "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams*, 529 U.S. at 413.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). State court findings are "presumed to be correct" unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

These standards will be applied in considering Petitioner's federal habeas claims.

### III.     INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner claims that trial counsel provided ineffective representation. "Claims of ineffective assistance of counsel involve mixed questions of law and fact and are governed by § 2254(d)(1)." *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010) (citing *Briseno v. Cockrell,* 274 F.3d 204, 206-08 (5th Cir. 2001)).

Courts assess an attorney's representation under the framework set out in *Strickland v. Washington*, 466 U.S. 668 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521. Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. In reviewing ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effects of hindsight." *Id.* at 689. An ineffective assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689–90.

Regarding the prejudice requirement, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534. A reasonable

probability is one that is sufficient to undermine confidence in the outcome.  *See Strickland*, 466 U.S. at 694; *Wiggins*, 539 U.S. at 534.

The habeas petitioner "bears the burden to show" both deficient performance and prejudice. *Woodfox v. Cain*, 609 F.3d 774, 799 (5th Cir. 2010) (citing *Strickland*, 466 U.S. at 687-88).  "A failure to establish either deficient performance or prejudice defeats the claim."  *Id*. (citing *Strickland*, 466 U.S. at 697).

Here, Petitioner's ineffective assistance of counsel claims were considered and rejected by the state habeas court.  As such, a "doubly deferential judicial review" applies under AEDPA. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).  A state court's adjudication of *Strickland* claims "must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Richter*, 562 U.S. at 101.  "The question ... is not whether a federal court believes the state court's determination was incorrect."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Rather, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Richter*, 562 U.S. at 105.

In answering *that* question, a federal court "review[s] with deference 'the ultimate legal conclusion that the state court reached.'"  *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010) (quoting *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002).  As the Fifth Circuit has explained:

> Importantly, whether the state court's decision involved an unreasonable application of Supreme Court precedent does not depend solely on the state habeas court's actual analysis. Section 2254(d) requires us to "determine what arguments or theories supported or, ... *could have supported*, the state court's decision." [*Richter*, 562 U.S.] at 102, 131 S.Ct. 770 (emphasis added). We are therefore tasked with considering not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the arguments and theories it could have relied upon. *Cf. Neal v. Puckett*, 286 F.3d 230,

244–46 (5th Cir. 2002) (en banc) (per curiam) (holding that § 2254(d) directs us to review "only a state court's 'decision,' and not the written opinion explaining that decision"). Once we have gathered the arguments and theories that could support the state court's ultimate decision, § 2254(d) requires us to "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102, 131 S.Ct. 770. This standard is purposefully "difficult to meet." *Id.*

*Evans v. Davis*, 875 F.3d 210, 216–17 (5th Cir. 2017) (footnote omitted) (emphasis in original).

Viewed from this perspective, the ultimate issue is whether the state habeas court's ruling constituted an unreasonable application of *Strickland*.[13]

## A.    Trial Counsel's Qualifications

Petitioner's first claim is that none of the attorneys who were appointed to represent him were qualified under state law to do so.  (Docket No. 1, at 35-37.)  Respondent argues that the Fifth Circuit does not recognize a "per se rule of deficiency" for violations of Article 26.052. (Docket No. 8, at 15.)  Petitioner does not dispute that point, nor could he.  (*See* Docket No. 11, at 11-12.)

---

[13] As noted earlier, the state trial court (Judge Gonzalez) entered findings of fact and conclusions of law recommending that Petitioner's ineffective assistance claims be denied.  *See supra* n.10 and accompanying text.  The CCA later summarily denied Petitioner's claims addressing the guilt/innocence phase of his trial.  *Ex Parte Armstrong*, No. WR-78,106-01, 2017 WL 5483404, at *16 (Tex. Crim. App. Nov. 15, 2017).  When the state's highest criminal court denies relief without written order, a reviewing federal court "should 'look through' the unexplained decision to the last reasoned state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018).  Here, as in *Evans*, the state trial court accurately recited the *Strickland* standard in recommending denial of state habeas relief.  *See Evans*, 875 F.3d at 217 n.4.  As such, the Fifth Circuit's *Neal* standard applies, and "the theories and arguments that could have potentially supported the state habeas court's decision" will be considered.  *Id*.  A federal court "must defer to a state court's ultimate ruling rather than to its specific reasoning."  *Sheppard v. Davis*, 967 F.3d 458, 467 (5th Cir. 2020) (relying on *Neal*, 286 F.3d at 246).  For simplicity, and unless otherwise specified, the CCA and the state trial court will be collectively referred to as the "state habeas court."

Article 26.052 of the Texas Code of Criminal Procedure provides that only lawyers who meet certain requirements are eligible to be appointed to represent a defendant who may be sentenced to death for the crime charged. One of those minimum standards is trial experience in "the use of . . . forensic expert witnesses."  Tex. Code Crim. Proc. Ann. Art. 26.052(d)(2)(F) (2005).  Article 26.052 requires that two attorneys be appointed to represent indigent defendants charged with a capital felony, at least one of whom must meet the requirements set forth in the statute.  *Id*. at Art. 26.052(e).  Respondent does not dispute that none of the attorneys who were appointed to represent Petitioner were certified pursuant to Article 26.052.[14]

Not surprisingly, the Fifth Circuit has rejected the notion that a technical violation of Article 26.052—standing alone—could support federal habeas relief.  *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) (agreeing with the district court that such an argument is "specious"). There are at least two reasons for this.  First, "[b]y complaining only of a state statutory violation, Petitioner has failed to allege a constitutional violation."  *Id*. at 590 (citing *Lawrence v. Lensing,* 42 F.3d 255, 258 (5th Cir. 1994)).  Second, to prevail on an ineffective assistance claim, a petitioner must satisfy the two *Strickland* requirements.  *Id*. at 589 (citing *Strickland*, 466 U.S. at 689-94)). Of course, where a defendant in a capital case actually receives constitutionally adequate representation, it would make no sense to say that his right to the effective assistance of counsel was nevertheless violated because his attorneys' names did not appear on a list mandated by state law.

---

[14] Four attorneys were appointed to represent Petitioner during his state court criminal proceedings.  *See supra* n.3.  The state trial judge found that Petitioner failed to show "that a list of attorneys approved for appointment in death penalty cases" existed or, if it had, that Petitioner's attorneys were not on that list.  (Docket No. 7-41, at 606-07.)  The trial court also noted that all four of the attorneys who were appointed to represent Petitioner were "experienced criminal law practitioners in Hidalgo County who had also previously represented defendants in death penalty cases."  (*Id.* at 607.)

In his summary judgment briefing, Petitioner acknowledges that the "failure to appoint Article 26.052-qualified counsel" must be analyzed within the parameters of the *Strickland* standard. (Docket No. 11, at 11 (citing *Hughes*, 412 F.3d at 589-90.)  Petitioner further recognizes that "the Fifth Circuit has declined to find a successful habeas claim based on technical violations of Article 26.052 that did not result in prejudice to the petitioner." (Docket No. 11, at 12 (citing *Hughes*, 412 F.3d at 589-90).)  Petitioner points to trial counsel's failure to investigate (as alleged in his § 2254 petition) in support of his claim that he was prejudiced as a result of being appointed counsel who did not meet the requirements of Article 26.052. (*See* Docket No. 11, at 11-12 & n.6.)

In other words, Petitioner's claim based on Article 26.052 is entirely dependent on whether he has satisfied the *Strickland* requirements on his other ineffective assistance claim (alleging failure to investigate). That claim is explored in detail below. To be clear, though, Petitioner has failed to show that the state habeas court's denial of his claim based on Article 26.052 was an unreasonable application of *Strickland*. To the contrary, the state court was clearly correct. But Petitioner's failure-to-investigate claim is not so easily decided.

## B.    Failure to Investigate

Petitioner's principal claim is that trial counsel "failed to conduct a constitutionally adequate investigation of his claim of innocence with respect to Mr. Castelan's murder." (Docket No. 1, at 34 (Br. 31).)  Petitioner points to two areas in which counsel fell short: 1) identifying and interviewing fact witnesses; and 2) investigating forensic evidence and retaining a forensic expert. (*Id.* at 38-44 (Br. 35-40).)  Such additional investigation was warranted by Petitioner's "videotaped statement in which he repeatedly professed his innocence, stating that he came upon Mr. Castelan as he was dying, and simply tried to help." (*Id.* at 39 (Br. 26).)  Once Petitioner's statement was

introduced as evidence, "[t]he jury was then faced with two alternatives: to believe Ms. Corona and Mr. Reyes or to believe Mr. Armstrong's videotaped statement."[15]  (*Id.*)  In this scenario, Petitioner argues, "any reasonable attorney would then seek to discover evidence that corroborated Mr. Armstrong's statement and undermined the State's case."  (*Id.*)

Petitioner contends that trial counsel failed to investigate facts that might have supported his statement.  Other than reviewing the State's evidence, trial counsel's factual investigation was limited to hiring an investigator, Ricardo Tamez.[16]  (*Id.* at 41 (Br. 38).)  Mr. Tamez's investigation consisted of "a total of 11.5 hours on the case," which included interviews of Petitioner, Petitioner's girlfriend (Ms. Losoya), and the two eyewitnesses (Ms. Corona and Mr. Reyes).  (*Id.*) Although Mr. Tamez suggested other investigative leads he could pursue, trial counsel did not authorize him to do so.  (*Id.*)  As to potential forensic evidence, Petitioner asserts that trial counsel did not appropriately consider the possibility of retaining a forensic expert to aid in Petitioner's defense.  (*Id.* at 43 (Br. 40).)

In support of his failure-to-investigate claim, Petitioner submits multiple affidavits from fact witnesses.  Those affidavits are the result of an apparently exhaustive investigation: "[W]rit counsel hired investigators to interview various witnesses whose accounts cast substantial doubt on the prosecution's theory."  (*Id.* at 28 (Br. 25).)  That new evidence includes statements from Max Guerra and Faustino Barrera.  According to Petitioner, "[t]aken together, the statement of

---

[15] As Petitioner notes, trial counsel "decided to get the videotaped statement . . . into evidence."  (*Id.*)  Petitioner acknowledges that this may have been "a defensible strategic decision."  (*Id.*)  That rather tepid endorsement understates the significance of trial counsel's decision to use the statement in Petitioner's defense at trial.  Indeed, Petitioner's actual innocence claim is premised on the defense theory reflected by his statement.

[16] Mr. Tamez prepared two reports describing his investigation.  (Docket No. 7-24, at 8-23.)  Petitioner called Mr. Tamez as a witness and introduced both his reports as exhibits during the first evidentiary hearing held to address Petitioner's state habeas application.  (*Id.*; *see also* Docket No. 7-23, at 15-16, 34-35.)

Messrs. Barrera and Guerra show that Mr. Armstrong was not present when Mr. Castelan was assaulted." (*Id*. at 40 (Br. 37).)   Other new witness statements are said to cast doubt on the prosecution's key evidence at trial.

In addition, Petitioner submits forensic expert reports developed by habeas counsel.  For example, one of those reports is by Barton Epstein, who is described as a forensic scientist with expertise in blood spatter analysis.  His report is based on crime scene photographs, physical evidence, and police reports.  Petitioner argues that Mr. Epstein's analysis of the blood stain patterns corroborates Petitioner's version of events and undermines the testimony of the eyewitnesses, Ms. Corona and Mr. Reyes. (*Id*. at 27-28, 42-43 (Br. 24-25, 39-40).)  According to Petitioner, other expert reports cast further doubt on the eyewitnesses' testimony and the State's physical evidence. (*See id*. at 42-43 (Br. 39-40).)

In moving for summary judgment, Respondent argues that trial counsel's investigation was constitutionally adequate. (*See* Docket No. 8, at 15-22.)  Noting that the State's witness list included 73 names, Respondent argues that "the first prong of *Strickland* does not require the 'interview of every claimed eyewitness, alibi witness, and/or assertedly exculpating criminal co-participant.'" (*Id*. at 18 (quoting *Bryant v. Scott*, 28 F.3d 1411, 1419 n.13 (5th Cir. 1994).)  Respondent reasons that the witness statements proffered by Petitioner were either unavailable at the time through a reasonable search or were not needed for strategic reasons.  Those "strategic decisions are 'virtually unchallengeable.'" (*Id*. at 19 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).)  As to Petitioner's forensic evidence, Respondent relies on the affidavits of Mr. Garza and Ms. Morales-Martinez for the proposition that they decided for strategic reasons that a forensic investigation was not needed. (*Id*. at 19-22.)

To prevail on his failure-to-investigate claim, Petitioner has the burden to prove both that trial counsel were deficient and that he was prejudiced as a result.  *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009) ("*Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs.") (citing *Strickland*, 466 U.S. at 2064).

### 1.     Deficient Performance

Petitioner contends that trial counsel's "complete failure to investigate probative facts and eyewitness testimony" and "decision not to conduct a forensic investigation" constitute deficient performance under *Strickland*.  (Docket No. 11, at 15.)  Petitioner cites the Fifth Circuit's ruling in *Bryant* for the proposition that counsel's investigation was deficient in that they failed to attempt to develop evidence in support of his version of events.  (*Id.* (citing *Bryant*, 28 F.3d at 1419 & n.13).)

In *Strickland*, the Supreme Court provided guidance in assessing the adequacy of defense counsel's investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. 668, 690–91.

Applying *Strickland*, the Supreme Court has recognized that "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."  *Richter*, 562 U.S. at 109. That is essentially what Petitioner's trial counsel did here.

On the other hand, it is also true that:

> Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. There are, however, "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." [*Strickland*, 466 U.S.] at 689, 104 S.Ct. 2052. Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. *Ibid.* It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it.

*Richter*, 562 U.S. at 106.

Here, the state trial court concluded that Petitioner's "trial attorneys . . . had done a commendable job of representing [him], particularly given the material they had to work with." (Docket No. 7-41, at 607.)  The record supports this conclusion to the extent it shows that trial counsel, Mr. Garza and Ms. Morales-Martinez, were well-prepared, knew the facts as developed by the police investigation, and effectively cross-examined the State's witnesses based on those facts.  *See Richter*, 562 U.S. at 111 (noting that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy").

But Petitioner's point is not that counsel were ineffective in their trial advocacy; rather, he insists that additional pretrial investigation would have strengthened Petitioner's defense and that counsel failed to take the steps necessary to make an informed decision about whether additional investigation was warranted.  *See Bryant*, 28 F.3d at 1419 ("assuming that [counsel's] cross examination was effective, that is not to say it could not have been improved by prior investigation").  As Petitioner emphasizes, during the state habeas evidentiary hearing, Mr. Garza acknowledged understanding his obligation to conduct a thorough investigation that was

independent of the police investigation, but stated: "Did I do it? No."[17]   (Docket No. 7-23, at 121.)

According to Petitioner, counsel's deficient investigation deprived him of the opportunity to

present evidence at trial from lay and expert witnesses that would have been helpful to his defense.

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant

must name the witness, demonstrate that the witness would have testified, set out the content of

the witness's proposed testimony, and show that the testimony would have been favorable."

*Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Alexander v. McCotter*, 775 F.2d 595,

602 (5th Cir. 1985)).   Essentially, this showing "require[s] petitioners making claims of ineffective

assistance based on counsel's failure to call a witness to demonstrate prejudice."   *Woodfox*, 609

F.3d at 808 (citing *Day v. Quarterman*, 566 F.3 527, 538 (5th Cir. 2009)).   "This requirement

applies to both uncalled lay and expert witnesses."   *Id*. (citing *Day*, 566 F.3d at 538).

---

[17] This statement, taken in isolation, does not do justice to Mr. Garza's explanation of his strategy in defending Petitioner.   As the state trial judge found, both Mr. Garza and Ms. Morales-Martinez were "experienced criminal law practitioners in Hidalgo County who had also previously represented defendants in death penalty cases."   (Docket No. 7-41, at 607 (Findings and Conclusions at 578).) In addition, Mr. Garza had previously worked as a police officer.   (Docket No. 7-23, at 115.)   In defending Petitioner at trial, Mr. Garza believed he had "a wealth of information" from reviewing the police files, meeting with Petitioner, visiting the crime scene, reviewing Mr. Tamez's investigative reports, assessing the credibility of the eyewitnesses (based on their statements to police and to Mr. Tamez), and consulting with co-counsel.   (*See id*. at 118-27.)   Mr. Garza explained why he did not request Mr. Tamez to do any further investigation: "I already had all the information.   I knew what work the police had done, what people they had interviewed.   I went to the crime scene."   (*Id*. at 124.)   Mr. Garza testified that he made a strategic decision, based on discrepancies in the evidence and inconsistent statements by witnesses, to rely on his cross-examination abilities to show that the State had not met its burden of proof.   (*Id*. at 124-28, 184-85.)   Both Mr. Garza and Ms. Morales-Martinez also explained in written statements why they did not request appointment of a forensic expert.   (*See* Docket No. 7-40, at 361-62, 399, 402-03.)   The state trial court concluded that trial counsel had made "valid strategic" choices in not taking steps to investigate potential forensic evidence.   (Docket No. 7-41, at 607-08 (Findings and Conclusions at 578-79).)   Moreover, even if Mr. Garza had conceded that he erred in failing to conduct further investigation, it would not suffice to prove *Strickland*'s deficient-performance prong.   *See Newland v. Hall*, 527 F.3d 1162, 1207-08 (11th Cir. 2008) ("Trial counsel's admission of error in a habeas evidentiary hearing does not control our review.").

Here, Petitioner has made at least part of the required showing.  He submits multiple affidavits from lay witnesses and reports from experts and makes plausible arguments in support of the proposition that such evidence would have helped his defense at trial.[18]  Indeed, Petitioner asserts that he "has come forward with strong newly discovered evidence of his innocence, including physical evidence, affirmatively proving that, as a matter of fact, he is innocent of the crime for which he was wrongfully convicted."  (Docket No. 1, at 51 (Br. 48).)

Whether Petitioner's new evidence would have altered the outcome of his trial goes to *Strickland*'s prejudice requirement.  Under the circumstances here, the two *Strickland* prongs essentially merge.  It is thus unnecessary to decide whether trial counsel rendered deficient performance because analysis of the prejudice requirement resolves Petitioner's ineffective assistance claim, while also addressing factual issues bearing on his actual innocence claim.[19]  *See Woodfox*, 609 F.3d at 799 ("A failure to establish either deficient performance or prejudice defeats the claim.") (citing *Strickland*, 466 U.S. at 697).

---

[18] During the state habeas evidentiary hearing, Mr. Garza appeared to agree that some of the evidence developed by Petitioner's habeas counsel would have been helpful if it had been available at trial (at least as that evidence was characterized by Petitioner's habeas counsel).  (*See* Docket No. 7-23, at 132-33, 135-36, 139-40, 142-43, 145-46.)

[19] As the Supreme Court explained in *Strickland*:

[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697.  Following that advice, this report will assess no final grade regarding whether Petitioner's trial counsel rendered constitutionally deficient performance.

## 2.    Prejudice

"Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S.

356, 371 (2010) (citations omitted).  This is particularly true as it relates to Petitioner's burden to

show prejudice:

> The Supreme Court standard on prejudice is sharply defined: "It is not
> enough for the defendant to show that the errors had some conceivable effect on
> the outcome of the proceeding." Instead, as the Court clarified in *Richter*, "The
> likelihood of a different result must be substantial, not just conceivable."  It is not
> enough to show that the jury *could* have reached a different result. [Petitioner] must
> show it was "reasonably likely" they *would* have.

*Sanchez v. Davis*, 936 F.3d 300, 306 (5th Cir. 2019), *cert. denied*, 2020 WL 1325983 (Mar. 23,

2020) (quoting *Strickland*, 466 U.S. at 693 and *Richter*, 562 U.S. at 112) (footnotes omitted)

(emphasis in original).

But Petitioner's challenge does not end there.  The AEDPA raises *Strickland*'s "high bar"

even further by adding a layer of deference to the state habeas court's ruling:

> Now layer on top of that the habeas lens of *reasonableness*.  Because the
> state court has already adjudicated [petitioner's] ineffective-assistance claim on the
> merits, he must show that the court's no-prejudice decision is "not only incorrect
> but 'objectively unreasonable.'"  Put differently, [petitioner] must show that every
> reasonable jurist would conclude that it is reasonably likely that [he] would have
> fared better at trial had his counsel conducted a sufficient pretrial investigation. "It
> bears repeating," the Supreme Court emphasized in *Richter*, "that even a strong
> case for relief does not mean the state court's contrary conclusion was
> unreasonable."

*Adekeye v. Davis*, 938 F.3d 678, 684 (5th Cir. 2019) (citing *Richter*, 562 U.S. at 100-02, and

quoting *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010)) (footnotes omitted) (emphasis

in original).

Applying this two-tiered standard of review, Petitioner's new evidence will be considered

to determine if he has met his burden to show that the state habeas court unreasonably applied

*Strickland* in concluding that he failed to show prejudice resulting from counsel's allegedly

deficient investigation. Petitioner addresses his failure-to-investigate claim in two parts: facts from lay witnesses and opinions by forensic experts. (*See* Docket No. 1, at 40, 42 (Br. 37, 29); Docket No. 11, at 12, 15.) While this is a logical way to brief the issues, the two types of evidence sometimes overlap in Petitioner's arguments about the points that could have been made through further investigation. For that reason, Petitioner's new evidence will be considered in the context of the various defense arguments he believes they would have supported.

In determining whether Petitioner has shown prejudice, those points must be viewed in the context of the "totality of the evidence" in the record. *See Strickland*, 466 U.S. at 695 ("a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury").[20] And to determine whether the state court unreasonably applied *Strickland*, a federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision."[21] *Richter*, 562 U.S. at 102.

a.    The Guerra/Barrera Timeline Alibi

Petitioner contends that, had trial counsel conducted a reasonable investigation of potential witnesses, evidence from Faustino Barrera and Max Guerra might have been the "cornerstone" of his defense. (Docket No. 1, at 40 (Br. 37).) In describing "several key pieces of exculpatory evidence" that trial counsel failed to discover, Petitioner's lists first—and places primary emphasis

---

[20] *See also Woodfox*, 609 F.3d at 806-13 (reviewing evidence in the record and concluding the petitioner failed to show that the state court unreasonably applied *Strickland* in denying habeas relief on a claim "of uncalled witnesses," including a "blood expert"); *Soffar v. Dretke*, 368 F.3d 441, 443-61, 471-79 (5th Cir. 2004) (finding deficient performance and resulting prejudice after conducting an "exhaustive review of the entire record" regarding counsel's failure to interview the sole eyewitness and to seek a ballistics expert).

[21] As explained earlier, *see supra* n.13 (and accompanying text), a federal habeas court's focus "on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

on—the affidavits of Messrs. Barrera and Guerra.  (Docket No. 11, at 2-3, 12-15, 19.)  According to Petitioner, they were "alibi witnesses" whose testimony would have "suggest[ed] that Castelan already lay dying for at least fifteen minutes before [Petitioner] Armstrong even arrived at the scene." (Docket No. 11, at 15.)  This would have "directly undermined, and cast significant doubt on, the State's theory of the case."[22]  (*Id*. at 18.)

Petitioner explains:

> Trial counsel's failure to uncover the testimony of Mr. Barrera and Mr. Guerra is particularly egregious. Mr. Barrera stated that he lived near the scene of the crime and that twenty minutes before he heard the police sirens, he heard a woman scream and Mr. Castelan call out (in Spanish), "Why me?" (Zebot Decl. Ex. 33 at ¶ 4(e).) This testimony—which was not presented at trial—is consistent with Mr. Armstrong's statement that he found Mr. Castelan lying on the sidewalk, already cut and bleeding profusely. (Schultz Aff. Ex. 25.) Trial counsel also failed to uncover or offer at trial Mr. Guerra's knowledge that no more than three minutes elapsed between the time he saw Mr. Armstrong outside the laundromat—without blood on his clothing or any sign that he had been in a fight—and when Mr. Guerra heard the police sirens approaching. (Zebot Decl. Ex. 7 at ¶¶ 6 & 9.) Taken together, the statements of Messrs. Barrera and Guerra show that Mr. Armstrong was not present when Mr. Castelan was assaulted, more than fifteen minutes prior to Mr. Armstrong being spotted by Mr. Guerra outside of the laundry and prior to Mr. Armstrong discovering Mr. Castelan already bleeding profusely on the sidewalk.

(Docket No. 1, at 40 (Br. 37).)

Respondent points out that the investigator retained by Petitioner's trial counsel, Mr. Tamez, did interview Mr. Guerra.  (Docket No. 8, at 17.)  Mr. Garza knew about Mr. Guerra but believed he could not provide any useful evidence.  (*Id*. at 17-18.)  As to Mr. Barrera, Respondent acknowledges that counsel did not know about him but argues that "there is no indication that a

---

[22] At various points in his briefing, Petitioner contends that the new evidence developed by habeas counsel is more consistent with Petitioner's account "than the prosecution's theory of what happened."  (*See* Docket No. 1, at 30 (Br. 27).)  To be sure, evidence that supports Petitioner's post-arrest statement is significant in determining whether he has shown prejudice.  But the critical inquiry is how that new evidence compares to the evidence in the record as a whole, not just to Petitioner's characterization of "the prosecution's theory."  As will be seen, Petitioner interprets the "prosecution's theory" in a way that tends to unnecessarily circumscribe the evidence.

reasonable search would have uncovered his testimony."[23]  (*Id*. at 18.)  There was no prejudice, according to Respondent, because "[t]here were two eyewitnesses who saw Armstrong kill Castelan"; "[w]here evidence of guilt is overwhelming, any deficiencies by counsel is harmless." (*Id*. at 22-23 (citing *Pondexter v. Quarterman*, 537 F.3d 511, 524 (5th Cir. 2008)).)

Whether or not the evidence against Petitioner at trial was overwhelming, the record supports the state habeas court's implicit finding that the affidavits of Mr. Barrera and Mr. Guerra were not so credible or compelling that the result of the trial would likely have been different had they testified.  The record suggests that the jury would have had substantial reasons to question the accuracy of the time estimates in both affidavits.

### i.    The Timeline of Mr. Castelan's Murder

Before addressing each affidavit, it should be noted that the story Petitioner attempts to tell depends on a precise timeline.  That timeline is based on Mr. Barrera's and Mr. Guerra's recollection of when events occurred and their perception of the passage of time as events took place.  Neither of the men claims to have looked at a watch, nor do they suggest any other reason that they paid particular notice of the time when the events occurred.  Mr. Barrera signed his affidavit five years after Mr. Castelan's murder, and Mr. Guerra signed his affidavit two and a half years after the murder.  (Docket No. 1-5, at 104, 238.)  As discussed below, and perhaps not surprisingly, their time estimates conflict with other evidence in the record—including their own prior statements.

---

[23] Respondent suggests that "the failure to find one witness in seventy-three listed witnesses is not constitutionally deficient."  (*Id*.)  Petitioner counters by pointing out that Mr. Barrera was Mr. Castelan's immediate next-door neighbor and that Mr. Barrera is a retired person who stays at home (and would likely have been there if counsel had authorized Mr. Tamez to knock on his door).  (Docket No. 11, at 13-14.)

The evidence at Petitioner's trial does not provide a precise, to-the-minute timeline of events related to the murder.[24]  Witnesses' time estimates were often imprecise and/or inconsistent with time estimates by other witnesses.  For example, when Petitioner was asked when he left the bar and went home, he replied: "I try to be home by eight-something or nine.  Somewhere up in there. I left the bar."  (Docket No. 1-3, at 119 (Armstrong Statement Tr. 6).)  When asked if it was about "eight-thirty or nine," Petitioner responded: "Yeah, okay.  I left the bar.  I was walking home."  (*Id.*)

However, the record reflects some time markers that appear more reliable than others.  At the scene of the murder, an HEB grocery receipt was found, along with a bloody HEB grocery bag and items that corresponded to the receipt.  The receipt shows a checkout time of 9:24 p.m. on the night of the murder, April 21, 2006.  (Docket No. 6-58, at 21 (Trial Day 4 Tr. 54); Docket No. 6-70, at 33 (State's Ex. 71 (HEB receipt).)  This suggests that Mr. Castelan was alive at 9:24 p.m. and presumably began walking home at that time.[25]  After exiting the HEB, he would have been about two blocks from his apartment, as shown in Appendix 1.[26]  Another relatively reliable

---

[24] Because Petitioner's trial counsel did not assert an alibi defense based on the precise timing of events, there was no need for either the State or the defense to focus on evidence showing the exact time events occurred.

[25] There is no evidence in the record to establish the accuracy of the timestamp on the HEB receipt.  But this contemporaneous, automated timestamp appears to be the best evidence available—certainly better than witnesses who attempted to remember, estimate, or re-construct a precise time.

[26] It is said that "a picture is worth a thousand words."  As an aid in understanding the evidence in the record, this report will include several appendices with maps and pictures. Appendix 1 consists of two Google Maps screenshot images.  *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (attaching as an appendix "a helpful map" and taking "judicial notice of a Google map and satellite image"); *see also Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013) ("We have taken judicial notice of—and drawn our distance estimates from— images available on Google Maps, a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining general distances.").  The first page of Appendix 1 shows a street map of the area in Donna, Texas, where the events relating to Mr. Castelan's murder took place.  Annotations in red have been added to identify certain relevant locations.  Google has given

timeframe is provided by officers responding to Ms. Corona's 911 call reporting the attack on Mr. Castelan.[27]   For example, Officer Norma De La Rosa was the first police officer to arrive at the murder scene, and she later noted in her incident report that she was dispatched "on Friday, April 21, 2006 at about 2132 hrs."—or about 9:32 p.m.  (Docket No. 1-3, at 164.)[28]  This is consistent with Ms. Corona's testimony that she and Mr. Reyes had driven to the scene of the murder at about 9:30 p.m.[29]  (*See* Docket No. 6-55, at 23 (Trial Day 1 Tr. 73).)  Ms. Corona stated that Mr. Castelan was still alive (just barely) when she called 911, but he was pronounced dead shortly after police and medical personnel arrived.

---

permission     for     such     non-commercial     use     of     its     content.     *See* https://www.google.com/permissions/geoguidelines/ (last visited July 24, 2020).  While the annotations are based on evidence in the record, they are intended solely as an aid in understanding the evidence.  The second page of Appendix 1 is a Google Maps satellite image showing roughly the same area as the first page, with the same annotations.  It should be noted that the satellite map image is based on data from 2011.  By then, the apartments where Mr. Castelan lived had been removed, as well as the fence and trees that had been present at the time of the murder.  An accurate depiction of the murder scene is shown by photographs in the record (and will be reflected by other appendices).

[27] Although the prosecution introduced the 911 call into evidence and played a recording of the call, the communications officer who answered the 911 call (Manuel Delgado, Jr.) was not asked what time the call came in, and there is no time stamp on the transcription of the call that was introduced into evidence.  (*See* Docket No. 6-61, at 20-21 (Trial Day 5 Tr. 63-68); Docket No. 6-73, at 9 (State's Ex. 189A).)  Again, the precise timing of events was not contested at trial.

[28] *See also* Docket No. 6-33, at 6 (De La Rosa suppression hearing testimony).

[29] In Ms. Corona's written statement, signed about two hours after the murder, she said that she and Mr. Reyes left their home "at approximately 9:30."  (Docket No. 1-3, at 192 (Schultz Ex. 40).)  In Mr. Reyes written statement, also signed the night of the murder, he said they left their apartment sometime "before 10:00 p.m."  (Docket No. 1-3, at 195 (Schultz Ex. 42).)

>        ii.       *Affidavit of Faustino Barrera*

Mr. Barrera avers that, at the time of the murder, he lived in the apartment next to Mr. Castelan (although he appears to be mistaken about his address at the time).[30]  (Docket No. 1-5, at 235 (Zebot Ex. 33 ¶ 4.b).)  He describes what happened on the night of the murder, April 21, 2006:

> At approximately 9 o'clock p.m., I suddenly heard from outside of my apartment a man's voice, which I immediately recognized as that of Rafa, cry out in Spanish, "Porque Yo." ["Why me?"] I did not go or look outside to see what was going on because I was scared and feared for my life.

(*Id.* (¶ 4.e).)  According to Petitioner, this statement shows that Mr. Barrera "apparently heard the murder as it occurred."  (*See* Docket No. 1, at 29-30; *see also id.* at 40, 44-45.)  There are at least three problems with this conclusion.

First, Mr. Barrera claims that he heard Mr. Castelan cry out at about 9:00 p.m.  But the HEB receipt found at the murder scene shows that Mr. Castelan was at the HEB checking out at 9:24 p.m.—24 minutes *after* the time Petitioner claims (based on Mr. Barrera's statement) that the attack on Mr. Castelan began.  Of course, maybe Mr. Barrera was just off on the time by 25-30 minutes, but that would also call into question his other time estimate upon which Petitioner relies.

Second, other than hearing Mr. Castelan cry out "why me," Mr. Barrera did not see or hear anything to suggest that the attack began at that moment.  He reports no cries of pain or sounds

---

[30] Mr. Barrera says that in April 2006 he lived at "423 South Seventh Street, Apartment D in Donna, Texas."  (Docket No. 1-5, at 235.)  Mr. Castelan's identification documents, found strewn about the murder scene, show that he lived at 316 South Seventh Street, Apartment E.  (*See* Docket No. 6-70, at 44 (State's Ex. 82 (voter registration card)); *see also id.* at 45 (State's Ex. 83 (loan payment receipt)).)  The address given by Mr. Barrera would have placed him about a block south of Mr. Castelan's apartment (and the murder scene).  Although Mr. Barrera gives the wrong street address, it appears he got the apartment number right.  It makes sense that Mr. Barrera would have been in apartment D since Mr. Castelan was in apartment E.  Ms. Corona testified that Mr. Castelan lived in the end apartment unit (nearest Silver Street).  (*See* Docket No. 6-55, at 19, 23-24 (Trial Day 1 Tr. 59, 74, 76, 79-80 (his apartment was "right behind the fence")).)  Despite the apparent address error in Mr. Barrera's affidavit, it will be assumed that Mr. Barrera was Mr. Castelan's neighbor at the time.

suggesting a struggle.  Petitioner's assertion that Mr. Barrera heard the murder taking place is speculation.  While it may be true, it may also be true that Mr. Barrera was verbally threatened at that point or was responding to some other circumstance.

Third, Mr. Barrera states that he heard Mr. Castelan cry out "from outside [his] apartment." (Docket No. 1-5, at 235.)  Mr. Barrera seems to be saying Mr. Castelan was in front of his (Mr. Barrera's) apartment or perhaps in front of Mr. Castelan's own apartment (right next door). However, as both Petitioner and the State appear to agree, the blood evidence suggests that Mr. Castelan was first attacked on or near the sidewalk, about halfway between the street and his apartment.[31]  Appendix 2 illustrates the likely location of the start of the attack in relation to Mr. Barrera's apartment.[32]  The fact that Mr. Castelan was not attacked in front of Mr. Barrera's

---

[31] For example, Petitioner's blood spatter expert, Mr. Epstein, noted "blood drops and many small blood stains on the sidewalk surface[,] consistent with blood coming from an active bleeding source." (Docket No. 1-3, at 3; *see also* Docket No. 6-58, at 16-18 (Trial Day 4 Tr. 36-37, 43 (State's Ex. 48 shows "blood drops" on the sidewalk).)  Mr. Epstein opined: "The blood stain patterns observed at the crime scene are consistent with the initial attack occurring near the sidewalk by the cluster of items," which included the bloody HEB bag.  (Docket No. 1-3, at 4.) At trial, the lead police investigator, Detective Ricardo Balli, similarly stated his belief that the attack began at the sidewalk, possibly with the attacker approaching Mr. Castelan from behind and cutting his throat.  (Docket No. 6-62, at 31 (Trial Day 6 Tr. 105); *see also* Docket No. 6-56, at 15, 18 (Trial Day 2 Tr. 41-42, 53) (Det. Suarez believed the attack began "by the sidewalk" and "ended" at the alley).)

[32] Appendix 2 consists of four images.  The first is a Google Maps street level image based on 2008 data, which shows the relationship between the apartments and the crime scene as of the time of the murder.  As noted, *see supra* n.26, the apartment complex was later torn down. Annotations have been added as a demonstrative aid and are not intended to be precise, although they are based on evidence in the record.  The next three images are screenshots taken from the crime scene video that was played for the jury (State's Ex. 169) and narrated by Detective Jose Elizondo, who recorded the video the night of the murder.  (*See* Docket No. 6-58, at 33-35 (Trial Day 4 Tr. 101-09).)  Respondent submitted a copy of the video as a supplement to the record. (Docket Nos. 13, 14, 16, 20, 24.)  The first of the screenshot images (page 2 of Appendix 2) shows the sidewalk leading to Mr. Castelan's apartment with the bloody HEB bag next to the sidewalk. This is the spot where (according to Mr. Epstein and the police detectives) the attack likely started. *See supra* n.30.  Det. Elizondo testified that the spots on the sidewalk are blood.  (Docket No. 6-58, at 34 (Trial Day 4 Tr. 107).)  The second screenshot image (page 3 of Appendix 2) shows the HEB bag in relation to the small tree and the larger trees; the victim's body can be seen beyond

apartment casts further doubt on Petitioner's speculation that Mr. Barrera "heard the murder as it occurred."

Based on this questionable assumption about when the attack started, Petitioner declares that Mr. Barrera's testimony "place[d] the murder approximately 20 minutes earlier than the police sirens were heard." (Docket No. 1, at 44 (Br. 41).) To reach this conclusion, Petitioner points to the following statement from Mr. Barrera's affidavit:

> Approximately 20 minutes after I heard Rafa cry out, I heard a woman scream. I did not recognize the woman's voice. Around that same time, I heard sirens, and shortly thereafter, the police arrived outside of the apartment.

(Docket No. 1-5, at 235 (Zebot Ex. 33 ¶ 4.f).) As Petitioner explains it, this shows that Mr. Barrera "heard Castelan cry out in Spanish approximately 20 minutes before he heard a woman (presumably Patty Corona, one of the eyewitnesses presented by the State at trial) scream, followed in quick succession by police sirens approaching the murder scene." (Docket No. 11, at 12 (citing Barrera affidavit).) This 20-minute timeframe is critical to Petitioner's alibi theory. (*Id.* at 44-45 (Br. 41-42).)

Here again, the record calls into question the accuracy of Mr. Barrera's 2011 affidavit. In July 2008—three years before Mr. Barrera signed his affidavit—he was interviewed by George Aguilar, an investigator working for Petitioner's habeas counsel.[33] (Docket No. 1-3, at 196, 201.) As Mr. Aguilar recounts, at that time Mr. Barrera stated: "Just *before* he heard the victim yell

---

the blue trash bin. The third screenshot image (page 4) is the view looking up the sidewalk toward the apartments; the HEB bag can be seen in the foreground on the right. The distance between the place where Mr. Castelan was attacked and the apartments is also reflected by the crime scene diagram admitted at trial. *See infra* n.64.

[33] As noted in Petitioner's summary judgment brief, he filed Mr. Aguilar's investigation report in support of his state habeas writ. (Docket No. 11, at 3 n.1 (citing Docket No. 7-36 at 450, 455-56.) He also filed Mr. Aguilar's report in support of his federal Petition. (*See* Docket No. 1-3, at 196-206.)

'Porque Yo' he heard a woman scream." (*Id*. at 201 (emphasis added).)  Mr. Aguilar emphasizes this point by repeating it later in his report: "Note: Mr. Barrera remembered that there was approximately 20 minute span between the time that he heard the scream and the Porque Yo and the time the police arrived at the scene." (*Id*. at 201-02.)  This is the opposite of what Mr. Barrera says in his affidavit—that he heard the woman scream about 20 minutes *after* hearing Mr. Castelan cry out.  Presumably Mr. Barrera remembered a different sequence of events when he signed his 2011 affidavit, but this circumstance further calls into question the accuracy of the timeline on which Petitioner relies.

There is another problem with Petitioner's theory that there was a 20-minute time span between when Mr. Castelan was attacked (immediately after he cried out) and when the police arrived (in response to Ms. Corona's 911 call).  Once again, it is inconsistent with other evidence of the timeline that seems more reliable.  As noted, Mr. Castelan was checking out at the HEB at 9:24 p.m., and Officer De La Rosa was dispatched in response to the 911 call at about 9:32 p.m. Based on that evidence, the window of time between when Mr. Castelan was attacked and when sirens would have been heard shrinks down to about 10 minutes or so.

All these circumstances tend to cast doubt on the probative value of Mr. Barrera's statement in pinning down the precise time of the murder.  Similarly, evidence in the record also casts doubt on the proposition, based on Mr. Guerra's affidavit, that Petitioner could not have been at the murder scene until after Mr. Castelan had been attacked.

### iii.    *Affidavit of Max Guerra*

In support of his alibi timeline, Petitioner relies on two time estimates in Mr. Guerra's affidavit, which he signed about two and a half years after the murder.  As to the first of these, Mr. Guerra states:

On April 21, 2006, I was working the evening shift at the M.P. Coin Laundry.

I locked the building and activated the building's security system, as I usually do, at approximately 9:30 p.m. on the evening of April 21, 2006. After I locked the building I crossed Eighth Street, so that I was on the opposite side of the street as the M.P. Coin Laundry, and started walking north on Eighth Street toward my apartment.

As I was walking on Eighth Street, about a half block north of the M.P. Coin Laundry building near the Dollar Store, I walked past a black man who I have seen before. I recognized this black man because he would come into the M.P. Coin Laundry with his girlfriend. The black man that I saw that night was Douglas Armstrong.

(Docket No. 1-5, at 103 (Zebot Ex. 7 ¶¶ 2-4).)  Mr. Guerra states that he and Petitioner were "both walking on the same side of the street" and that when he "walked by Douglas we both said 'hi.'" (*Id.* at 104.)  Petitioner was walking south on Eighth Street at a normal pace, with "no blood on his clothing or any signs that he had been in a fight."  (*Id.*)

The location of the laundromat and the approximate location where Mr. Guerra walked past Petitioner are illustrated in Appendix 1.  Mr. Guerra provides at least some objective basis for his belief—over two years later—that he left work at about 9:30 p.m.: he "usually" locked the building and turned on the alarm at about that time.

However, he had a different recollection two years earlier.  About four months after the murder, on August 29, 2006, Mr. Tamez located Mr. Guerra at the laundromat and interviewed him at the request of Petitioner's trial counsel.[34]  (Docket No. 7-24, at 9-10, 13-14.)  Mr. Guerra

---

[34] Mr. Tamez looked for Mr. Guerra at the request of Ms. Morales-Martinez: "she was interested in locating a witness who worked at a laundry mat located close to the downtown area. She stated [Petitioner] told her he had talked to this man outside the laundry mat on the night of the incident. She wanted him identified and for me to inquire if he had seen [Petitioner] the night of the incident."  (Docket No. 7-24, at 9.)  Apart from the prejudice issue, trial counsel's instructions to Mr. Tamez suggest that they were not deficient in investigating information relating to Mr. Guerra.

confirmed that he remembered Petitioner because he often went to the laundromat with his girlfriend, but Mr. Guerra did not know him well.  (*Id.* at 13.)  As to the night of the murder, Mr. Tamez reported: "Max did confirm that he closed the business *shortly after 9:00 p.m.* that evening and said hello *from a distance* to a black male he saw walking south on 8th street."[35]  (*Id.* (emphasis added).)  Of course, this is different from Mr. Guerra's later affidavit in which he says that he passed directly by Petitioner and that it was around 9:30 p.m., not 9:00 p.m.  Once again, if Mr. Guerra passed Petitioner at around 9:00, this would have been well before Mr. Castelan left the HEB (at 9:24 p.m.).

Mr. Guerra's earlier recollection that he passed Petitioner at around 9:00 p.m. is consistent with Petitioner's own statement about when he left the bar to go home.  Petitioner told the investigators that he wanted to be home by "eight-something or nine" and agreed that he left the bar at about 8:30 or 9:00 "walking home."[36]  (Docket No. 1-3, at 119 (Armstrong Tr. 6).)  But the bar is located only about two blocks from the spot Mr. Guerra says he passed Petitioner (as shown in Appendix 1).  Leaving the bar by 9:00 p.m. (at the latest), Petitioner would have passed that

---

[35] From Mr. Tamez's report, it appears that Mr. Guerra did not positively identify Petitioner as the man he saw that night, only that he "said hello from a distance to a black male."  (Docket No. 7-24, at 13.)  As Mr. Tamez recounts, Mr. Guerra then mentioned that "there was another black male that used to live in Donna about the same time that resembled [Petitioner]."  (*Id.*)  Mr. Guerra described where the other black man used to live, noting that "both guys resembled one another."  (*Id.*)  After speaking with Mr. Guerra, Mr. Tamez observed that "Max seemed to have a nervous condition or a handicap."  (*Id.*)

[36] Ms. Losoya's affidavit dated April 26, 2006, further confirms that Petitioner had left the bar by about 8:45 p.m.  After hearing that Petitioner had been going to the bar, Ms. Losoya went to the bar on the night of the murder to look for him.  (Docket No. 6-73, at 68.)  At "around 8:30 to 8:45 P.M." she "opened the door" of the bar and "looked all around the bar but Tyron[e] was not there."  (*Id.*)  About four months later, Ms. Losoya told Mr. Tamez (Petitioner's investigator) that, after learning Petitioner had been hanging out at the bar with a barmaid, she had gone to the bar to confront him.  (Docket No. 7-24, at 12.)  In speaking to Mr. Tamez, Ms. Losoya said that she went to the bar "at approximately 8:00 p.m." but did not see him.  (*Id.*)  This suggests that Petitioner may have left the bar much earlier than 9:00 p.m.  It also throws another wrench in Petitioner's precise alibi timeline.

spot (and the laundromat) long before 9:30 p.m.—and with more than enough time to have killed

Mr. Castelan at around 9:30 p.m.[37]

Petitioner's alibi theory also relies heavily on another time estimate reflected in Mr.

Guerra's 2008 affidavit:

> A very short time after I walked past Douglas, I heard sirens and saw several
> police cars. It could not have been more than three minutes after I walked past
> Douglas that I heard the sirens and saw the police cars. There were several police
> cars that went rushing past me. The police cars were heading north on Eighth Street
> in the direction of the Sunshine Bar.

(Docket No. 1-5, at 104 (Zebot Ex. 7 ¶ 9).)  Relying on Mr. Guerra's statement that he passed

Petitioner on the street "not more than three minutes" before police cars rushed by, Petitioner

argues that "the crime was committed while Mr. Armstrong was blocks away."  (Docket No. 1, at

42, 45.)

Given Mr. Guerra's conflicting statements about when he closed up shop and left work that

day, it is questionable whether a jury would have any confidence in his ability to have accurately

perceived at the time—and to remember later—the precise amount of time that passed between

when he saw Petitioner and when the police cars rushed by him.  Apart from this, his three-minute

time estimate seems improbable, even assuming Petitioner's version of events is true.

According to Mr. Guerra's affidavit, he passed Petitioner on Eighth Street, about mid-way

between Fordyce Avenue and Miller Avenue.  (*Id*. at 103 ("about a half block north of the M.P.

Coin Laundry building near the Dollar Store").)  This location is shown on Appendix 1.  According

to Mr. Guerra's account, the three-minute clock begins running there.  "[Petitioner] was walking

---

[37] In his briefing, Petitioner states that he left the bar at 9:00 p.m.  (Docket No. 1, at 8 (Br.
5).)  Citing Mr. Guerra's affidavit, Petitioner also asserts that he passed Mr. Guerra at about 9:30
p.m.  (*Id*. at 5-6.)  For the reason explained above, however, this timing does not make sense.
Petitioner would have passed Mr. Guerra long before 9:30 p.m.

at a normal pace and was heading south on Eighth Street." (*Id.*) Petitioner would then have walked about two blocks to where he claims he found Mr. Castelan lying next to the sidewalk that led from Silver Avenue to his apartment.[38] (*See* Appendix 1.) Petitioner says he saw Mr. Castelan on the ground bleeding and helped him up. Then, "supporting Mr. Castelan under the arm, [Petitioner] began trying to walk him to the police station four blocks away"; "[t]hey walked from the sidewalk . . . toward the alley, which was about thirty feet away." (Docket No. 1, at 9 (Br. 6).) Given Mr. Castelan's slashed throat and loss of blood, this 30-foot walk would likely have been slow going. After seeing the van "approaching, honking, and driving onto the curb," Petitioner let Mr. Castelan down to the ground, turned, and ran north up the alley. (*Id.*; *see also* Docket No. 1-3, at 155 (Armstrong Statement Tr. 42) ("I just let the man go . . . and took off running").)

All of this would likely have taken more than three minutes from the time Mr. Guerra passed Petitioner. But the three-minute clock has not yet stopped. Ms. Corona testified that she "got scared" and did not get out of the van until "after [Petitioner] ran." (Docket No. 6-55, at 18-19 (Trial Day 1 Tr. 53, 60).) She did not call 911 until she and Mr. Reyes had gotten out of the van and approached Mr. Castelan to check on him.[39] (*Id.*) Once she called 911, it must have taken some time (however brief) for the dispatcher to contact police and medical personnel and additional time for the first responders to arrive at the crime scene.

---

[38] From where he passed Mr. Guerra, Petitioner would have walked south on Eighth Street for about a block and a half, then turned to his right (west) on Silver Avenue. The sidewalk leading from the street to Mr. Castelan's apartment would have been about a half a block or so from the corner of Eighth and Silver. Mr. Castelan's body would have been next to the sidewalk, about halfway between the street (Silver) and Mr. Castelan's apartment.

[39] In her written statement signed the night of the murder, Ms. Corona explained that she got out of the van, went to Mr. Castelan, and asked him what happened. (Docket No. 1-3, at 192 (Schultz Ex. 40).) When he could not answer, she "then grabbed [her] cell and dialed 911." (*Id.*) Similarly, Mr. Reyes stated that they "both got out of the van" after "the black man ran north" up the alley. (Docket No. 1-3, at 195 (Shultz Ex. 42).) After seeing the "large cut around [Mr. Castelan's] neck," Ms. Corona then called 911. (*Id.*)

Yet Mr. Guerra's three-minute clock may still not have stopped.  He states that within no more than three minutes he "heard the sirens and saw the police cars," which were "heading north on Eighth Street in the direction of the Sunshine Bar."  (Docket No. 1-5, at 104.)  Based on the testimony at trial and the police reports in the record, the police responded first to the crime scene, which was on Silver south of Mr. Guerra's location.  Manuel Nunez was one of the three people who saw Petitioner running from the crime scene north on Seventh Street.  (Docket No. 6-57, at 19-20 (Tr. 59-61).)  Mr. Nunez testified that after Petitioner ran by, it was another "minute, minute and a half" before the police were at the crime scene.  (*Id*. at 21 (Tr. 65).)

After the police arrived at the crime scene, they spoke to Ms. Corona and Mr. Reyes and learned that Petitioner had fled north up the alley.  It was then that Sergeant Guerrero left the crime scene and went north up Eighth street to search for Petitioner. (Docket No. 6-56, at 5-6 (Trial Day 2 Tr. 3-5).).  This is presumably when Mr. Guerra began seeing police "rushing past" him "heading north on Eighth Street."[40]   Even accepting Petitioner's version of events, it seems highly improbable that all this could have occurred within three minutes of the time Mr. Guerra passed him on the street.

For all these reasons, it is apparent that the time estimates in the affidavits of Messrs. Barrera and Guerra should be taken with more than a grain of salt.  Although Petitioner asserts that this new evidence should have been the "cornerstone" of his defense, it is simply not persuasive

---

[40] As Sergeant Guerrero explained during a pretrial suppression hearing, after arriving at the crime scene, he learned from Ms. Corona that the attacker was a black man who ran north up the alley.  (Docket No. 6-33, at 12.)  Hearing this, Sergeant Guerrero "decided to go northbound on 8th Street" in search of the suspect.  (*Id*.)  He went to the Sunshine Bar, which was "located about three blocks north from [the crime scene] on the alleyway."  (*Id*.)  He learned from a bar patron that two black men had entered the bar.  He then called for backup, and three other officers responded to the bar.  (*Id*. at 12-13.)  Mr. Guerra may have also seen the three officers' police cars rushing past him toward the bar.

when viewed in the context of the record.  Such evidence does not support a finding of prejudice, much less the more difficult showing that the state habeas court unreasonably applied the *Strickland* standard in concluding that Petitioner failed to show prejudice resulting from trial counsel's failure to discover and present the Guerra/Barrera timeline alibi theory.[41]

### b.   The Blue Box Cutter Knife

Petitioner also contends that trial counsel were deficient in investigating facts and witnesses related to the blue box cutter knife found by police and offered into evidence at trial as the murder weapon.  (Docket No. 1, at 28-29, 40-41 (Br. 25-26, 37-38).)  In support of this claim, Petitioner points to new evidence from fact witnesses, Raul Luna and Joe Martinez, as well as forensic evidence.  Such evidence, he argues, "establishes the extremely suspicious circumstances under which the knife allegedly used to kill Castelan was found."  (Docket No. 11, at 3.)

---

[41] Review of this new evidence also suggests that Petitioner's trial counsel were not deficient in failing to discover it prior to trial.  Petitioner amended his state habeas application several times, and along the way the Guerra/Barrera alibi theory was developed and refined until it matured into the argument reflected in the instant federal petition.  (*See* Docket No. 7-35, at 21, 27, 32, 52, 65, 66, 77 (state application filed February 27, 2009); Docket No. 7-38, at 208, 214, 219, 220, 239, 240, 257, 269 (amended state application filed November 18, 2011); Docket No. 7-38, at 479, 485, 490, 511, 528, 540 (second amended state application filed July 12, 2012); Docket No. 7-55, at 62, 68, 73, 94, 111, 123 (third amended state application filed September 22, 2014.)  For example, in his initial state application, Petitioner stated that Mr. Barrera heard Mr. Castelan cry out and a woman scream twenty minutes *before* he heard the sirens of police cars; he now relies on Mr. Barrera for the proposition that Mr. Barrera heard the woman scream 20 minutes *after* hearing Mr. Castelan cry out and just before he heard the police sirens.  (*Compare* Docket No. 7-35, at 52 *with* Docket No. 1, at 30.)  Similarly, Petitioner's arguments based on other new evidence were augmented and refined in the amended state applications.  This process took more than five years and resulted from who-knows-how-many hours of time expended by investigators, experts, attorneys, and legal staff.  Petitioner's trial counsel did not have the luxury of years to develop alternate defense theories, nor did they have the impressive resources reflected by the work of his habeas legal team.  During the state habeas proceedings, Petitioner was well represented by the Minneapolis law firm Maslon Edelman Borman & Bran, LLP (now Maslon LLP), as well as counsel from the Texas Innocence Network of the University of Houston Law Center.  As discussed earlier, however, in this case the Court need not decide whether Petitioner's trial counsel rendered deficient performance.  *See supra* Part III.B.1.

43

Petitioner's new evidence regarding the knife must be considered in the context of the evidence presented at trial, as well as other evidence in the record that the State could have pointed to in response to the new evidence.  The knife was found during the police's third search for evidence along the zig-zag route taken by Petitioner after fleeing from the murder scene and returning to the Sunshine Bar.  The first search began late in the evening (apparently after 11:00 p.m.) on the night of the murder.  Detective Ricardo Suarez testified that the police investigators and other available officers, with assistance from the fire department, began to "canvass the area" looking for evidence.  (Docket No. 6-56, at 18-20 (Trial Day 2 Tr. 56-61).)  They met "just south of the bar in the alleyway" and "began walking southbound in the alleyway of 7th and 8th Street." (*Id*. (Tr. 56, 60).)  They were "going through all the trash bins" and "looking at the back yards, in the grassy areas."  (*Id*.)  The fire department assisted by "looking at the top of roofs."  (*Id*. (Tr. 60).)

Only one piece of evidence was found that night, but it was significant.  A bloody gray T-shirt was found behind a trash bin in the alley (south of Miller Street).  (*Id*. (Tr. 56, 60-61); *see* Appendix 1.)  DNA testing later showed that the blood on the shirt came from Mr. Castelan and scrapings from the collar of the shirt showed that it had been worn by Petitioner.  Petitioner was wearing this gray T-shirt during his encounter with Mr. Castelan.[42]  The first search was called off at about 12:45 a.m.  (*Id*. (Tr. 61).)

Police investigators searched again about nine hours later at 10:00 a.m., Saturday, April 22, 2006.  The investigators were again assisted by the fire department.  (Docket No. 6-56, at 24

---

[42] Although Petitioner was less than forthcoming about this gray shirt during his statement to police, neither his trial counsel nor habeas counsel have disputed that he wore the shirt during his encounter with Mr. Castelan and that he later threw it behind a trash bin in the alley after fleeing from the crime scene.  In seeking habeas relief, Petitioner relies on a blood spatter expert to show that the blood stains on the gray shirt are consistent with his story.  *See infra* Part III.B.2.f.iii.

(Tr. 80).)  Among other things, they were "looking for the knife" used to kill Mr. Castelan.  (*Id.*)  This time they began at the crime scene, not the bar.  They searched "through each trash can bin that was in the alley."  (*Id.*)  They even looked on "all the roof tops from the crime scene all the way to Business 83."  (Docket No. 1-3, at 185 (Schultz Ex. 36).)  No physical evidence was found, although a witness was identified.[43]  (Docket No. 6-56, at 24 (Tr. 80).)

Det. Suarez testified that he "had to try it one more time," and he coordinated another search; this time, they "called out more help" from the police department and the Donna Independent School District (DISD).  (*Id.* at 25 (Tr. 81).)  This third search was conducted on Monday, April 24, 2006, starting at about 10:00 a.m.  (*See* Docket No. 1-3, at 185 (Det. Balli investigation report).)  Again, the search started at the scene of the murder, with some searchers going through the alleyway and others going through yards.  (Docket No. 6-56, at 25 (Tr. 81).)  The third time proved to be the charm.

At around 10:45 a.m., Det. Suarez received a call informing him that DISD security guard Raul Luna had spotted a blue knife behind the Sunshine Bar.  (*Id.*)  At trial, Det. Suarez described what he saw when he arrived at the bar:

> Q. And once a blue knife or a blue item was found, you yourself went out to recover it?
>
> A. Once I received a call from Officer Limon, I advised him that no one was to touch it or remove it. I went myself to the Sunshine Bar, and they pointed out where the knife was. And it was behind the Sunshine Bar in a grassy area near a telephone pole.
>
> Q. Now, you say "grassy area." Was it just short grass, tall grass?

---

[43] During this second search, police spoke to Olga Gomez.  Ms. Gomez lived at 305 South Seventh Street, which is about two or three blocks from the bar.  *See* Appendix 1.  The night before, she had heard someone scream and saw Petitioner run by her house (heading north on Seventh). (Docket No. 6-61, at 33 (Tr. 113-14).)  That morning she saw policemen and firemen searching in her yard.  (*Id.* (Tr. 115).)  She told the police what she had seen the night before.  (*Id.* (Tr. 115, 117).)

A. It was about waist high. It was in a corner. It was very grassy.

Q. And had that area been searched - that general area, had it been searched before?

A. We had checked it out, yes.

Q. But you missed it?

A. Correct.

(Docket No. 6-56, at 25-26 (Tr. 81-82).)

Before moving the knife, Detective Jose Vecchio photographed it.  (*Id*. at 25 (Tr. 82).)  The State introduced Det. Vecchio's photographs of the knife, which showed it lying in the grass.  (*Id*. (Tr. 83); *see also* Docket No. 6-68, at 42-49 (State Exhibits 34-41.)  One of those pictures, admitted as State's exhibit 34 (top photo), shows Det. Suarez in the tall grass "pointing exactly to where the knife" was found; the rear entrance to the Sunshine Bar can be seen in the background.  (Docket No. 6-56, at 25 (Tr. 84); referring to Docket No. 6-68 at 42 (Exhibit 34).)  A better-quality copy of exhibit 34 is attached as [Appendix 3](#).[44]  From this trial exhibit, the jury could also see exactly where the knife was found.  The bottom photo on the exhibit is a closer shot of the knife in the grass.  (Docket No. 6-56, at 25-26 (Tr. 84-85).)  State's exhibit 35 is attached as [Appendix 4](#); this photo is a close-up shot of the folded blue box cutter knife as it was found in the grass.

---

[44] The record as initially filed in this action contained many black and white copies of color photographs that had been admitted as evidence at trial or filed during state habeas proceedings.  To make matters worse, the black and white copies appear to be copies of copies.  These poor-quality copies make it difficult (and sometimes impossible) to decipher what is being depicted.  Other evidence from the record was missing, such as the crime scene video shown to the jury and aerial photographs of the area.  To facilitate federal court review of the state court record, the undersigned directed the parties to provide better quality images and missing evidence (if available).  (Docket Nos. 13, 14.)  Through the cooperative and commendable efforts of counsel, this task has largely been accomplished, and the supplemental record materials are in the custody and care of the Clerk.  (*See* Docket Nos. 17-19, 21, 23-25.)

The box cutter knife folds like a pocketknife.  It has "a regular pocket knife handle" that fits well in one's hand.  (Docket No. 6-56, at 26 (Tr. 87).)  The knife was found folded; when opened, the razor-like blade of a box cutter is presented, as shown in Appendix 5, which is a better quality image of State's exhibit 36 (*see supra* n.44).  (*Id.* (Tr. 87-88); *see* Docket No. 6-68, at 44 (State's Ex. 36.)

DISD security guard Raul Luna found the knife and testified at trial.  Mr. Luna stated that he participated in the search on April 24, 2006, along with several other security officers, police officers, and fire department personnel.  They started at the crime scene and searched north up the alley.  Ultimately, Mr. Luna found the blue box cutter knife behind the bar in "a bunch of brush out there in the alleyway."  (Docket No. 6-61, at 5 (Trial Day 5 Tr. 3).)  After seeing the knife, he did not touch it, but advised Officer Limon, who in turn called Det. Suarez.  (*Id.*)  Det. Suarez soon arrived on the scene, along with Det. Vecchio and Det. Balli.  (*Id.*)  Mr. Luna confirmed that Exhibit 34 (Appendix 3) shows Det. Suarez pointing to the spot where he found the knife.  (*Id.* at 5-6 (Tr. 4-5).)

The State also presented some limited forensic evidence about the knife.  The prosecution called Crystal Dawn Anderson, a forensic scientist for the Texas Department of Public Safety (DPS) Crime Laboratory.  (Docket No. 6-62, at 39 (Trial Day 6 Tr. 139).)  She testified that both Mr. Castelan's and Petitioner's DNA were found on Petitioner's black cap, gray T-shirt, white T-shirt, and jeans.  (*Id.* at 42-44 (Tr. 149-160).)  As to the blue box cutter, however, the DNA evidence showed only that the blood on the knife belonged to Mr. Castelan.[45]  (*Id.* at 44 (Tr. 159-60).)  On cross examination of Ms. Anderson, Mr. Garza confirmed this point.  (*Id.* at 45 (Tr.

---

[45] The DNA test results were also summarized in an exhibit admitted into evidence.  (*See* Docket No. 6-62, at 44 (Trial Day 6 Tr. 159 (State's Ex. 216 admitted into evidence).)

162).)  Similarly, Mark Wild, a DPS fingerprint examiner, testified that although there was a partial print on the knife blade, it was insufficient for identification.  (Docket No. 6-61, at 15-16 (Trial Day 5 Tr. 44-46).)  In short, there was no evidence that Petitioner's fingerprints or DNA were on the knife.[46]

The pathologist who performed the autopsy on Mr. Castelan was Fulgencio P. Salinas, M.D.  He testified that the precise cuts on Mr. Castelan's neck were done with "a real sharp object, probably like a razor blade, probably like a knife, a real sharp knife."  (Docket No. 6-62, at 37 (Trial Day 6 Tr. 131-32).)  When shown the blue box cutter and asked if Mr. Castelan's injuries could have been inflicted by such a knife, Dr. Salinas responded: "Yes.  As you can see here, this is what looks like a blade, and it is a real sharp blade.  This is the type of instrument that I was thinking about."  (*Id*. at 38 (Tr. 134-35).)

During closing argument, Petitioner's trial counsel emphasized the absence of evidence linking Petitioner to the blue box cutter knife: "No fingerprints, no mixture of what? Of DNA." (Docket No. 6-63, at 10 (Tr. 28).)  Mr. Garza reminded the jury that Petitioner's DNA was found on only four items: his gray T-shirt (worn during the encounter with Mr. Castelan), the white T-shirt (worn when he entered the bar the second time), his pants, and his cap.  (*Id*. at 10-11 (Tr. 28-29).)  Counsel asked rhetorically whether the State could prove Petitioner cut Mr. Castelan "[w]ith this knife?"  Answering his own question: "Not Douglas."  (*Id*. (Tr. 29-30).)  Mr. Garza urged the

---

[46] Det. Balli submitted 23 items to DPS for fingerprint analysis, including some items found at the crime scene (presumably belonging to Mr. Castelan) and several items that had been found in Petitioner's pockets.  (*See* Docket No. 6-72, at 55 (State's Ex. 187 (DPS fingerprint analysis report)).)  After examining all 23 items, the only identifiable fingerprint was found on a slip of paper taken from Mr. Castelan's wallet; the print was his.  (*Id*.)  No identifiable print was found on any of the items from Petitioner's pockets, including two cigarette lighters.  During Mr. Wild's testimony, he described the procedures used in attempting to obtain fingerprints from various objects.  He explained that, even with an object that is known to have been handled by someone, it is sometimes not possible to obtain an identifiable print.  (Docket No. 6-61, at 16 (Tr. 48).)

jury to look at the five DPS forensic reports because "in none of those five, any of those five reports, are you going [to] see anything that says that Douglas Armstrong committed anything." (*Id*. at 12 (Tr. 33-34.)  During Ms. Morales-Martinez's portion of the closing argument, she also emphasized that "the physical evidence is not there.  They have not linked this box cutter that they have shown you . . . to Mr. Armstrong, at all."[47]  (*Id*. at 13 (Tr. 40).)  For the prosecutor's part, he did not argue that the evidence linked the blue box cutter knife to Petitioner; instead, he emphasized the eyewitness testimony from Ms. Corona and Mr. Reyes and re-played Ms. Corona's 911 call for the jury to hear.[48]  (*Id*. at 7-8 (Tr. 16-17), 16-18 (Tr. 49-57).)

Based on this record, the question is whether Petitioner's new evidence about the knife makes it "'reasonably likely' the jury *would* have reached a different result."  *Adekeye*, 938 F.3d at 683 (emphasis in original).  For the reasons explained below, the answer is no.

### i.    *Affidavit of Raul Luna*

As noted, Mr. Luna was a security guard with DISD who helped with the third search.  He found the blue box cutter knife.  In his affidavit, Mr. Luna explains that he was asked to help with the search during his lunch hour, which was between 9:00 a.m. and 11:00 a.m.  (Docket No. 1-5, at 134 (Zebot Ex. 13 ⁋ 3.)  The group, which consisted of eight to ten police officers and security guards, was divided into three teams.  His team searched in the alley, beginning at Silver Avenue (the murder scene).  They "walked in the alleyway north looking only in dumpsters, bushes, on

---

[47] Petitioner echoes this point in his federal habeas briefing: "[T]he State failed to elicit any eyewitness testimony or physical evidence linking Mr. Armstrong to the knife, which was found in plain view after several comprehensive searches of the area."  (Docket No. 1, at 44 (Br. 41).)

[48] The prosecutor mentioned the "box cutter or knife" only in the context of describing the element of the crime requiring proof that the defendant did "intentionally cause the death of an individual . . . by cutting the victim."  (*Id*. at 8 (Tr. 20-21).)  The prosecutor argued that the "multiple cuts" showed an intent to murder.  (*Id*.)

top of boxes or trash, and around and behind poles or fences along the alley" until the alley ended at U.S. Business Highway 83, next to the Sunshine Bar.  (*Id.*)

      Mr. Luna described the search as follows (in relevant part):

> The teams had no idea what type of weapon, except that it might be some kind of knife according to the Donna police department information. As I walked north in the alley, I saw what appeared to be some kind of knife laying on the top of some high grass by a utility pole located behind the Sunshine Bar rear parking lot. I saw the knife easily from about six feet to ten feet away. The knife was a box cutter green or blue in color.
> . . .
>
> The area had not been searched. I stayed and watched Donna Police detectives take pictures of the knife and recover it from the ground. They put it in some kind of cardboard box. That was the last time he saw it until the trial.
>
> On the day I found the knife, the weather was sunshine, clear, hot with little breeze.

(*Id*. at 135 (Aff. ¶¶ 4, 6-7).)

      Petitioner emphasizes that, despite the two previous searches, Mr. Luna had "no difficulty seeing" the knife, and it was "readily visible" from six feet away.  (Docket No. 1, at 29, 41 (Br. 26, 38).)  But this "new evidence" adds little, if anything, to the evidence at trial.

      Mr. Luna signed his affidavit almost three years after he spotted the blue box cutter knife. At trial, he said he saw the knife in "a bunch of brush," and he confirmed the accuracy of the pictures admitted into evidence and shown to the jury.  Those pictures are consistent with the testimony of Det. Suarez that the knife was found in tall grass in a corner behind the bar.  *See* Appendix 3.  Even if trial counsel had interviewed Mr. Luna, and even assuming he told them what he told Petitioner's habeas counsel or investigator (three years later), it seems doubtful that he would have agreed at trial with Petitioner's suggestion that anyone within ten feet of the knife could have easily seen it from any angle, day or night.

In addition, the affidavit's description of the location of the knife would likely have provided the prosecutor with a basis for cross-examination—and perhaps some amusement.  As if to emphasize how easy the knife was to spot, Mr. Luna says in the affidavit that he saw "some type of knife laying on the top of some high grass."  (Docket No. 1-5, at 135 (Aff. ⁋ 4).)  This description conjures an image of the blue box cutter perched precariously on the top of strands of tall grass, apparently in defiance of the law of gravity.  In contrast, the picture of the knife taken at the time it was found appears to show the knife on the ground within the tall grass.  *See* Appendix 3.

To be sure, it seems odd that the knife was not discovered during one of the earlier searches.  But it should be noted that the search for the knife spanned about four blocks zig-zagging in and out of the alleyway.  Appendix 10 illustrates Petitioner's meandering route (with a red line).[49]  Faced with this large search area, investigators may have failed to ensure that one obvious area (behind the bar) was thoroughly searched at the outset.  The first search was started late at night and began at the entrance to the alleyway, which was just east of the bar.  While the knife was later found not far from there, it was not in the alleyway; rather, it was directly behind the bar in a

---

[49] If Petitioner remained in the alley all the way from the crime scene to the bar, the distance would have been three blocks.  But Petitioner did not stay in the alley.  After initially fleeing north up the alley, he veered west (or northwest) through someone's lot and then continued fleeing north on Seventh Street, where he was observed by several people (including Ms. Gomez and Messrs. Nunez and Garcia).  (*See* Appendix 1.)  Those witnesses saw Petitioner run by "fast" up Seventh and then turn right (east) on Fordyce Avenue.  It appears from Petitioner's statement to police that when he reached the intersection of the alley and Fordyce, he turned left (north) and reentered the alley.  He then continued up the same alley for two blocks until it ended near the bar, which he entered through the back door.  Petitioner's apparent route as he fled from the crime scene to the bar is shown by the red line on Appendix 10.  Appendix 10 is an image of State's exhibit 26, which was a blow up aerial photograph admitted at trial.  (*See* Docket No. 6-56, at 19 (Trial Day 2 Tr. 58-59 (Det. Suarez)).)  The aerial photograph is looking south, with the Sunshine Bar at the bottom and the crime scene at the top.   The red line and all the annotations on Appendix 10 were present on State's exhibit 26 as admitted at trial; no annotations have been added.  Appendix 10 is taken from an image submitted by Respondent to supplement the record.  *See supra* n.44.

"corner" near a "telephone pole."[50]   (Docket No. 6-56, at 25-26 (Trial Day 2 Tr. 81-82).)  The search the next day started at the crime scene and headed north over the four-block distance.  Upon reaching the end of the alley near the bar, perhaps the searchers ceased their efforts, assuming the area directly behind the bar had been searched.

On the other hand, perhaps the searchers did not find the knife the first two tries because it was not there and was instead later planted by someone.  But drawing such a conclusion is not materially more likely based on new information in Mr. Luna's affidavit, which seems inconsistent with his trial testimony.  Beyond that, the jury could be expected to have placed more weight on the pictures showing the actual location where the knife was found; at the least, it would not have been unreasonable for the state habeas court to make such an assumption.

### ii.     *Affidavit of Joe Martinez*

Mr. Martinez was a manager at Amex Distributing, which is where Petitioner was working at the time of the murder.  In an affidavit signed almost three years later, he states, in relevant part:

> 2.     A Donna Police detective and three or four uniformed officers showed up at Amex Distributing well before 10:00 a.m. on Monday, April 24, 2006. They asked if I worked here. I told them I did. . . .

> 3.     The Donna Police asked me what kind of box cutter knives we used on the premises for work. . . .

> 4.     The Donna Police showed me a picture of the blue box cutter knife that they said was found that morning. I told police that it was not the kind of knife used at Amex Distributing.

---

[50] Petitioner also states that the knife was found "a few feet from the door to the Sunshine Bar."  (Docket No. 1, at 15 (Br. 12).)  Even if given some leeway for advocacy, this is a significant exaggeration, as shown by the picture taken at the scene (Appendix 3).  About mid-way between where the knife was found and the back door of the bar, a police car is parked, which by itself is more than "a few feet" wide.  *Id.*

(Docket No. 1-5, at 137.)  From this, Petitioner argues that police showed Mr. Martinez a picture of the knife before Mr. Luna found it behind the bar (at about 10:45 a.m.), which "cast[s] serious doubt on the circumstances in which the knife was found."  (Docket No. 1, at 29 (Br. 26).)

Yet again, the significance of Petitioner's new evidence hinges on a witness's recollection of a specific time.  Mr. Martinez does not explain how he was able to remember, three years later, that the police spoke to him before 10:00 a.m., as opposed to before 11:00 a.m. or some other time.

The record tends to cast doubt on the accuracy of his recollection.  Det. Suarez testified that Det. Vecchio was also present shortly after the knife was found and that he had taken the pictures of the knife, including the one where Det. Suarez is pointing to the knife's location.  Mr. Luna confirmed that Det. Vecchio was there.  The lead detective, Ricardo Balli, noted in his report that Det. Suarez called him at 10:36 a.m. to report that Mr. Luna had located a blue box cutter knife "in the tall grass just south" of the bar.  (Docket No. 1-3, at 185.)  Det. Balli also noted that Det. Vecchio took pictures of the knife.  (*Id.*)

Significantly, Det. Balli states that Det. Vecchio and others then "proceeded to the Amex Produce (defendant[']s place of employment)."  (*Id.*; *see also* Docket No. 6-62, at 19 (Trial Day 6 Tr. 59-60).)  The report states that Det. Vecchio contacted Petitioner's co-workers, although it does not mention Mr. Martinez.  (Docket No. 1-3, at 185.)  Because Det. Vecchio took the pictures of the knife that was found, it makes sense that he brought a picture of the knife to Amex Distributing.

The record reflects that Det. Vecchio took several pictures of the blue box cutter using a Polaroid-type camera.[51]  (*See* Docket No. 6-68, at 44-49 (State's Ex. 36-41).)  Using such an instant camera, he would have had a physical picture of the blue box cutter to take with him to

---

[51] The trial exhibit index describes each of State's exhibits 36 through 41 as a "Polaroid Photograph."  (Docket No. 6-56, at 4.)

Petitioner's workplace.  For example, he could have taken the Polaroid picture in Appendix 5, which was admitted at trial as Exhibit 36.  Of course, if Det. Vecchio brought one of the Polaroid pictures, then Mr. Martinez must have been mistaken on the time, since Det. Vecchio took the picture himself—after the knife had been found, as witnessed by Mr. Luna and others.[52]

Petitioner relies on Mr. Martinez's time estimate to suggest that the police planted the blue box cutter knife.  But this theory would have required the jury to believe that the police were not only corrupt but also absurdly incompetent—taking a picture of evidence to be planted and then foolishly showing it to someone before confirming that the planted evidence was found.  As will be seen, it appears they would also have had to be prescient.

### iii.    Petitioner's Blue Box Cutter Knife

On April 26, 2006—two days *after* the blue box cutter knife was spotted by Mr. Luna—Petitioner's girlfriend, Ms. Losoya, signed an affidavit stating:

> I would like to say that Tyrone had a blue box cutter that he would carry with him everyday.  He got that box cutter when he went to work at Monohans, Texas working with Labor Ready.

(Docket No. 6-73, at 68 (State's Ex. 219 (marked but not admitted)).)[53]  In her trial testimony during the punishment phase, Ms. Losoya confirmed that Petitioner had a blue box cutter knife,

---

[52] The State did not call Det. Vecchio as a witness at trial, nor does it appear that any report he authored is part of the record.  It is reasonable to assume that he would have been called if Petitioner had presented evidence at trial suggesting that Mr. Martinez was shown a picture of the knife before it had been found.

[53] Det. Balli's report states that he obtained the affidavit from Ms. Losoya at about 5:00 p.m. on April 26, 2006.  (Docket No. 6-74, at 22.)  He noted that she "observed the defendant with a blue box cutter knife that he used for work."  (*Id.*)  Det. Balli's report is attached (twice) as an exhibit to Petitioner's federal petition.  (*See* Docket No. 1-3, at 182 (Schultz Ex. 36); Docket No. 1-5, at 197 (Zebot Ex. 30).)  There is no indication in the record that Det. Balli was aware before April 26, 2006, of Ms. Losoya's statement that Petitioner possessed and carried a blue box cutter knife.  In her affidavit signed almost three years later, dated February 16, 2009, Ms. Losoya states that on the day after the murder, Saturday, April 22, 2006, she went to the Donna police station and spoke to an investigator, "who told [her] that Tyrone had stabbed a 40 year old man."  (Docket

although she denied saying that he carried it "every day."  (Docket No. 6-65, at 9 (Trial Day 7 Tr.

19).)  If the police had planted a blue box cutter knife, as Petitioner suggests, then their choice of

color was fortuitous since they learned two days later that Petitioner in fact had a blue one.

The evidence that Petitioner owned and carried a blue box cutter knife was apparently not

presented to the jury during the guilt/innocence phase of trial.[54]  It is unclear why.[55]  But the fact

that Ms. Losoya had observed Petitioner with a blue box cutter is significant here in two ways.

First, if Petitioner had presented testimony suggesting that the police had planted the knife, it is

---

No 7-37, at 165.)  She does not suggest that she was questioned about her relationship with
Petitioner, let alone that she disclosed Petitioner's ownership of a blue box cutter knife.

[54] On Petitioner's direct appeal, the CCA addressed his challenge to the sufficiency of the
evidence.  *Armstrong v. State*, No. AP-75,706, 2010 WL 359020, at *1-4 (Tex. Crim. App. Jan.
27, 2010).  In reciting the facts, the CCA included the following: "Armstrong's girlfriend, Cynthia
Losoya, told police that Armstrong 'always' carried a blue box-cutter knife."  *Id*. at *2.  However,
the CCA did not discuss the knife in analyzing the sufficiency of the evidence.  *Id*. at *3-4.  The
record here shows that this evidence was admitted during the punishment phase of trial—after the
jury found Petitioner guilty of murder.

[55] The prosecutor set the stage for Ms. Losoya's statement about the knife by eliciting
testimony from Det. Balli that he obtained an affidavit from her and that she provided "useful
information."  (Docket No. 6-62, at 20 (Trial Day 6 Tr. 64).)  But the State ultimately did not call
Ms. Losoya as a witness.  Perhaps the prosecution expected Petitioner to call her as a witness,
since by the time of trial she had reconciled with him and was attempting to help him.  Another
possibility is that the prosecution anticipated that if the State called Ms. Losoya for this purpose,
she would invoke the spousal privilege under Texas law, which allows an accused's spouse to
refuse to testify as a witness for the State in a criminal case.  *See* Tx. R. Evid. 504(b)(1).  If she
had invoked the privilege, it is unclear whether the trial court would have found it applicable.
While the Texas spousal privilege applies to common law marriages, it must be shown that the
couple had "agreed to be married" and were living together "as husband and wife" during the
relevant time.  *See Colburn v. State*, 966 S.W.2d 511, 514 (Tex. 1998).  The privilege does not
apply to "matters that occurred before the marriage."  Tx. R. Evid. 504(b)(1).  Ms. Losoya and
Petitioner had been living together before his arrest, but it is unclear whether they had agreed to
be married.   At a pretrial bond hearing, Ms. Losoya had described herself as Petitioner's
"girlfriend"; later, during her punishment-phase trial testimony, she said they were "common law"
married.  (*Compare* Docket No. 6-28, at 5-6 (Bond Hrg. Tr. 8-9), *with* Docket No. 6-65, at 7 (Trial
Day 9 Tr. 12).)  Rather than contest this issue, the prosecution may have concluded that there was
enough evidence without Ms. Losoya's statement about the knife.  Whatever the reason, the jury
did not hear during the guilt/innocence phase that Petitioner's girlfriend had often seen him with a
blue box cutter knife.

reasonable to assume that the State would have attempted to call Ms. Losoya to show that Petitioner had a blue box cutter knife; also, consistent with Det. Balli's report, he would presumably have testified that she told him about Petitioner's blue box cutter after the police had already found a blue box cutter. *See supra* n.53. If that evidence had been presented to the jury during the guilt/innocence phase of trial, Petitioner's chances of an acquittal would have likely decreased, not increased.

Second, even though Ms. Losoya's statement was not admitted into evidence during the guilt/innocence phase, the timing of her statement to police about Petitioner's ownership of a blue box cutter casts serious doubt on Petitioner's attempt to suggest that the police planted a blue box cutter. In any event, Ms. Losoya's statement about Petitioner's blue box cutter is relevant to his claim that he is actually innocent, whether or not it would have been admissible at trial. *See infra* Part IV.

### iv. New Forensic Evidence Regarding the Knife

In addition to fact witnesses, Petitioner asserts that forensic evidence developed by habeas counsel casts further doubt on the police's discovery of the blue box cutter knife.[56] He relies on forensic evidence relating to the knife in two ways.

---

[56] If Petitioner's trial counsel had offered expert forensic evidence at trial, it would have come as no surprise to the prosecution. Before trial, Judge Gonzalez granted the State's motion to require Petitioner's counsel to disclose the identity of any defense experts and to provide copies of their reports. (*See* Docket No. 6-20, at 127-28; Docket No. 6-54, at 8 (Final Pretrial Hrg. Tr. 17-20).) While we do not know what the prosecution's response would have been to the various forensic reports developed by Petitioner's habeas counsel, it is reasonable to assume the State would have developed expert evidence in response. It is likely that a battle of experts would have ensued as to some or all the points Petitioner attempts to make based on his new forensic evidence. Without speculating about what the State's experts might have said in response to Petitioner's experts, his new evidence will be considered in the context of other evidence in the record to determine if it likely would have affected the jury's verdict.

First, Petitioner states that the post-conviction forensic testing of the knife "revealed no evidence that Mr. Armstrong had ever touched" it.  (Docket No. 1, at 30 (Br. 27).)  The "blood and cellular debris recovered from the knife" show that while it originated from a male individual, "Mr. Armstrong was conclusively eliminated as their source."  (*Id.* at 31 (Br. 28).)

But this "new" forensic evidence regarding the knife adds little, if anything, to the evidence and argument the jury heard at trial.  As noted, the DPS forensic scientist who testified at trial, Ms. Anderson, found only Mr. Castelan's DNA on the knife, which is what Petitioner's forensic experts also found.  This suggests that the knife was the murder weapon but does not tie Petitioner to the knife.   And that is precisely the argument made by Petitioner's trial counsel during closing argument.

Second, Petitioner contends that forensic testing shows he did not carry the bloody knife in his pants pockets:

> [T]esting of the insides of the pockets of Mr. Armstrong's jeans revealed several small blood stains which originated from the exterior. That is, the blood soaked through from the jeans into the pocket and was not directly deposited in the inside of the pockets themselves. Thus, the absence of stains inside Mr. Armstrong's pockets is inconsistent with sustained contact with a bloody knife or a bloody Medicaid card.

(*Id.* at 33 (Br. 30) (citing Zebot Ex. 34 at 49, 52, 55, 58 & 67).)  Petitioner emphasizes that none of the three witnesses who saw him fleeing from the crime scene reported seeing a knife in his hand, so it must have been in his pocket if he had a knife.  (*Id.* at 26, 33 (Br. 23, 30).)

Petitioner's argument appears to be contradicted by his own forensic expert reports.  He cites a report by Forensic Science Associates (FSA) dated March 30, 2010.  (Docket No. 1-5, at 239 (Zebot Ex. 34).)  Regarding the left front pocket of Petitioner's jeans, the report states:

> A relatively large quantity of smeared blood stain is present on the *inside* obverse surface of the left front pocket flap as illustrated in figure 72. The heaviest blood stained areas penetrate the white fabric of the pocket flap to the outside flap surface

as illustrated in figure 70, below.  No further work was conducted on these specimens at the present time.

(*Id*. at 289 (Rpt. 52); emphasis added.)  In addition, the same report notes "[a] small quantity of blood is present on the left rear pocket *inside* reverse surface" of his jeans.[57]  (*Id*. at (Rpt. 55-56); emphasis added.)  These findings do not support Petitioner's contention that there was an "absence of stains inside Mr. Armstrong's pockets."[58]

Similarly, an earlier forensic report also contradicts Petitioner's pants-pocket argument.  Petitioner relies on a report by Barton Epstein, a forensic scientist with Forensic Serology & Microscopy, dated February 10, 2009.  (Docket No. 1-3, at 1 (Schultz Ex. 1).)  Based on Mr. Epstein's examination of Petitioner's jeans, this earlier report states: "Contact blood smears *inside* the left front pocket are consistent with *a bloody object contacting* the *inside* surface of the pocket." (*Id*. at 4 (Rpt. 4); emphasis added.)  To state the obvious, this finding does not help Petitioner prove that he did not carry the box cutter knife in his pocket.[59]  If anything, this new forensic evidence is harmful to him as it relates to the knife.

---

[57] The blood found on the inside of Petitioner's left rear pocket is consistent with the testimony of the jailer, Joshua Edwards.  He said that he removed Mr. Castelan's Medicaid card, with blood on it, from Petitioner's "left rear pocket."  (Docket No. 6-61, at 27 (Trial Day 5 Tr. 89, 91).)

[58] The report also describes the examination of Mr. Castelan's shorts, which did not reveal blood stains originating from the inside of the front pockets.  (Docket No. 1-5, at 271-74 (Rpt. 34-37).)  In summarizing those findings, the report notes that there were "[n]o blood stain deposits originating on the inside pocket surfaces of the Castelan denim shorts."  (Docket No. 1-5, at 303 (Rpt. 67).)  In summarizing the observations from Petitioner's jeans, however, the report states: "No *patterned* blood stain deposits were detected on the inside surfaces of the Armstrong denim jeans pockets."  (*Id*. (emphasis added).)  Apparently, the criminologists who authored the report concluded that the blood stains inside the left front pocket of Petitioner's jeans were not "patterned," although that was not mentioned earlier in the report.  Patterned or not, the blood stains found on the inside of Petitioner's left front pocket do not support his position.  The significance of the absence of blood stains on the inside front pockets of Mr. Castelan's shorts is discussed later in this report.  *See infra* Part III.B.2.h.ii.

[59] Another problem with Petitioner's pants-pocket theory is that when the blue box cutter was found, there was little or no blood on the handle (although there was blood on the blade).  (*See*

Moreover, the probative value of Petitioner's new evidence about blood inside his pants pockets is undercut by a more fundamental flaw.  According to his argument, the absence of blood inside his pockets is significant because there is "clear and consistent testimony of witnesses that Mr. Armstrong was not carrying a knife in his hands as he ran back to the Sunshine Bar."  (Docket No. 1, at 33 (Br. 30).)  Presumably, Petitioner is referring to the testimony of three witnesses who saw him running up Seventh Street—none of whom reported seeing a knife in his hand.

However, even if no blood had been found inside Petitioner's pockets, it would fail to show that he was not carrying the blue box cutter knife during his flight from the crime scene.  The record provides no reason to believe that the witnesses would have—or could have—seen the blue box cutter had it been in Petitioner's hand.  Det. Suarez, who took the blue box cutter into evidence, noted that it "fits in your hand pretty good."  (Docket No. 6-56, at 26 (Trial Day 2 Tr. 87).)  This is confirmed by pictures in the FSA report, which show the well-worn blue box cutter next to a ruler; as the report notes, the knife when folded is only about 3.5 inches long.[60]  (Docket No. 1-5, at 245-46 (Zebot Ex. 34, Rpt. 7-8).)  The folded box cutter thus would be hard to see in the closed hand of an adult male, especially one who is running by "fast" at night.[61]  Under such conditions,

---

Docket No. 6-68, at 43-44 (State's Exs. 35-36).)  As noted, Appendix 4 is a better-quality image of the folded knife (State's exhibit 35) as it was found.  Even if blood had not been found inside Petitioner's pocket, the absence of blood on the handle could also suggest that he wiped the knife off (on a T-shirt or jeans, for example).  This possibility is further suggested by the fact that neither the DPS crime lab nor Petitioner's forensic investigators could identify *anyone's* fingerprints on the handle of the knife.

[60] The report states: "The fully extended box cutter is approximately 5.75 inches long with a 3.5 inch handle."  (Docket No. 245 (Rpt. 7).)

[61] From the video of Petitioner's post-arrest statement and from seeing him during the trial, the jury would have observed the size of his hands in comparison to the box cutter knife.

it is unlikely the three Seventh Street witnesses would have been able to see the small, folded knife had it been in Petitioner's hand.[62]

In sum, Petitioner has failed to show that new witness testimony and forensic evidence related to the blue box cutter knife would have likely contributed to a different result in his case.

### c.   The Medicaid Card

At trial, the State presented evidence to show that Mr. Castelan's Medicaid card was found in Petitioner's back pocket.[63]  If accepted by the jury, this evidence suggested that Petitioner murdered Mr. Castelan and then robbed him.  The record shows that Petitioner's trial counsel vigorously contested the State's evidence regarding the Medicaid card.  Attempting to cast further doubt on the State's evidence, Petitioner's habeas counsel subjected the Medicaid card to intensive post-conviction forensic analysis.  Petitioner asserts that DNA testing does not link Petitioner to the card and, perhaps more importantly, that an "unidentified fingerprint and bloody footprint on the Medicaid card suggest that a third person was present around the time of the murder." (Docket No. 1, at 45 (Br. 42).)  Petitioner's new forensic evidence must be considered in the context of the evidence at trial.

The physical evidence at the crime scene showed that the person who murdered Mr. Castelan also rummaged through his belongings, ripping the back pockets off his shorts in the process.  When the police arrived at the scene, they saw Mr. Castelan's personal effects strewn

---

[62] There is no dispute that the three witnesses saw Petitioner running by as he fled from the crime scene.  But only one of the three Seventh Street witnesses noted that Petitioner was wearing a black hat, and one of the witnesses failed to notice the blood stains on his shirt.

[63] While often referred to as the "Medicaid card" or "Medicaid ID," it was actually a one-page (8 ½" by 11") document.  For consistency with the record, it will be referred to as the Medicaid card in this report.

about the area.  This is illustrated by the crime scene diagram attached as [Appendix 6](#).[64]  During

the trial, the jury saw pictures and a video of the crime scene.  The video was recorded by Det.

Elizondo, and he narrated what was being shown as the jury watched.[65]  (Docket 6-58, at 33-35

(Trial Day 4 Tr. 99-109).)

There were blood spatters on the sidewalk leading to Mr. Castelan's apartment.  Next to

the sidewalk, Mr. Castelan's blood-covered HEB shopping bag and store receipt were on the

ground near a large pool of blood.  One of the torn-off pockets from Mr. Castelan's shorts was

found near the HEB bag.  Several feet to the east, closer to one of the two larger trees, Mr.

Castelan's cellphone, comb, and his other back pocket lay on the ground.  Moving still closer to

the tree, Mr. Castelan's glasses and various cards and pictures—apparently taken from his wallet—

were scattered about.  Moving northeast diagonally from the tree toward the red fence, there was

a blood-covered pack of cigarettes, which Mr. Castelan had just purchased (as shown by the HEB

---

[64] [Appendix 6](#) consists of two images.  The crime scene diagram on the first page was prepared by Detective Jose Elizondo and submitted by Petitioner as a black and white copy. (Docket No. 1-3, at 206 (Schultz Ex. 50).)  The diagram is apparently a smaller-scale copy of the same diagram that was admitted at trial as State's exhibit 173.  (*See* Docket 6-58, at 32-22 (Trial Day 4 Tr. 99-101).)  As Det. Elizondo testified and noted on the diagram, it is "not to scale"; however, there are a few measurements on the diagram that seem to reflect precise distances.  The color annotations and red labels on Appendix 6 were added to aid in understanding the diagram and were not part of the original.  Also, a gray figure representing the eyewitnesses' van has been added to the diagram as an aid; the location of the van on the diagram is an approximation based on the testimony of Ms. Corona and Off. De La Rosa.  (*See* Docket No. 6-55, at 26, 40 (Trial Day 1 Tr. 86-88, 143-44).)  The second page of Appendix 6 is a better-quality copy of the crime scene photo admitted into evidence at trial as State's exhibit 24.  (*See* Docket No. 6-56, at 17 (Trial Day 2 Tr. 51); *see also* Docket Nos. 13, 14, 21, 25  (Respondent's record supplements).)  This photo reflects alphabetic markers (placed at the scene by police) corresponding to some (but not all) of the items shown on the crime scene diagram.

[65] The video was admitted into evidence as State's exhibit 169.  (Docket 6-58, at 33 (Tr. 101-03).)  Although not initially part of the record filed in this Court, counsel for Respondent, with the cooperation and assistance of counsel for Petitioner, has supplemented the record with a copy of the video in electronic format, which is located in the exhibit vault under the care of the Clerk. (*See* Docket Nos. 13, 14, 21, 24.)

receipt).  Further along the fence to the east lay Mr. Castelan's wallet—which was open, empty, and bloody.  It is little wonder that the jury found, as shown by their verdict, that the murderer had robbed Mr. Castelan or attempted to do so.

Officer Albert Salinas, Jr., was one of the police officers who arrived at the Sunshine Bar in response to Sgt. Guerrero's request for assistance.  (Docket No. 6-62, at 5-6 (Tr. 3-6).)  After Petitioner was detained and positively identified by Ms. Corona, Officer Salinas was outside the bar with Petitioner and began "checking for ID."  (*Id*. at 7 (Tr. 9-10).)  To do that, he went through all four of Petitioner's pants pockets.  (*Id*. (Tr. 10-12).)  Officer Salinas remembered that Petitioner "had a lot of property with him," but he could recall little else about what he found, other than some "folded paperwork."  (*Id*. (Tr. 12).)  As he took items out of Petitioner's pockets, he put them on the trunk of a police car.  (*Id*. at 8 (Tr. 12).)  Next, Officer Salinas gathered everything up to be transported with Petitioner to the police station, but he did not remember if he put the items "back into [Petitioner's] pockets, plac[ed] [them on] the front seat, or on top of his lap."  (*Id*. (Tr. 14).)

Sgt. Guerrero transported Petitioner to the police station.  He testified he did not know that Officer Salinas had searched Petitioner and that he did not see any of Petitioner's property on the front seat of the police car or in Petitioner's lap.  (*Id*. at 13 (Tr. 33-34, 36).)  On cross-examination, Sgt. Guerrero suggested it was not standard practice to remove all of a defendant's property and place it on the trunk of a car, nor should a defendant's property be left on the front seat or in his lap; instead, everything should be removed at the police station during the booking process.  (*Id*. (Tr. 35-36).)

After Petitioner arrived at the police station, jailer Joshua Edwards began the booking process, which included recording the defendant's personal information on the booking sheet and removing "anything in [his] pockets."  (Docket No. 6-61, at 26 (Tr. 88).)  Mr. Edwards

remembered removing from Petitioner's pockets "an envelope, some money, a pack of cigarettes, and a Medicaid form."  (*Id*. at 27 (Tr. 89, 91).)  He found the Medicaid form in Petitioner's left rear pocket.  (*Id*.)  As he removed items from Petitioner's pockets, Mr. Edwards put them on the counter.  The money and the Medicaid card had blood on them, so Det. Balli moved those items under the counter to separate them.  (*Id*. (Tr. 89, 91-92).)

Mr. Edwards filled out a booking sheet, noting Petitioner's personal information and describing his property.  (*Id*. (Tr. 92).)  The only property listed was a watch and $41 in currency.  (*Id*. (Tr. 99); Docket No. 6-73 (State's Ex. 194).)  The Medicaid card was not listed, nor was other property taken from Petitioner's pockets, including coins, a wallet, lottery tickets, cigarettes, and cigarette lighters.  Mr. Edwards explained that he did not list those items because they were being held as evidence.[66]  (Docket No. 6-61, at 29, 32 (Tr. 100, 110-11).)

Petitioner's booking was video recorded by an automated system, although the resulting recording stops and starts intermittently because the system is motion activated.  The booking video was played for the jury during the testimony of Det. Balli.  The video shows Mr. Edwards "taking everything out of Mr. Armstrong's pockets" and placing them on "top of the booking desk."  (Docket 6-62, at 22 (Tr. 69-71).)  After starting this process, Mr. Edwards reached down for gloves and put them on.  The video shows Det. Balli "examining the items that were placed on the table."  (*Id*. (Tr. 72.)  He takes some currency with blood on it and places it under the counter.  (*Id*.)  He is not wearing gloves at this point.  (*Id*.)  Later, after leaving and returning with some evidence bags, Det. Balli puts on gloves.  (*Id*. at 23 (Tr. 73).)  He then begins placing items in

---

[66] Petitioner candidly notes that the Medicaid card was listed in a separate "booking inventory sheet," which was obtained during habeas counsel's post-conviction investigation.  (*See* Docket No. 1, at 25 (Br. 22); referring to Schultz Aff. Ex. 24.)  Although the Petition indicates the document is attached as Schultz Affidavit Exhibit 24, the referenced exhibit appears to be missing.  The document was apparently not discussed at trial.

bags, at one point dropping Petitioner's wallet before putting it in the bag with the bloody currency. (*Id.* (Tr. 74).)  The video shows Det. Balli placing more than one folded item into the bag.  (*Id.*).

On cross-examination, Det. Balli acknowledged that the booking video does not show the Medicaid card being taken from Petitioner.  (*Id.* at 29 (Tr. 100).)  Like Sgt. Guerrero, Det. Balli was not aware Off. Salinas had searched Petitioner before bringing him to the police station.  (*Id.*)  Det. Balli's report described what was taken from Petitioner during booking:

> Jailer Edwards began to empty out the defendants pockets and upon him doing so he located US currency, scratch off lottery tickets, an Amex pay check stub and other papers in his back pockets.

(Docket No. 1-3, at 198 (Zebot Ex. 30; Def. Ex. 6).)  Det. Balli admitted that his report did not mention that Mr. Edwards found a bloody Medicaid card in Petitioner's pocket.  (Docket No. 6-62, at 32 (Tr. 112).)

Petitioner's trial counsel also asked Det. Balli why the Medicaid card was not tested for fingerprints or DNA; he did not know.  (Docket No. 6-62, at 30 (Tr. 102).)  During cross-examination of Ms. Anderson, counsel confirmed that the State had not performed DNA testing on the Medicaid card.  (Docket No. 6-62, at 45 (Tr. 162).)  Similarly, Petitioner's counsel confirmed that the police did not submit the Medicaid card for fingerprint analysis by the State's fingerprint expert, Mr. Wild.  (Docket No. 6-61, at 17 (Tr. 50).)  Indeed, it is hard to understand the police's failure to submit the card for fingerprint analysis since it appears (even to a layman) to bear a bloody print.  (*See* Docket No. 6-71, at 39 (State's Ex. 125).)[67]

Perhaps recognizing issues relating to the Medicaid card, the prosecutor hardly mentioned it during his initial closing argument.  He referred to the card in explaining why the charge was

---

[67] A better-quality color image of the Medicaid card, with a close-up of the print, was filed with the Petition.  (*See* Docket No. 1-5, at 377 (Zebot Ex. 35).)

capital murder, which included a robbery element: "The victim's medical identification card, it was removed from the person of the defendant.  But even without this you still have the robbery, based on the crime scene."  (Docket No. 6-63, at 16 (Tr. 51).)  To put it mildly, this was not much of an endorsement for the evidentiary value of the card.  Rather than discuss the card, the prosecutor emphasized the testimony of the eyewitnesses and pointed out multiple issues with Petitioner's version of events.

In contrast, Mr. Garza and Ms. Morales-Martinez repeatedly referred to the Medicaid card throughout during their closing arguments, emphasizing the absence of forensic evidence linking it to Petitioner.  (Docket No. 6-63, at 10-14 (Trial Day 7 Tr. 27-29, 33-37, 40, 42-44.)  They also both pointed out the irregularities in how the police discovered and handled the card, suggesting that it was really a plant.[68]  (*Id*.)  For example, Mr. Garza told the jury: "The video from the booking desk taken on 4-21-06 tells you the real story.  There is no medical—or Medicaid card from Douglas Armstrong.  I'm going to ask you to please review it . . .."  (*Id*. at 10 (Trial Day 7 Tr. 27).)  Mr. Garza later repeated that the "answer is in the video . . . look at it, please."  (*Id*. at 12 (Tr. 34).)  Just to be sure, he also played part of the booking video and again asked the jury to review it.  (*Id*. at 13 (Tr. 37).)

In response to these arguments about the card, the prosecutor said *nothing* about it during his final closing argument, instead focusing again on the eyewitness testimony and other evidence.  (*See id*. at 16-18 (Tr. 49-59).)  With this record backdrop, Petitioner's new evidence relating to the card will be considered.

---

[68] Petitioner makes similar arguments in his federal Petition.  (Docket No. 1, at 24-25 (Tr. 21-22).)

i.      *Post-Conviction Fingerprint Analysis of the Medicaid Card*

Petitioner criticizes both the police and trial counsel for not performing fingerprint and DNA analysis of the Medicaid card, "[d]espite the presence of a visible bloody fingerprint on the card." (Docket No. 1, at 25 (Br. 22).)  At the direction of Petitioner's habeas counsel, "two third-party forensic laboratories" examined the Medicaid card several times and prepared multiple reports over the course of about two years.[69]  (*See* Docket No. 1, at 30 (Br. 27).)  FSA's first report, dated March 30, 2010, included physical examination and analysis of the Medicaid card.  (Docket No. 1-5, at 255-66 (Zebot Ex. 34, Rpt. 17-28).)  FSA's next report, dated January 16, 2011, summarizes their analysis of the fingerprints found on the card.  (Docket No. 1-5, at 375 (Zebot Ex. 35).)  That report was followed by two supplemental reports with additional fingerprint analysis, dated January 25, 2011, and June 21, 2011.  (Docket No. 1-5, at 380-86 (Zebot Exs. 36, 37).)

FSA found a total of 17 prints or partial prints on the Medicaid card, but ten of those had "no value" (meaning they had "insufficient detail for either identification or elimination" of anyone).  (Docket No. 1-5, at 382-83 (Zebot Ex. 36, Rpt. 2-3 (table)).)  That left seven prints with some identification value.  Petitioner describes the report's findings as follows:

> Of the 17 prints found on the document (Zebot Decl. Ex. 35 at 3), only seven were sufficient to permit comparative analysis. (*Id.* at 4.) This analysis did not identify Mr. Armstrong as the source of any of the seven prints, and, in fact, conclusively eliminated him as the source of five of them. (Zebot Decl. Ex. 36 at 2.) When these same seven prints were compared to Mr. Castelan's known fingerprints, FSA was able to eliminate Mr. Castelan as the source of one of the prints (Latent Print "N") for which Mr. Armstrong had also been eliminated. (Zebot Decl. Ex. 36 at 2.) Therefore, someone other than either the victim or Mr. Armstrong left his print, a fact that is again consistent with Armstrong's claim of innocence.

---

[69] Petitioner notes that this testing and analysis was done by FSA and Serological Research Institute (SERI).  (Docket No. 1, at 30 (Br. 27).)  While the various resulting reports were submitted by FSA, SERI apparently performed the DNA analysis reflected in those reports.  (*See id.*; *see also* Docket No. 1-5, at 297 (Zebot Ex. 41, Rpt. 61).).

(Docket No. 1, at 32 (Br. 29); footnote omitted.)  A closer look at FSA's analysis casts doubt on this conclusion.

Of the seven identifiable prints on the card, FSA found that both Mr. Castelan and Petitioner could be eliminated as the source of one print.  Petitioner suggests that this tends to show his innocence.  But this would be true only if they were both eliminated as the source of the one bloody print—since the other prints on the card could have originated at any time before or after the murder.[70]

> Not surprisingly, the FSA report addresses the critical bloody print:

>> The bloody impression does not contain pattern-type information, nor does it have sufficient points for positive identification. Comparison of this impression with the known impressions from Douglas Armstrong revealed limited similarity. This limited similarity does not provide evidence that this impression was made by Armstrong, but neither can he be eliminated as the possible source of this impression. At least two areas on the right palm of Armstrong exhibit ridge characteristics that can be found in the bloody impression but the features that can be observed in the bloody impression are insufficient to permit a positive identification of the source of that impression.

(Docket No. 1-5, at 378 (Zebot Ex. 35 at 3).)[71]  In other words, FSA's analysis reveals that the bloody print has some similarity to Petitioner's palm print, although not enough for a positive

---

[70] The card itself appears to have been issued about two months before the murder.  (*See* Docket No. 6-71 at 39 (State's Ex. 125).)  Of course, anyone who handled the card before the murder (April 21, 2006) would not have been a person of interest.  Regarding the time after the murder, the evidence at trial (summarized above) shows that both Mr. Edwards and Det. Balli handled items taken from Petitioner's pockets before putting on gloves.  Off. Salinas had also taken all the items out of Petitioner's pockets at the bar and placed them on the trunk of a police car.  Although Off. Salinas claims to have worn gloves, this seems open to doubt, particularly since higher-ranking officers (Sgt. Guerrero and Det. Balli) implied that he never should have emptied Petitioner's pockets outside the bar.

[71] FSA's report dated January 25, 2011, includes an annotated image of the card showing the location of each print and a chart showing the results of the comparison with Petitioner's fingerprints at each location.  (Docket No. 1-5, at 382 (Zebot Ex. 36, Rpt. 2).)  The critical bloody fingerprint on the card is labeled "F."  (*Id.*; *see also* Docket No. 1-5, at 377 (Zebot Ex. 35, Rpt. 2) (image of Medicaid card with a magnified call-out showing the bloody fingerprint).)

identification.  Interestingly, even though it was Mr. Castelan's Medicaid card, *none* of the prints could be positively identified as his.  (*Id*. at 386 (Zebot Ex. 37 at 2).)  Mr. Castelan could not be eliminated as the source of six of the prints.[72]  (*Id*.)

Petitioner fails to show any likelihood that this new forensic evidence would have persuaded the jury to reach a different verdict.  To the contrary, Petitioner is arguably worse off with this new fingerprint evidence.  At trial, his attorneys were able to proclaim (accurately) that there was *no* evidence that his fingerprints were on the card.  Based on FSA's fingerprint analysis, we know that Petitioner cannot be eliminated as the source of the bloody print on the card, which has "[a]t least two areas" of similarity to his palm print.

### ii.   *Post-Conviction DNA Analysis of the Medicaid Card*

Petitioner also points out that "DNA test results confirm that Mr. Armstrong was not the source of any blood or cellular debris on the Medicaid document."  (Docket No. 1, at 31 (Br. 28); citing Zebot Ex. 34 at 65.)  For this, Petitioner relies on the FSA report dated March 30, 2010.  (Docket No. 1-5, at 239 (Zebot Ex. 34).)  This DNA evidence likewise would have done little, if anything, to further Petitioner's defense.

The DNA obtained from the Medicaid card was determined to have come from only one person: Mr. Castelan.  (*Id*. at 301 (Zebot Ex. 34 at 65).)  At trial, Petitioner's counsel emphasized that there was no DNA evidence linking Petitioner to the card.  The new evidence further confirms what trial counsel said, but it does not help since it also shows that whoever committed the murder—whether it was Petitioner or someone else—did not leave their DNA on the card.

---

[72] One of those six prints was the bloody fingerprint.  (Docket No. 1-5, at 386 (Zebot Ex. 37, Rpt. 2) (noting that Mr. Castelan could not be eliminated as the source of print "F").)  This shows that neither Mr. Castelan nor Petitioner could be eliminated as the source of the bloody print. *See supra* n.71.

### iii.       The "Apparent" Bloody Shoe Print on the Medicaid Card

A closer question is presented by Petitioner's new forensic evidence regarding a possible bloody shoe print on the card.  In Mr. Epstein's original report, dated February 10, 2009, he examined the Medicaid card and noted "a partial fingerprint in blood" on the card.[73]  (Docket No. 1-3, at 4 (Schlutz Ex. 1 at 4).)  He did not mention a shoe print.

In a report two and a half years later, September 7, 2011, Mr. Epstein refers to an FSA report revealing "an arced impression of round dots" in blood on the card.[74]  (Id. at 387 (Zebot Ex. 38, Rpt. 1.)  Each of the small dots has a "uniform diameter of approximately 3 mm" with each dot spaced "approximately 5 mm" apart.  (Id. at 388 (Rpt. 2.)  Mr. Epstein compared this pattern to pictures of the soles of the shoes worn by Mr. Castelan and Petitioner and concluded that their shoe soles did not have the same "small dot patterns."  (Id.)  He did not say that the small dot patterns were in fact shoe prints.

Petitioner's habeas counsel later "retained a professional tracker, Joel Hardin, to analyze the bloody shoe prints on the Medicaid card."  (Docket No. 1, at 31 (Br. 28).)  About six months after Mr. Epstein's supplemental report, Mr. Hardin submitted a report dated March 20, 2012, which was followed by a second report, dated April 24, 2012.  (See Docket No. 7-39, at 29, 48

---

[73] Mr. Epstein also noted the "Medicaid letter was folded when blood was deposited on the surface."  (Docket No. 1-3, at 3 (Schlutz Ex. 1 at 3).)  This observation is unexceptional since the blood stain seems to be bounded by straight lines consistent with fold lines on the paper.  Attempting to add to that, Petitioner asserts that "the blood on the Medicaid card was not smeared, indicating that the blood was completely dry before it was allegedly put in Mr. Armstrong's pocket."  (Docket No. 1, at 31 (Br. 28).)  This is presumably Petitioner's own deduction since he does not cite Mr. Epstein or any of his other experts.  While he may be right, this point is not apparent from the document itself, which does appear to reflect smeared blood (at least to an untrained eye).  (See Docket No. 1-5, at 377 (Zebot Ex. 35, Rpt. 2).)

[74] This FSA report is dated March 30, 2010.  It noted "an arced impression of round dots running through" the blood stain on the Medicaid card.  (Docket No. 1-5, at 261 (Zebot Ex. 34, Rpt. 23).)  After describing the dot pattern, FSA stated that the "impression in blood may be caused by a shoe."  (Id.)

(2d Suppl. Schultz Ex.s 3, 4.))[75]  Petitioner cites Mr. Hardin's reports for the proposition "that the bloody impressions on the Medicaid form are from the outsole of a shoe and that they were not made by either the shoes worn by the victim or the shoes worn by Mr. Armstrong at the time of the incident."  (Docket No. 1, at 31 (Br. 28).)  From this, Petitioner concludes that "a third person was present around the time of the murder."  (*Id*. at 45 (Br. 42).)

To be sure, Mr. Hardin concludes that the "strip with dots" is "evidence of a shoe gear outsole."  (Docket No. 7-39, at 54.)  But he also notes at least two important caveats.  First, his "examination is related to a very small section of this Medicaid document.  The impressions and transfers examined are a small portion, and at best, very limited in presentation or definition or identification."  (*Id*. at 53-54.)  Second, in addition to not matching the soles of the shoes worn by Mr. Castelan and Petitioner, Mr. Hardin could not find *any* brand or type of shoes that matched the tiny "strip with dots" pattern on the card.[76]  (*See id*. at 34, 55 (referring to "objective question (3)").)

If Mr. Hardin had testified at trial, it is possible one or more jurors would have concluded that the dot pattern on the card was a partial print from the sole of a shoe.[77]  Yet this would not

---

[75]  Although cited as exhibits to his federal Petition, the referenced reports were not included.  Mr. Hardin's two reports are found in the record as attachments to Petitioner's "Second Amended Application for Postconviction Writ of Habeas Corpus," filed in state court on July 12, 2012.  (Docket No. 7-38, at 479.)  Had Petitioner's trial counsel attempted to introduce the testimony of a "professional tracker," the State would have seen Mr. Hardin's report before trial (*see supra* n.56) and may well have raised a *Daubert* challenge.  *See Daubert v. Merrell Dow Pharms.*, 509 U.S 579 (1993); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992) (the state court equivalent of *Daubert*).  It is unclear whether Mr. Hardin would have been permitted to testify as an expert.  For purposes of this report, it will be assumed (without deciding) that the state court would have allowed his testimony.

[76]  In attempting to identify a matching outsole pattern, Mr. Hardin searched the internet.  (*Id*.)  Presumably, he also relied on his expertise as "a professional tracker."  *See supra* n.75.

[77]  As noted, based on the trial court's pretrial discovery order, the State would have obtained Mr. Hardin's report before trial.  *See supra* n.56.  We do not know how the prosecution would have addressed such evidence.  If the DPS lacked expertise in forensic analysis of shoe

necessarily mean that an unknown person murdered Mr. Castelan.  To reach that conclusion, the jury would probably have had to also be convinced that the police planted the bloody Medicaid card.  If the card was not a police plant, and if Petitioner had taken the card from the crime scene, such conduct would be completely inconsistent with his story that he was just trying to help Mr. Castelan.  If the card was not a plant, then the partial shoe print (assuming there is one) could have been made by accident (or incompetence) during the arrest and booking process (for example, when Off. Salinas was removing items from Petitioner's pockets at the bar).

On the other hand, if the jury believed that the card was a plant, it would not necessarily mean that someone else killed Mr. Castelan—though it would mean that one or more police officers committed a crime.  While unlawful, corrupt, and misguided, the card could have been planted to ensure a conviction even though Petitioner in fact had committed the crime.  Then again, the jury may have concluded both that the card was planted and that the possible shoe print raised reasonable doubt about Petitioner's guilt.

Of all Petitioner's new evidence regarding the Medicaid card, the evidence suggesting a bloody shoe print may be the most significant.  It is possible that this evidence would have affected the jury's verdict, but that does not seem probable.  Despite Petitioner's assertion that the State "relied heavily" on evidence relating to the Medicaid card, the prosecutor did not refer to it at all during his opening statement.  Likewise, during closing argument, the prosecutor relied on other evidence as proof of Petitioner's guilt, particularly emphasizing the eyewitness testimony.  In

---

impressions, the State may have requested assistance from the FBI, which does have such expertise.  *See* Michael B. Smith, *The Forensic Analysis of Footwear Impression Evidence*, FBI Forensic Science Communications (July 2009), https://archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2009/review/2009_07_review02.htm.  Whether the State would have presented forensic evidence that undermined Mr. Hardin's conclusion is a matter of speculation and will not be considered in analyzing Petitioner's claim.

contrast, Petitioner's trial counsel repeatedly brought up the Medicaid card, implying it was a plant and emphasizing the absence of evidence linking it to Petitioner. The jury apparently found the State's other evidence compelling enough to prove Petitioner's guilt beyond a reasonable doubt.

d.    The Barmaids

At trial, the State presented testimony from the bartender and several barmaids who saw Petitioner at the Sunshine Bar the day of the murder. Their testimony supported the following narrative:

- Petitioner was at the bar for five or six hours, beginning about 3:00 p.m. and continuing well into the evening;

- He was drinking beers, buying rounds for the barmaids, dancing with the ladies, and playing pool;

- Petitioner spent over $200 buying rounds for himself and the barmaids;

- Eventually, he refused to buy more rounds, saying he had no more money;

- Petitioner emphasized he was out of money by patting his wallet or showing it was empty;[78]

- After running out of money, he left the bar;

- When Petitioner returned to the bar, he was sweating profusely and shaking; he promptly bought a beer with a $5 bill.

To complete this narrative, the State called Darrin Douglas, who was the other black man at the bar initially detained by police.

Mr. Douglas testified that he had seen Petitioner at the bar earlier that evening and later saw him leave. After Petitioner returned, Mr. Douglas saw him "sitting on a bar stool and he was

---

[78] The trial transcript reflects that some witnesses demonstrated with gestures how Petitioner showed them he was out of money. On Petitioner's direct appeal, the CCA stated that, before leaving the bar, Petitioner showed the bartender "his empty wallet." 2010 WL 359020 at *3.

counting his money underneath . . . the bar counter." (Docket No. 6-58, at 11 (Trial Day 4 Tr. 14).) At the time of his arrest, Petitioner had $41, and at least two of the bills had Mr. Castelan's blood on them. (*See* Docket No. 6-61, at 27-28, 30 (Trial Day 5 Tr. 89, 95-96, 102-03); Docket No. 6-73, at 15 (State's Ex. 194).)

Petitioner contends that newly discovered evidence undercuts the suggestion that he spent all his money at the bar:

> A critical piece of the evidence at trial came from the so-called employees at the Sunshine Bar. These witnesses testified as to precisely how many beers Mr. Armstrong purchased on April 21, 2006. This testimony, which matched up precisely with the amount of money Mr. Armstrong had left from his paycheck, was critical to establishing his putative motive for the attack on Mr. Castelan. In reality, however, these witnesses were not employees of the bar whose job necessarily meant keeping tabs on the number of beers their customers purchased. They were friendly women who liked to drink and entertain customers there.

(Docket No. 1, at 53 (Br. 50).) Considered in the context of the trial record, this argument is unpersuasive.

Cinthia Berenice Alanis Olvera was the State's key witness about what happened at the bar.[79] (Docket No. 6-57, at 24 (Trial Day 3 Tr. 77-80.) The record shows both that she was employed at the Sunshine Bar and that she was in a position to know how much money Petitioner spent during the five-plus hours he stayed at the bar on the day of the murder. Ms. Alanis Olvera was a bartender at the bar. (*Id*.) As the bartender, it was her responsibility to receive payments from customers, and she was accountable to the bar owner. (*Id*.) She opened the bar at about 2:00 p.m. on the day of the murder. (*Id*. at 80.)

Around the time Ms. Alanis Olvera opened the bar, Karina Martinez arrived. She was one of the barmaids. Later, other barmaids arrived, including Shaquira, Adela, and Yesenia. When

---

[79] She is sometimes referred to as Ms. Alanis and sometimes as Ms. Olvera. In the hopes of lessening confusion, she will be referred to as Ms. Alanis Olvera in this report.

asked whether they worked at the bar, Ms. Alanis Olvera explained: "They just go pony, the girls." (*Id*. at 24, 27 (Tr. 79, 90.)  Going "pony" means that the ladies socialize with the bar "clients" in the hopes that the clients will then buy them beers.  When a client buys a barmaid a beer, some of the payment goes to the "girl" and some goes to the bar.  For example, when a client buys a regular-size beer for a barmaid the cost is $4.50: "$2 for the girl and $2.50 for the register."  (*Id*.)

Not long after the bar opened, Petitioner arrived.  He invited both Ms. Alanis Olvera and Karina Martinez to have a beer, which cost him $10.50 ($1.50 for his and $4.50 each for the two women).  After the other barmaids arrived, Petitioner began playing pool, dancing, and buying rounds of beer for all the ladies.  As Ms. Alanis Olvera explained, each round cost Petitioner $21.50 because he was buying beers for himself and five ladies: "Shaquira, Adela, Yesenia, Karina and me."  (Docket No. 6-57, at 27, 29 (Tr. 90, 100).)  Petitioner bought "about ten" rounds of beer for the group.  (*Id*. at 27 (Tr. 90).)  On cross-examination, Ms. Alanis Olvera acknowledged she did not know the total amount that Petitioner spent on beers, but it was over $200.[80]  (Docket No. 6-57, at 30 (Tr. 104).)  Eventually, Petitioner ran out of money.  Ms. Alanis Olvera heard him telling Adela "no money, no money" and saw him "looking for money" and patting his pockets to emphasize the point.  (*Id*. at 27 (Tr. 91).)

As the bartender who received Petitioner's payments, Ms. Alanis Olvera testified from personal knowledge, and the jury was able weigh her testimony and assess her credibility.  There is no basis to suggest that the jury was misled regarding her status at the bar.[81]

---

[80] Mr. Garza pointed out that she must have had 10 or 11 beers by her calculation.  Ms. Alanis-Olvera responded: "I wasn't drinking any.  I was just charging.  I was just keeping the money."  (*Id*. at 29 (Tr. 100).)  She then clarified that she drank two beers.  (*Id*.)

[81] In Petitioner's federal petition, he neither cites nor attaches evidence in support of the proposition that the State's bar witnesses were not employees of the bar.  In his state application, Petitioner attached an affidavit from an investigator, Douglas C. Crumly, to show that the witnesses were not bar employees.  (Docket No. 7-37, at 171-72.)  Mr. Crumly states that the bar

The status of the barmaids was also obvious to the jury.  In addition to Ms. Alanis Olvera's description of their activities at the bar, two of the barmaids testified: Mildred Adelaida ("Adela") Chavez and Karina Martinez.  Both made it clear what they were doing at the bar.  When asked how she was paid at the bar, Ms. Chavez said, "[i]t is not a salary."  (Docket No. 6-57, at 31 (Tr. 106).)  When pressed about how she earned money, she responded: "Doing ponies."  (*Id.*)  Similarly, Ms. Martinez explained that there were days where she would "just go and play" at the bar.  (*Id.* at 35 (Tr. 123).)  She could "drink, but there is not a salary." (*Id.*)  Ms. Martinez received money when a customer bought her a beer (for a large beer, she got $2 and "$2.50 for the bar"). (*Id.*)  Both ladies also confirmed that Petitioner was playing pool, dancing, and buying rounds for all the ladies.  That is, until he ran out of money.  Based on the trial record, there is no likelihood that the jury misunderstood the role of the barmaids.

In addition, it cannot be disputed that the three bar witnesses observed Petitioner at the bar, they saw him leave, and they were still at the bar when he later returned.  Whether they were bar

---

owner, who has another full-time job, did not recognize the names of the bar witnesses, including "Cinthia Alanis," as employees of the bar.  It is unsurprising that the apparent bar owner did not acknowledge that the barmaids were employees.  No one who understood what they were doing at the bar—including the jury—would have assumed that the barmaids were official employees.  But Ms. Alanis Olvera is a different story.  She opened the bar by herself (presumably with a key), and she accepted payment from customers as the bartender.  Ms. Chavez confirmed that on the day of the murder, Ms. Alanis Olvera was working "behind the bar."  (Docket No. 6-57, at 32 (Tr. 112).) Ms. Alanis Overa testified that she worked Wednesday through Sunday and that she opened the bar on those days.  (Docket No. 6-57, at 24 (Tr. 80).)  Consistent with this, Karina Martinez stated that Ms. Alanis Olvera was "in charge" of the bar when she arrived on the day of the murder. (Docket No. 6-57, at 35 (Tr. 124).)  In addition, Ms. Alanis Olvera was working at the bar the day after the murder, Saturday, April 22, 2006.  She called the police to report seeing a shiny object beside the toilet in the restroom.  She told the responding officer that she saw the shiny object after "she unlocked the bathroom door."  (Docket No. 1-3, at 173 (Schultz Ex. 32 (police report of Officer Ortega).))  As it turned out, the object was a spatula.  But it is telling that Ms. Alanis Olvera was working at the bar the day after the murder, and she again had the keys.  It would be very strange if Ms. Alanis Olvera was not a bar employee since she was opening the bar for business and receiving payments from customers.  From all this, it appears that the information in Mr. Crumly's affidavit is inaccurate regarding Ms. Alanis-Olvera's status at the bar.

employees has little or no bearing on the accuracy of their testimony.  The jury knew what they were doing at the bar and had the opportunity to hear their testimony and observe their demeanor.

The main point of Petitioner's "new" evidence about the barmaids is to call into question the State's calculation of how much he spent on beer that day.  But the source of that calculation was Ms. Alanis Olvera, who as the bartender was the person responsible for charging Petitioner.  Moreover, her testimony about the number of beers Petitioner purchased was confirmed by Petitioner himself, who told police investigators that he had "drunk about 11 beers or so."[82]  (Docket No. 103, at 139 (Armstrong Tr. 26).)  That is consistent with what Ms. Alanis Olvera said: Petitioner initially bought one round for himself, for her, and Ms. Martinez, and he thereafter bought ten more rounds for himself and all the ladies—totaling 11 rounds.

For all these reasons, Petitioner has failed to show that any new evidence regarding the employment status of the three bar witnesses would likely have changed the result of his trial.

e.    The Cocaine Connection – Drug Hit Theory

At trial, Petitioner's defense counsel highlighted evidence suggesting that the victim, Mr. Castelan, both used and sold cocaine.  This was first brought out during the testimony of one of the State's eyewitnesses, Ms. Corona.  On direct, she testified that she knew Mr. Castelan well since he had allowed her to live with him for a time.[83]  During cross-examination by Ms. Morales-Martinez, Ms. Corona admitted that she had previously used cocaine, although she did not use it anymore.  (Docket No. 6-55, at 30-31 (Trial Day 1 Tr. 104-05).)  She also stated that Mr. Castelan had supplied her with cocaine "once in a while."  (*Id.*)  Later in the trial, Mr. Garza cross-examined

---

[82] Eleven beers may have been an understatement.  Petitioner told his trial investigator, Mr. Tamez, "on that day he probably drank about 12 to 14 beers."  (Docket No. 7-24, at 14.)

[83] Mr. Castelan had apparently allowed other women to reside with him in times of need.  For example, the bartender at the Sunshine Bar, Ms. Alanis Olvera, had also lived with him at one point.  (Docket No. 6-57, at 26 (Trial Day 3 Tr. 87-88).)

the pathologist who performed Mr. Castelan's autopsy.  Dr. Salinas testified that the toxicology report showed Mr. Castelan was under the influence of cocaine at the time he was murdered. (Docket No. 6-62, at 38-39 (Trial Day 6 Tr. 136-37).)  During closing argument, Ms. Morales-Martinez reminded the jury of Mr. Castelan's involvement with cocaine, noting that he was Ms. Corona's "former supplier."  (Docket No. 6-63, at 15 (Trial Day 7 Tr. 48).)

Petitioner complains that trial counsel did not go far enough and should have discovered and emphasized additional evidence of Mr. Castelan's cocaine connection.  Petitioner points to Ms. Corona's apparent statement to police that Mr. Castelan had experienced a break-in at his apartment a few days before the murder.  (Docket No. 1, at 29 (Br. 26); citing Schultz Ex. 41.)[84] Also, one of Petitioner's post-conviction investigators, Mr. Aguilar, learned that a maintenance man had changed Mr. Castelan's "door lock because Rafa had lost the key"—a circumstance that Petitioner deems suspicious.  (Docket No. 1-3 at 198 (Schultz Ex. 45).)

In addition, Petitioner's habeas counsel discovered new evidence as a result of additional forensic testing done on Mr. Castelan's shorts.  The analysts discovered two small slits on the inside of the waistband.  Within the slits, they found three small plastic bags, two of which contained a white powdery substance.  (*Id*. at 33-34 (Br. 30-31).)  The third small bag was empty. Petitioner reasons that all this new evidence "lend[s] significant credence to the theory—which was never allowed into evidence or argued to the jury at trial—that Mr. Castelan was an active drug dealer and may have been the victim of a drug hit."  (Docket No. 1, 34 (Br. 31).)

---

[84] Petitioner cites to Schultze exhibit 41, but that exhibit is simply a picture of a CD or DVD.  Petitioner supplemented the record with an electronic copy of the video, but in the video Ms. Corona speaks Spanish.  (*See* Docket No. 18.)  There does not appear to be an English translation of the video in the record.  Petitioner also cites this video statement for the proposition that "Mr. Castelan was well known by reputation to be a drug dealer."  (Docket No. 1, at 29 (Br. 26).)

Assuming Mr. Castelan was selling drugs, the evidence suggests that it was on a very small scale—three tiny baggies concealed in the waist band of his shorts.  It also appears that any such activity was not lucrative, based on the modest personal effects that were scattered on the ground at the murder scene.[85]  The suggestion of a "drug hit" is pure speculation.  There is no evidence that small-time drug dealers in the surrounding area had been targeted by anyone.

More significantly, the record shows that the "drug hit" theory may have done Petitioner more harm than good.  Petitioner's girlfriend, Ms. Losoya, testified (during the punishment phase) that prior to the murder she was "fed up with his conduct and his cocaine use."  (Docket No. 6-65, at 8 (Trial Day 9 Tr. 15).)  In a later affidavit, Ms. Losoya said that both Petitioner and her brother had told her that Petitioner was using crack cocaine.  (Docket No. 7-37, at 163.)  In Petitioner's statement to police after his arrest, he explained that he left Mr. Castelan and ran because "it started to dawn" on him that he had "snorted cocaine today."  (Docket No. 1-3, at 124 (Armstrong Statement Tr. 11).)  He repeated later in the interview that he had "snorted the powder" and said he bought it "[r]ight there in the bar."  (*Id*. at 149 (Tr. 36).)

The bartender, Ms. Alanis Olvera, testified that after Mr. Castelan arrived at the bar, he and Petitioner spoke by a pool table for about 10 minutes.  (Docket No. 6-57, at 26 (Trial Day 3 Tr. 88).)  Mr. Castelan then went into the restroom and Petitioner followed; the two remained in the restroom for about 20 minutes.  (*Id*.)  The restroom was small, with only one stall and a urinal; as Ms. Alanis Olvera explained, "it is a single."  (*Id*. at 26-27 (Tr. 88-89); *see also* Docket No. 6-56, at 7 (Trial Day 2 Tr. 10 (Sgt. Guerrero describing the bathroom as "small").)  It did not even

---

[85] There is no indication Mr. Castelan even owned a car.  Among Mr. Castelan's papers found at the crime scene was a statement from a loan company, showing that he owed $408 on a personal loan and that his last payment on the loan was $51.  (Docket No. 6-70, at 45 (State's Ex. 83).)  This small loan, together with the other papers found at the scene, hardly suggest that Mr. Castelan was a high rolling, "active drug dealer."

have a sink, which was out in the hall.[86]  (*See* Docket No. 6-58, at 11 (Trial Day 4 Tr. 15).)  If Mr.

Castelan's alleged drug dealing had been emphasized at trial, the jury may well have wondered

what Petitioner and Mr. Castelan were doing together in a tiny bathroom for 20 minutes.  Did it

have something to do with the empty baggie found in Mr. Castelan's shorts?[87]

      Petitioner's apartment was only about a block from Mr. Castelan's apartment (as shown in

Appendix 1).  Both he and Mr. Castelan frequented the Sunshine Bar.  Ms. Alanis Olvera testified

that they knew each other before the night of the murder and had spoken together before that night.

(Docket No. 6-57, at 26 (Trial Day 3 Tr. 85, 88).)    Given Petitioner's cocaine use during the

period before the murder, it would be surprising if he had not been aware of a cocaine supplier

who lived short distance away and hung out at the same bar.  This possibility is further suggested

by Mr. Aguilar's investigation report.  He spoke with one of Mr. Castelan's neighbor's, Maria

Macias, who "was living at Apartment 'A' at the time of the incident."  (Docket No. 1-3, at 198

(Schultz Ex. 45).)  "She remembered that there were two black individuals in the area and that on

at least one occasion she remembered seeing a black man visit Rafa at his apartment."  (*Id*.)  Mr.

Aguilar added: "She remembered the big, black man that would visit Rafa."  (*Id*. at 199.)

---

      [86] When Petitioner returned to the bar, Mr. Douglas saw him enter the bathroom and followed him there.  He saw Petitioner taking his shirt off and pouring beer on his hands.  Mr. Douglas thought this was "odd" and told Petitioner "there was a sink there . . . right outside the bathroom door."  (Docket No. 6-58, at 11 (Trial Day 4 Tr. 15).)

      [87] The possibility that Petitioner was buying cocaine from Mr. Castelan in the bathroom is further suggested by his comment to police about later trading shirts with a man in the bathroom. Petitioner said that he had already put on the other man's shirt and was talking to him, explaining: "The guy had some cocaine on him."  (Docket No. 1-3, at 157 (Armstrong Tr. 44).)  Apparently, Petitioner was trying to get some more cocaine and talking about it in the bathroom.  In addition, during Ms. Corona's interview with Petitioner's trial investigator, Mr. Tamez, she told him she "believes that the black male [Petitioner] may have been getting drugs off" Mr. Castelan.  (Docket No. 7-24, at 22.)

At trial, Darin Douglas testified that he had met Petitioner at the bar prior to the night of the murder.  Mr. Douglas felt comfortable approaching Petitioner and introducing himself because Petitioner "was the only other Black guy I seen in town."  (Docket No. 6-58, at 10 (Trial Day 4 Tr. 11).)  Of the two, Petitioner was much bigger.  Ms. Corona referred to Mr. Douglas as a "skinny Black guy," who was *not* Mr. Castelan's attacker.  (*See* Docket No. 6-55, at 18 (Trial Day 1 Tr. 54).)  Petitioner, on the other hand, was a "[b]ig man, a big man."[88]  (*Id.* at 17 (Tr. 51).)

If jurors had believed Petitioner bought cocaine from Mr. Castelan on the night of the murder and possibly on other occasions, they may well have found this to be additional evidence of motive.  *See House v. Bell*, 547 U.S. 518, 540 (2006) (noting that "[w]hen identity is in question, motive is key").  Petitioner would have had reason to think that Mr. Castelan was likely to have cash from drug sales (perhaps including money he paid Mr. Castelan for cocaine earlier that day).  The possible benefit from Petitioner's drug-hit theory seems outweighed by the harm that may have resulted from further emphasis at trial on Mr. Castelan's alleged drug dealing.  At a minimum, Petitioner has failed to show that new evidence suggesting the victim was selling cocaine would have likely changed the result in his case.

     f.    The Blood Evidence

Petitioner contends that blood spatter and blood pattern evidence from the crime scene is consistent with his statement to police and inconsistent with the accounts of Ms. Corona and Mr. Reyes.  For this, he relies principally on Barton Epstein, "a forensic scientist with particular expertise in blood spatter and pattern analysis."  (Docket No. 1, at 27 (Br. 24).)  Mr. Epstein

---

[88] Det. Suarez, who interviewed both Petitioner and Darin Douglas, likewise observed that Mr. Douglas was "smaller" than Mr. Armstrong.  (Docket No. 6-56, at 27 (Trial Day 2 Tr. 91-92).)  Mr. Reyes similarly described the black man pushing and hitting Mr. Castelan as "big."  (Docket No. 6-57, at 10 (Tr. 23).)

prepared a report dated February 10, 2009, which was filed with Petitioner's initial state habeas application.[89]  (Docket No. 1-3, at 1 (Schultz Ex. 1).)  To a lesser extent, Petitioner relies on the report prepared by Susan Jeanne Roe, M.D., a board-certified forensic pathologist.  (*See* Docket No. 1, at 28 (Br. 25); Docket No. 1-5, at 203 (Zebot Ex. 32 (affidavit of Dr. Roe)).)

> Petitioner describes Mr. Epstein's report and findings as follows:

> > Mr. Epstein analyzed the crime scene photographs, the physical evidence in the case, and the reports of the Donna Police, as well the reports of the Texas Department of Public Safety. (*Id.*) Based on that analysis, Mr. Epstein concluded that the blood stain patterns at the crime scene not only corroborate Mr. Armstrong's version of events, they are in fact more consistent with Mr. Armstrong's version of events than with the prosecution's theory of how this crime occurred.

(Docket No. 1, at 27 (Br. 23); citing Schultz Ex. 1.)  From this, one might conclude that Mr. Epstein compared Petitioner's version of events with the "prosecution's theory."  He did not; he offered no opinion about the "prosecution's theory."  (*See* Docket No. 1-3, at 4 (Schultz Ex. 1).)  He did opine that the blood stain patterns were not inconsistent with Petitioner's statement.  (*Id.*)  To put this new evidence in perspective, it must be considered in the context of the other evidence in the record.

> i.    The "Prosecution's Theory"

As noted earlier, *see supra* n.22, Petitioner frequently refers to the "prosecution's theory of how this crime occurred."  For example, Petitioner states: "At trial, the crucial evidence relied upon by the State was the eyewitness testimony that Mr. Armstrong threw Mr. Castelan to the ground in the alley, bent over him, and, then and there, slashed his throat."  (Docket No. 1, at 51 (Br. 48).)  According to Petitioner, the "prosecution's theory" is that Mr. Castelan was killed

---

[89] The report was also signed by Terry L. Laber, a forensic scientist.  Petitioner refers only to Mr. Epstein, so this discussion will likewise refer only to him.

during "an arms length knife battle."[90]  (*Id*. at 52 (Br. 49).)  Petitioner argues that the new forensic blood evidence "is not consistent with a person who attacked Castelan at arms' length with a knife."  (Docket No. 11, at 17.)

The record does not support Petitioner's characterization of the "prosecution's theory."  Neither the prosecutor's opening statement nor closing argument suggest that the State was advancing an arms-length-knife-fight theory.  More importantly, the critical issue here is whether, based on the evidence in the record, there is reason to believe Petitioner's new forensic blood evidence would have probably resulted in a different outcome in his case.  The key evidence in that regard is the eyewitness testimony and other evidence from the scene of the murder.

It is undisputed that Mr. Castelan was slashed multiple times before he finally died.  Dr. Salinas's autopsy report provides the gruesome details.  (Docket No. 6-73, at 34-40 (State's Ex. 213).)  He found three separate cuts across the right side of Mr. Castelan's neck, including two long, deep slashes (one "underneath the previous one") that sectioned his right jugular vein and "incised the right hyoid bone."  (*Id*. at 37.)  There were also two long cuts on the left side of Mr. Castelan's neck and his left cheek.  (*Id*.)  In addition, a cut was found on his lower right thigh (although that one did not penetrate the skin deeply).

But that is not all.  Mr. Castelan had multiple deep lacerations on his hands, apparently defensive wounds as he tried to protect himself.  (Docket No. 6-62, at 24-26 (Trial Day 6 Tr. 80-81, 86-88).)  One of those cuts went all the way to the bone.  In all, the murderer slashed Mr. Castelan about ten times.

---

[90] In moving for summary judgment, Petitioner again described "the State's theory of the case that Armstrong stood over Castelan, slit his throat, rifled his pockets, and took his Medicaid letter, before running back to the bar after being confronted by Corona and Reyes."  (Docket No. 11, at 18.)

Mr. Castelan was already cut and bleeding when Ms. Corona and Mr. Reyes first see him. As the two came on the scene in the minivan, Ms. Corona recognized Mr. Castelan and said to Mr. Reyes: "[L]ook, look, somebody is beating up Rafa."  (Docket No. 6-55 at 17 (Trial Day 1 Tr. 49).)  When she recognized Mr. Castelan, Petitioner was attacking him near the red fence.[91]  She saw Petitioner throw him against the fence.  (Docket No. 6-55 at 17, 19, 24, 27-28 (Trial Day 1 Tr. 50, 59-60, 79-80, 90, 93).)  Ms. Corona noticed that Mr. Castelan was already covered with a lot of blood; in fact, "[b]oth of them"—Mr. Castelan and Petitioner—were already covered in blood.  (Docket No. 6-55 at 27-28  (Trial Day 1 Tr. 90, 93-94).)  Because Petitioner was attacking Mr. Castelan and "hitting him," Ms. Corona told Mr. Reyes to try to hit Petitioner with the van; Mr. Reyes did so, but the large trash bin and trees were in the way.  (*Id.* at 18, 19 (Tr. 53, 60).)

Similarly, Mr. Reyes testified that as they got to the corner (where Silver Avenue intersects with the alley), he "saw that there was two people fighting."  (Docket No. 6-57, at 10 (Trial Day 3 Tr. 22).)  When he recognized Mr. Castelan, the two were fighting "[c]lose to the tree."  (*Id.* (Tr. 23).)  Petitioner then "pushed him toward the fence twice."  (*Id.*)  Mr. Castelan attempted to get away from Petitioner by running around the tree and "behind the big trash can," but Petitioner caught him and "pulled him back."  (*Id.* (Tr. 24).)  Like Ms. Corona, Mr. Reyes observed that Mr. Castelan was already "covered in blood" from "his ears down . . ., including his shirt."  (Docket No. 1-3, at 195 (Schultz Ex. 42; Reyes Aff.).)  He also "noticed the black male subject that was running after 'Rafa' to have blood on his shirt and pants."  (*Id.*)

---

[91] Ms. Corona also said she saw two men "jumping."  (Docket No. 6-55 at 17 (Trial Day 1 Tr. 49).)  She later explained what she meant: "Fighting, jumping.  It is the same thing for me. And you could see the hands, and he was pushing him around."  (*Id.* at 27 (Tr. 91).)  The "fighting" she described was decidedly one-sided: Petitioner was hitting and pushing Mr. Castelan, while he was just trying to get away.

Mr. Reyes was honking the horn, and this seemed to distract Petitioner, who just "stood there for a while." (Docket No. 6-57, at 11 (Trial Day 3 Tr. 24).) This allowed Mr. Castelan to approach the van and attempt to open the rear passenger door, behind where Ms. Corona was sitting. (*Id*.) As described by both Mr. Reyes and Ms. Corona, however, Mr. Castelan was able to only touch the door before Petitioner grabbed him from behind, jerked him back, and violently threw him to the ground. (*Id*.; *see also* Docket No. 6-55, at 17 (Trial Day 1 Tr. 50-51).) Both witnesses commented that Petitioner threw Mr. Castelan down so forcefully that they heard his head strike the ground. (*Id*.)

All of this occurred *before* what Petitioner describes as the "prosecution's theory" (i.e., an arms-length knife fight). After seeing Petitioner throw Mr. Castelan to the ground, Ms. Corona testified that Petitioner—who was standing close to the van—looked straight at her with wide eyes, as if he were high on drugs. (Docket No. 6-55, at 17 (Trial Day 1 Tr. 51).) Petitioner then "bent down and went like this (indicating)." (*Id*.) Clarifying what she meant, Ms. Corona said Petitioner bent down, went through Mr. Castelan's pockets, and "cut him." (*Id*. (Tr. 52).) This part of Ms. Corona's testimony is what Petitioner calls the "prosecution's theory."

For his part, Mr. Reyes testified that after Petitioner threw Mr. Castelan to the ground near the van, he saw Petitioner bend down over Mr. Castelan twice. (Docket No. 6-57, at 10-11 (Tr. 24-25).) But from where Mr. Reyes was sitting (on the driver's side), he "wasn't able to see when he cut him or anything like that." (*Id*.)

After Petitioner ran north up the alley, Ms. Corona and Mr. Reyes waited "a while" to be sure that he was gone. (*Id*. at 11 (Tr. 25).) When they got out of the van, they saw that Mr. Castelan's neck was cut wide open, and he was bleeding profusely but still alive; they then called 911. (*Id*.; *see also* Docket No. 6-55, at 19 (Trial Day 1 Tr. 60).) When police arrived at the crime

scene, they observed Mr. Castelan "laying in a pool of blood."  (Docket No. 6-56, at 14 (Trial Day 2 Tr. 40).)

Petitioner's new forensic evidence must be considered in the context of the eyewitnesses' complete testimony, not a caricature of the "prosecution's theory."

ii.      <em>The Epstein Report</em>

In considering the new blood spatter and blood pattern evidence developed by habeas counsel, it will be assumed that Mr. Epstein is qualified as an expert in those areas.  Indeed, his curriculum vitae reflects that he has impressive training and experience in blood spatter and blood pattern analysis.  (<em>See</em> Docket No. 1-3, at 5-17.)

Mr. Epstein lists the evidence that he considered, which included crime scene photographs and the crime scene video (played for the jury at trial).  He begins his observations and findings with an important caveat: "It should be noted that blood spatter interpretations from photographs are often limited compared to working with the actual crime scene."  (<em>Id</em>. at 2.)  His observations include the following:

> Examination of the crime scene photographs and video revealed Rafael Castelan lying on his back on the ground with his hands on top of his chest. He has apparent gaping wounds to his neck. There are heavy deposits of blood on his face, neck and down the front of his chest. His shirt is blood soaked in the chest and arm areas and his cut-off pants are also heavily blood stained. An EKG patch is observed on his lower abdomen. A large pool of blood is observed under his head and body. An area containing dripping blood stains is observed on the pavement and dirt near the feet where Castelan is found.

> A number of items are observed on the grass and dirt area west of where Castelan is found. These include a plastic bag with a water bottle, eyeglasses, a cell phone, a lottery ticket, a pack of cigarettes, two torn pieces from Castelan's pockets, and assorted receipts, cards and pictures. Blood drops are observed in the dirt near the eyeglasses and assorted cards. Blood smears and heavy soaking blood deposits are observed in the grass and dirt around the area of the blood smeared plastic bag.

> Photographs of the sidewalk located west of the items found on the dirt/grass reveal blood drops and many small blood stains on the sidewalk surface.

These blood stains are consistent with blood coming from an active bleeding source.

(*Id*. at 2-3.)

Regarding the crime scene, Mr. Epstein drew the following conclusions:

3)      Rafael Castelan was actively bleeding when he produced the dripping blood stains on the sidewalk west of the found items, on the dirt and grass by the eyeglasses and on the pavement and dirt where he was found.

4)      The large blood deposits located by the items on the dirt and grass are consistent with Rafael Castelan being in this area for some period of time and possibly on the ground while bleeding heavily from his wounds.

. . .

7)      The blood stain patterns observed at the crime scene are consistent with the initial attack occurring near the sidewalk by the cluster of items.

8)      Nothing observed in the blood stain patterns at the scene or on the examined clothing is inconsistent with the statement given by Armstrong to police on the morning of April 22, 2006 that he found Rafael Castelan on the ground bleeding, helped him up and walked him to the area where he was found.

(*Id*. at 4.)

### iii.    *Petitioner's Gray Shirt*

Mr. Epstein examined Petitioner's gray T-shirt—the one he wore at the crime scene and later discarded behind a trash bin in the alley.[92]  Mr. Epstein noted: "Heavy contact blood staining is located in the lower stomach and chest areas. A few small (1-3mm) circular blood stains are observed on the lower right side and lower left sleeve areas of the shirt."  (*Id*. at 3.)  Mr. Epstein concludes:

The blood staining observed on the grey T-Shirt (# 112) is consistent with direct contact with the bloody body or clothing of Castelan. The exact mechanism that produced the small blood stains on the T-Shirt cannot be determined.

---

[92] When Petitioner arrived at the bar, he was wearing a white shirt.  Petitioner told his trial investigator (Mr. Tamez) that after throwing his gray shirt away in the alley, he then stole the white shirt from a clothesline in someone's yard.  (Docket No. 7-24, at 15.)

(*Id*. at 4.)  From this, Petitioner argues: "The blood spatter and blood pattern evidence from Mr. Armstrong's clothing is inconsistent with the testimony of Ms. Corona and Mr. Reyes and is consistent with Mr. Armstrong's statement."  (Docket No. 1, at 42 (Br. 39).)

Before addressing the consistency argument as it relates to the State's eyewitness testimony, it should be noted that Mr. Epstein had no explanation for a few small blood stains in two areas on Petitioner's gray shirt.  Arguably then, those stains are not consistent with Petitioner's story, in which he simply "walked" with Mr. Castelan for "about thirty feet."  (Docket No. 1, at 9 (Br. 6).)

More to Petitioner's point, it is true that his version of events is consistent with Mr. Epstein's finding that the other blood stains on his gray shirt resulted from "direct contact."  In this way, the new evidence would have been helpful to Petitioner's defense.

But Mr. Epstein's finding is not necessarily inconsistent with the testimony of Ms. Corona and Mr. Reyes.  Both stated that Petitioner's shirt was blood-soaked when they first saw him attacking and chasing Mr. Castelan.  In other words, the contact blood stains on Petitioner's shirt were already there and could have resulted from earlier direct contact with Mr. Castelan that they did not see.  Consistent with this possibility, Mr. Epstein opines that the attack on Mr. Castelan started at the sidewalk (as shown by blood spatter there) and that he lay bleeding a few feet away from the sidewalk (near the bloody HEB bag) for some time.  When Ms. Corona and Mr. Reyes arrive on the scene, Mr. Castelan and Petitioner are near a tree and moving toward the red fence.

We also know that Mr. Castelan was slashed multiple times.  Even though he had been cut and was bleeding profusely near the sidewalk, this does not rule out the possibility, as Ms. Corona testified, that Petitioner cut Mr. Castelan again near the van.  As Mr. Epstein noted, another "large pool of blood" was found under Mr. Castelan's body, which was in the alley where Petitioner left

87

him. Det. Balli testified that the multiple wounds Mr. Castelan sustained and the blood at the crime scene were consistent with Mr. Castelan having been cut near the sidewalk and again near the van (as recounted by Ms. Corona and Mr. Reyes). (*See* Docket No. 6-62, at 31, 35-36 (Trial Day 6 Tr. 105-06, 123-25).)

### iv.    *Kneeling in Blood and Dirt*

Mr. Epstein noted that the right knee area of Petitioner's jeans (which he had torn off in the police car and tried to hide) "has heavy contact blood staining consistent with kneeling in blood." (Docket No. 1-3, at 3 (Schultz Ex. 1).) Likewise, the "left knee area is heavily stained with a mixture of blood and dirt." (*Id.* at 3-4.) From this, he concluded: "The heavy blood and dirt staining on the blue jeans is consistent with Armstrong kneeling in blood and dirt." (*Id.* at 4.) Apparently, Mr. Epstein was including the jeans when he said that nothing in the blood stain patterns on the "examined clothing is inconsistent with" Petitioner's statement. (*Id.*) While the blood and dirt on the knees of Petitioner's jeans may not be inconsistent with his story, neither is it inconsistent with the jury's implicit finding that he attacked, robbed, and killed Mr. Castelan.

FSA's March 30, 2010, report confirms Mr. Epstein's observation of "heavy" blood and dirt stains on the knees of Petitioner's jeans, observing: "The left front leg is heavily stained with soil." (Docket No. 1-5, at 282-83 (Zebot Ex. 34, at 45-46).)[93] The stain on the knee area of the left pant leg is shown in Appendix 7.[94]

---

[93] As to the right pant leg, FSA noted that the "front section of the right front leg has previously been cutaway and is now missing." (Docket No. 1-5, at 282-83 (Zebot Ex. 34, at 45-46).) This is the section that Petitioner ripped off and tried to hide in the police vehicle while being transported to the police station. Apparently, FSA did not have access to the missing piece, although Mr. Epstein did have the opportunity to examine it. (Docket No. 1-3, at 1-3 (Schultz Ex. 1) (referring to "[o]ne plastic bag containing blue jeans from Armstrong (#163)").)

[94] Appendix 7 is a close-up of the photograph in figure 59 of the FSA report. (Docket No. 1-5, at 283 (Zebot Ex. 34 at 46).) The photo in Appendix 7 is taken from the better-quality copy of the FSA report submitted by Petitioner to supplement the record. (*See* Docket Nos. 13, 14, 17.)

In his statement to police, Petitioner variously stated that he "helped the guy up," "tried to help that man get up," "picked the man up," and "tried to help that man off that ground." (Docket No 1-3, at 124, 132-33 135, 148, 151-52 (Armstrong Tr. 11, 19-20, 22, 35, 38-39).) Petitioner said nothing about getting down on his knees to move Mr. Castelan around or lift him. Whether he had given Mr. Castelan a helping hand up or physically lifted him off the ground, it does not seem likely that Petitioner would have gone down to his knees at all, much less being on his knees long enough to result in the "heavy" blood and dirt stains on the knees of his jeans.[95]

Whether or not the heavy stains on the knees of Petitioner's jeans are *inconsistent* with his statement, they are arguably *consistent* with the conclusion that he murdered and robbed Mr. Castelan. As already described, the crime scene evidence shows that Mr. Castelan's belongings were strewn about the ground near a large pool of blood, where Mr. Epstein believes Mr. Castelan "was possibly on the ground" for some time. The ripped off pockets and personal items on the ground in this area seem consistent with the attacker going down on his knees near Mr. Castelan and rummaging through his belongings.

### v.   The Blood Trail

Mr. Epstein stated that the "blood stain patterns at the scene" were also not inconsistent with Petitioner's statement. (Docket No. 1-3, at 4.) He did not explain what he meant by this. Contrary to his assertion, some of the blood evidence at the scene does appear inconsistent with Petitioner's version of events.

---

The annotations shown in Appendix 7 are from the original FSA report. No annotations were added. The front section of the right pant leg is not shown in this photo. *See supra* n.93.

[95] Petitioner emphasized during his statement that he "tried to help that man off that ground" and "was walking with the man." (Docket No. 1-3, at 152-53 (Armstrong Tr. 39-40).) Petitioner objected when Det. Suarez suggested he had said he put Mr. Castelan "over [his] shoulder and started walking"; Petitioner responded: "Not over my shoulder." (*Id*. at 153 (Tr. 40).)

Petitioner claims that he found Mr. Castelan "lying near the sidewalk." (Docket No. 1, at 9 (Br. 6).) He was trying to help Mr. Castelan by "walking with him" to the police station, which was four blocks away. (*Id.*; Docket No. 1-3, at 120 (Armstrong Tr. 7).) The most direct route to the police station was to walk east along Silver Avenue for two and a half blocks and then turn left (north) on Tenth Street. (*See* Appendix 1.) The police station was on Tenth, about a block and a half up (north) from Silver.

Petitioner says he walked with Mr. Castelan about 30 feet to the intersection of Silver and the alley, where he let go of Mr. Castelan and ran. (*See* Docket No. 1, at 9 (Br. 6).) To get from near the sidewalk where they started to the spot in the alley where Mr. Castelan was found, Petitioner and Mr. Castelan should have simply walked in a straight line diagonally southeast across the grass and dirt area toward the intersection of the alley and Silver; alternatively, they could have walked on the sidewalk a few feet to Silver and then east along Silver to the alley intersection. The blood evidence suggests they did neither of these, but instead took a zig-zag route ending in the alley where Mr. Castelan died.

As Mr. Epstein notes, "heavy soaking blood deposits" were found near the bloody HEB bag, just east of the sidewalk, as shown in Appendix 6.[96] (Docket No. 1-3, at 3.) Mr. Epstein believes Mr. Castelan may have been "on the ground" here "for some period of time" while "bleeding heavily." (*Id.*) This is presumably where Petitioner claims to have found Mr. Castelan. In addition, "[b]lood drops are observed in the dirt near the eyeglasses." (*Id.* at 3.) This spot appears to be several feet to the east or northeast of the HEB bag, near the first of the two larger trees. (*See* Appendix 6.) Mr. Epstein opines that "Rafael Castelan was actively bleeding when he produced the dripping blood stains . . . on the dirt and grass by the eyeglasses." (Docket No. 1-3,

---

[96] Appendix 6 is described *supra* n.64.

at 4 (Schultz Ex. 1).)  This suggests that Mr. Castelan had moved away from the HEB bag (where there are "large blood deposits") and towards the tree.

From there, moving ten feet or so to the northeast, investigating officers found blood on the red fence, suggesting Mr. Castelan was also at the fence.  (*See* Docket No. 6-56, at 14, 17 (Trial Day 2 Tr. 40, 50 (Det. Suarez)); Docket No. 6-62, at 16 (Trial Day 6 Tr. 45-46 (Det. Balli)); *see also* Docket No. 1-3, at 184 (Schultz Ex. 36, Det. Balli report).)  If so, Petitioner was leading Mr. Castelan away from the road and toward the fence and the alley.[97]

To get from the fence to the spot where Mr. Castelan's body was found, Petitioner and Mr. Castelan would have turned and headed southeast toward the intersection of the alley with Silver. Along the way, Mr. Castelan took another detour toward Mr. Reyes's and Ms. Corona's gray minivan, as shown by the drops of his blood found on the rear passenger door.  (*See* Docket No. 6-56, at 15 (Trial Day 2 Tr. 43-44 (Det. Suarez saw "blood drops" on the "passenger side of the van")); Docket No. 6-58, at 34 (Trial Day 4 Tr. 106 (crime scene video showing blood on van)).) This resulting zig-zag route is illustrated in Appendix 8 (as a red dashed line), which also shows a more sensible direct route (shown as a blue dashed line) diagonally from the sidewalk to the intersection of the alley and Silver, where Petitioner left Mr. Castelan and fled.[98]

---

[97] During the prosecutor's closing argument, he suggested to the jury why Petitioner was taking Mr. Castelan away from the apartments and away from the road: "He is taking him to the alley, to the dark, to the shadows, where he can go through his pockets, where he can get everything."  (Docket No. 6-63, at 9 (Trial Day 7 Tr. 22).)

[98] Appendix 8 is two pages.  The first page is a crime scene photo that was admitted at trial as State's exhibit 18.  (Docket No. 6-68, at 26 (State's Ex. 18).)  This version of exhibit 18 is a better-quality image of the photo, which was filed as a supplement in the record (explained *supra* n.44).  (*See* Docket Nos. 13, 14, 17, 20, 21, 23, 24.)  The colored annotations were added as a demonstrative aid for purposes of this report.  The second page of Appendix 8 is a revised version of the annotated crime scene diagram from Appendix 6.  *See supra* n.64.  Additional annotations have been added to illustrate the same red and blue routes as shown on the first page.

Apart from the peculiar route apparently taken by Petitioner in "helping" Mr. Castelan walk to the police station, the blood on the fence by itself is inconsistent with Petitioner's story. Given his version of events, it should not be there.[99] Moreover, the discovery of Mr. Castelan's blood on the rear passenger door of Mr. Reyes's van is also inconsistent with Petitioner's account of what happened. According to Petitioner, he walked Mr. Castelan to the alley, saw the van, let go of him, and ran. Mr. Castelan died where Petitioner left him. Here again, in Petitioner's version of events, there should be no blood on the van. But it was there.[100]

> vi.    Dr. Roe's Report

Dr. Roe reviewed Mr. Epstein's report, the autopsy report by Dr. Salinas, and several photographs of the crime scene. (Docket No. 1-5, at 204 (Zebot Ex. 32).) Petitioner describes her conclusions as follows:

> [F]orensic pathologist Dr. Susan Roe determined that this pool of blood near the sidewalk could have only come from one wound that Mr. Castelan sustained during the attack (the severed jugular vein in his neck), that he had lain near the sidewalk for at least several minutes, and that it is unlikely Mr. Castelan could have walked the thirty feet from the sidewalk to the alley where he died, without assistance. (Schultz Aff. Ex. 1; Zebot Decl. Ex. 32 at ¶¶ 7-8.)

(Docket No. 1, at 28 (Br. 25).)

Dr. Roe's opinion that Mr. Castelan probably could not have walked without help from the sidewalk to the alley would have likely helped Petitioner at trial. It suggests that Mr. Castelan's

---

[99] In addition to the blood on the fence, Det. Suarez testified that there was blood "by the fence." (Docket No. 6-56, at 31 (Trial Day 2 Tr. 105).)

[100] The points discussed above are based on evidence in the record that the state habeas court could have considered in determining that Petitioner's new evidence failed to show prejudice. *See Richter*, 562 U.S. at 102 (a federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision"). As noted, *see supra* n.56, had Petitioner offered Mr. Epstein's testimony at trial, the State would have received his report before trial and could have obtained its own blood spatter expert in response.

attempt to get away from Petitioner, as reported by Ms. Corona and Mr. Reyes, likely did not happen.

But there are also several ways the State may have attempted to blunt the impact of this point.  First, Dr. Roe's opinion about Mr. Castelan's ability to function after having his throat cut is presumably based on an estimate of the volume of blood he had lost.  Dr. Roe appears to be a highly experienced and exceptionally well-qualified pathologist.  She is more than qualified to opine about a person's ability to function after losing a given amount of blood.  But she does not seem to have expertise in estimating the volume of a liquid (here blood) from a picture.  Mr. Epstein, the blood spatter expert, does not suggest how many pints (or liters) of blood are on the ground near the sidewalk, and he warns "that blood spatter interpretations from photographs are often limited compared to working with the actual crime scene."  (Docket No. 1-3, at 2.)

Second, Dr. Roe states it is "unlikely" that Mr. Castelan could have walked without assistance.  This suggests it is possible, under some set of conditions, Mr. Castelan could have been able to walk and try to evade Petitioner despite his severe wounds.  In fact, the number of cuts Mr. Castelan sustained and the blood trail at the crime scene suggest that the murderer found him very difficult to kill.[101]  As discussed in the preceding section, *see supra* Part III.B.2.f.v, the blood trail is arguably inconsistent with the notion that Mr. Castelan was simply assisted in walking from near the sidewalk to the spot in the alley where he died.

---

[101] Mr. Epstein found that Mr. Castelan was "actively bleeding" at multiple locations: "on the sidewalk west of the found items" (as shown by "dripping blood stains"); "in the grass and dirt around the area of the blood smeared [HEB] plastic bag" (where "heavy soaking blood deposits are observed"); "on the dirt and grass by the eyeglasses" (where "[b]lood drops are observed"); "on the pavement and dirt near the feet where Castelan is found" (which shows "[a]n area containing dripping blood stains"); and "under [Mr. Castelan's] head and body" (where a "large pool of blood is observed").  (Docket No. 1-3, at 4 (Schultz Ex. 1 at 2-4).)  In addition, Mr. Castelan also made his way to the red fence and Mr. Reyes's van, as shown by blood on the fence and on the van.  *See supra* Part III.B.2.f.v.

Third, if Ms. Corona and Mr. Reyes did not both misperceive, misremember, or misrepresent what they saw, then Mr. Castelan himself showed that Dr. Roe's prediction was inaccurate. Ultimately, the case turns—as it did at trial—on whether the jury believed Petitioner's statement about what happened or the testimony of the State's eyewitnesses, Ms. Corona and Mr. Reyes.

g.     <u>Mr. Armstrong's Post-Arrest Statement</u>

Petitioner's habeas counsel has made valiant efforts to develop new evidence that is consistent with Petitioner's post-arrest statement. In considering that new evidence, we must also bear in mind evidence in the record that casts doubt on his story. The prosecutor emphasized such points during closing argument. Circumstances that call into question the truthfulness of Petitioner's explanation include the following:

- Petitioner repeatedly told the detectives that he had left the bar "heading home" when he unexpectedly encountered Mr. Castelan. But to go home, he should have turned left (west) coming out of the bar; instead, although he was already late, he turned right, adding an extra block to his walk home.[102] (*See* Appendix 1.) Petitioner's longer route took him down Eighth Street past the HEB and, more significantly, past Mr. Castelan's apartment.

- Petitioner's alleged plan to "help" Mr. Castelan makes little sense. He claims he was going to walk with Mr. Castelan to the police station, which was four blocks away. (*See* Appendix 1.) If his story were true, he would have seen Mr. Castelan's neck cut wide open from one side to the other (as shown in the crime scene photos). Mr. Castelan would have been already covered in blood with a large pool of blood near him on the ground. If there was any hope that Mr. Castelan could be aided by prompt medical treatment, it would have evaporated during a long, slow walk to the police station. And once at the police station, the police still would have had to call an ambulance, just as Petitioner should have tried to do from the outset—if he had wanted to "help."

- Petitioner made no effort to check to see if there was anyone in the nearby apartments who could have called for an ambulance.

---

[102] Petitioner told police that he "tr[ies] to be home by eight-something or nine." (Docket No. 1-3, at 119 (Armstrong Tr. 6).) According to Ms. Losoya's post-conviction affidavit, she spoke with Petitioner on the phone that afternoon, and he said he would be home by 5:00 p.m. (Docket No. 7-37, at 164.)

- In helping up an injured, bleeding man, taking him under the arm, and walking with him to seek medical treatment, Petitioner's actions to rescue a virtual stranger would have been compassionate and heroic—a modern-day Good Samaritan.[103]

- Even according to Petitioner's account, however, that virtuous impulse completely vanished after walking 30 feet.  Seeing the van, Petitioner drops Mr. Castelan and takes off running.  He makes no effort to ensure that the people in the van would aid Mr. Castelan.  As Petitioner runs up Seventh Street, he passes several people but does not ask anyone to call 911 or tell them there is an injured man needing help.  Instead, all he says is "Hey, hey, what's up, Bro?"  (Docket No. 6-57, at 19-20 (Trial Day 3 Tr. 60-61).)

- Petitioner gives his reasons for dropping Mr. Castelan and running—he was drunk, he is an ex-con, and/or he had been snorting cocaine.  But the jury may well have been skeptical of the near-instantaneous transformation from the Good Samaritan to an ex-con, so fearful he would be blamed that he fled without giving a second thought to the person he was supposedly trying to save.

- Fleeing from the crime scene, Petitioner tried to conceal his involvement.  He started north up the alley but then veered through a lot to Seventh Street, where three testifying witnesses saw him running "fast" up Seventh.  He then turns right (east) on Fordyce Avenue and goes half a block to the intersection with the alley, turning left (north) up the same alley he had initially entered a block south.  (*See* Appendix 10.)

- While running up the alley toward the bar, Petitioner removes his bloody gray shirt and throws it behind a trash bin.  He arrives back at the bar wearing a white shirt, which he apparently stole from a clothesline somewhere along the way.[104]

- When Petitioner enters the bar, he is sweating profusely and shaking.  He buys a beer, and Mr. Douglas sees him counting money under the bar—although Petitioner had left the bar earlier after saying he had no more money.

---

[103] As recounted in the New Testament, Jesus told the parable of the Good Samaritan to show what it means to "love . . . thy neighbor as thyself."  *See* Luke 10:25-37 (King James ver.).  The story describes a traveler attacked by thieves, who "wounded him" and left "him half dead."  *Id*. at 10:30.  After a priest and a Levite pass the injured man without offering aid, a Samaritan came upon him.  Although at the time Samaritans and Jews were said to despise each other, the Samaritan had "compassion" for the man, "bound up his wounds, . . . set him on his own beast, and brought him to an inn, and took care of him."  *Id*. at 10:34.  The next morning before leaving the inn, the Samaritan left money with the innkeeper with instructions to take care of the injured man, assuring the innkeeper that "whatsoever thou spendest more, when I come again, I will repay thee."  *Id*. at 10:35.  After telling this story, Jesus asked his listeners: "Which now of these three, thinkest thou, was neighbor unto him that fell among the thieves?"  *Id*. at 10:36.

[104] *See supra* n.92.

- Petitioner then goes into the restroom and begins washing blood off his hands with his beer, even though there is a sink right outside. He convinces a Hispanic man to give him a shirt, and Petitioner takes off the white shirt, throws it under the urinal, and puts on the other man's dark shirt. The man has "some cocaine" and Petitioner begins talking to him about it. (Docket No. 1-3, at 157 (Armstrong Tr. 44).)

- After police find Petitioner in the bathroom and take him into custody, Det. Balli asks him about the red stains on his jeans. Petitioner tells the detective "he works as a maintenance man and the red stains were paint." (Docket No. 1-3, at 183.)

- On the drive to the police station, Petitioner rips a large section off the right front thigh area of his bloody jeans (*see* Appendix 7) and stuffs it in the opening for the seat belt.

- About three and a half hours after the murder, at 1:11 a.m., Petitioner waived his Miranda rights and gave his statement to two police detectives. By this time, he is no longer claiming the red stains on his pants are from paint.

- Petitioner emphasized his lack of connection to Mr. Castelan. He begins by explaining that he had been at the bar since 3:00 p.m. and while there he "sent *somebody* to go get me some cigarettes." (Docket No. 1-3, at 118 (Armstrong Tr. 5); emphasis added.) While "walking home," he saw "a guy over there." (*Id*. at 119 (Tr. 6).) Petitioner then clarifies: "I remember seeing the guy in the bar one time before. He was there earlier today and he was up there about two weeks ago." (*Id*. at 120 (Tr. 7).) When later asked if he knew the victim, Petitioner said: "I don't know the guy. I just seen him." (*Id*. at 137 (Tr. 24).) When specifically asked if he spoke to the victim at the bar, Petitioner said that he spoke to "the guy" because the girl he was with owed the victim ten dollars, and the girl asked Petitioner to pay "the guy" the ten dollars, which he did. (*Id*. at 138 (Tr. 25).)

- Other evidence at trial paints a different picture of Petitioner's interaction with Mr. Castelan. As noted, the bartender, Ms. Alanis Olvera, stated that when Mr. Castelan arrived, he spoke with Petitioner for about ten minutes near a pool table and then the two went into the small, one-stall restroom where they stayed for about 20 minutes. One of the barmaids testified that Mr. Castelan told her he was going to the HEB to buy cigarettes for Petitioner. Ms. Alanis Olvera also said that both Petitioner and Mr. Castelan frequented the bar and that they had previously spoken together.

- When Det. Suarez stated that witnesses saw him stabbing the victim, Petitioner responded: "I don't have no knife. I'm talking the only knife I got is at the house." (Docket No. 1-3, at 206 (Armstrong Tr. 8).) When Det. Suarez later repeated the allegation that he cut the victim's throat, Petitioner stated: "I did not cut that man. The knife that I have is at home. You'll see. It's a Old-Timer knife that I've got, it's at home." (*Id*. at 144 (Tr. 31).) Petitioner explained that the knife was brown, it had a broken tip, and it was in a kitchen drawer. (*Id*. at 144-45 (Tr. 31-32).) Petitioner did

not mention the blue box cutter knife that, according to Ms. Losoya, he possessed and often carried.

- Petitioner was evasive when asked about the gray T-shirt that he had taken off on the way back to the bar and thrown behind a dumpster in the alley.  When asked if he did anything on the way to the bar, Petitioner flatly said no.  (*Id.* at 127 (Tr. 14).)  When specifically asked whether he took off his shirt on the way to the bar, Petitioner referred only to the white shirt he had removed in the bar's bathroom: "The guy in the bathroom, I swapped my shirt with him.  The guy in the bathroom."  (*Id.*)  When told the police found a T-shirt in the alley, Petitioner again referred to the white shirt he removed in the bathroom: "I'm telling you the shirt that I'm talking about I swapped the shirt, you know, with the guy in the bathroom."  (*Id.*)  When pressed further about the shirt found in the alley, Petitioner said that the shirt he had had on was gray.  (*Id.*)  Still, he did not acknowledge throwing it behind a trash bin in the alley.  DNA testing later confirmed that Petitioner had worn the blood-soaked gray shirt found in the alley.  Petitioner now relies on Mr. Epstein's report to show that the blood stains on the gray shirt resulted from contact, rather than spatter.

- When Det. Suarez suggested Petitioner tried to take the victim's money, he replied: "Why would I take the man's money?  I got money.  I got paid today. . . . I never will take some money when I got my own money."  (Docket No. 1-3, at 159 (Tr. 46).)

- At the time if his arrest, Petitioner had $41 in cash, and two of the bills had Mr. Castelan's blood on them.  Before Mr. Castelan's murder, Petitioner had spent either all—or almost all—of his two-week paycheck in one afternoon and evening at the bar.

- Before Petitioner left the bar, he stated he was out of money and gestured to his wallet to emphasize the point.  Other evidence suggests that his statement was literally true.  He had been paid earlier that day and cashed his $308 paycheck before going to the bar.[105]  He also stopped and paid (in cash) his energy bill and utility bill, which were about $77 and $21, respectively.[106]  This left him with $210.  Before arriving at the bar, he also bought some lottery tickets.[107]  At the bar, according to Ms. Alanis Olvera's testimony, Petitioner spent over $200 on beer for himself and the girls.  He also gave

---

[105] Petitioner's earnings statement was found in his pants pocket, showing a "pay date" April 21, 2006 (the same day as the murder).  (Docket No. 6-71, at 35 (State's Ex. 121).)  For the two-week pay period ("4/02/2006 to 4/15/2006"), he was paid $308.06.  (*Id.*)

[106] The receipts for Petitioner's cash payments of these bills were found in the pocket of his gray T-shirt (which he had discarded in the alley).  (*See* Docket No. 6-71, at 27 (State's Ex. 113); Docket No. 6-62, at 43 (Trial Day 6 Tr. 154-55).)  They show Petitioner made cash payments of $76.95 for his energy bill and $20.64 for his utility bill.

[107] Blood-covered lottery tickets were found in Petitioner's pocket.  When asked about those, Petitioner said he "had bought [] some lottery tickets" and mentioned a store name ("Coastal").  (Docket No. 1-3, at 133-34 (Armstrong Tr. 20-21).)  It is unclear how much he spent on the lotto tickets.

$10 to Mr. Castelan (either as payment for a debt owed by one of the girls or to buy cigarettes).  In addition, Petitioner bought cocaine at the bar.[108]  Adding it all up, the jury could have concluded that Petitioner left the bar with no money and came back with about $45.[109]

- During the attack on Mr. Castelan, his back pockets were completely ripped off his shorts.  As the prosecutor observed during closing argument: "It had to take some strength.  And who do we know is strong enough to do that?  The defendant."  (Docket No. 6-63, at 9 (Trial Day 7 Tr. 23).)  The prosecutor then asked: "How do we know that?  Because he tore off his blue jeans in the unit, ripped off the whole pocket, all the way down the leg.  Just ripped it off."  (*Id.*)

- Mr. Castelan's empty wallet was found near the red fence, and there was blood on the fence.  As noted, if Petitioner was "helping" Mr. Castelan walk to the police station, they should not have been near the fence.  Similarly, the drops of blood on the eyewitnesses' van does not fit Petitioner's story.

- The prosecutor acknowledged that the evidence did not conclusively show that the $41 in Petitioner's pocket came from Mr. Castelan.  But even if the $41 was not from Mr. Castelan, Petitioner had essentially spent his entire paycheck on beer and cocaine, even though his girlfriend was pregnant.  Petitioner had almost no money left to help with living expenses or to save in preparation for the birth of his child.[110]

- Near the beginning of his post-arrest interview, Petitioner insisted he was telling the truth about trying to help Mr. Castelan, saying: "That's God help me true, I'm telling you I got no reason to lie. I got a girlfriend, I got a baby on the way."  (Docket No.1-3, at 121 (Armstrong Tr. 8).)  Petitioner appears to have been oblivious to the inconsistency between that statement and his conduct at the bar.  Apart from that, police found a note in his wallet from his girlfriend, Ms. Losoya, which read:

     Tyrone,

---

[108] It is unclear how much Petitioner spent on cocaine at the bar.  Det. Vecchio asked how much he paid for it, and Petitioner said, "A dime."  (*Id.* at 150 (Tr. 37).)  When asked if it was only a "dime," Petitioner said (as transcribed): "Yeah, hundred dollars (ph)."  (*Id.*)

[109] In addition to the $41 found in his pocket (or wallet) after his arrest, Petitioner had bought a beer after returning to the bar, paying "[w]ith a $5 bill."  (Docket No. 6-57, at 28 (Trial Day 3 Tr. 94).)  He also gave Mr. Douglas a dollar so he could get quarters.  (*Id.*)  Det. Suarez later found a bloody $1 bill in the bar's cash register.  (Docket No. 6-56, at 18 (Trial Day 2 Tr. 55-56).)

[110] As the prosecutor noted during closing argument at the penalty phase, Petitioner also has several other children who live in Alabama and Georgia.  (Docket No. 6-66, at 23 (Trial Day 10 Tr. 73-74).)

> Thanks 4 everything. [Y]ou stole, lied, and cheated on me . . .
> There[']s nothing between us so have @ nice life.  [E]njoy doing
> crack and please don't look for me.
>
> [E]njoy the apartment it all yours
>
> Love
> Cindy

(Docket No. 6-72 at 28 (State's Ex. 162.)[111]

From these various circumstances, the jury could easily conclude that Petitioner was willing and able to conceal evidence and misrepresent facts to avoid being held accountable for Mr. Castelan's murder.  Even after he was caught literally red-handed—washing blood off his hands with beer—Petitioner told an officer that the stains on his jeans were from paint at work. On the way to the police station, he ripped his pants and tried to conceal evidence in the police car. After supposedly coming clean during his statement, he was evasive in answering questions about the gray shirt he discarded in the alley, and he played down his interaction with Mr. Castelan at the bar.  In addition, Petitioner volunteered information about his old knife with a broken tip— saying it was in a drawer at his apartment.  But he failed to mention he often carried a blue box cutter.

Finally, because Petitioner did not testify at trial, the jury did not hear the details of his troubling criminal history during the guilt/innocence phase, *see supra* n.8, nor was he subjected to cross-examination about his statement.  This scenario may well have played out differently had

---

[111] The note from Ms. Losoya was identified during the guilt/innocence phase of trial and later admitted during the punishment phase.  (Docket No. 6-62, at 10 (Trial Day 9 Tr. 20-21).)  By the time of her trial testimony, Ms. Losoya stated that she loved Petitioner "[v]ery much."  (*Id*. at 8 (Tr. 14).)  In her later affidavit, Ms. Losoya said that she wished his trial counsel had given her the chance to explain more about their relationship and why she left the note.  (Docket No. 7-37, at 166.)  However, this would not have changed the fact that Petitioner—on the night of the murder—had a note from her saying their relationship was over due to his bad behavior.

Petitioner presented an affirmative defense (including forensic evidence) in support of his version of events.[112]  Had Petitioner needed to testify at trial to tell his story, the jury may have found him even less credible.

h.    The Testimony of the Eyewitnesses: Ms. Corona and Mr. Reyes

At trial, the jury was well aware of credibility issues regarding the State's eyewitnesses and inconsistencies in their statements.  This is particularly true as to Ms. Corona.  During cross-examination, Petitioner's trial counsel emphasized her prior drug abuse and criminal history.  Ms. Corona acknowledged that some years before, child protective services had taken custody of her three children due to her use of crack cocaine.  She added that she had since started "another life," no longer used drugs, and had regained custody of two of her children.  (Docket No. 6-55, at 30 (Trial Day 1 Tr. 103-04).)  She had also served a six-month sentence for forgery and unauthorized use of a motor vehicle, and she had a conviction for burglary of a habitation.[113]

In addition, Ms. Corona admitted that she was "not a very good person to say everything exactly."  (Docket No. 6-55, at 29 (Trial Day 1 Tr. 97).)  The evidence at trial showed that her memory of what happened was not perfect.  For example, the first police officers to arrive at the

---

[112]  To prove its case, the State did not need to offer Petitioner's statement in evidence. Overwhelming physical evidence placed Petitioner at the crime scene, including the fact that Mr. Castelan's blood was found all over his clothes.  The two eyewitnesses, Ms. Corona and Mr. Reyes, testified that they saw Petitioner attacking Mr. Castelan.  This evidence would have supported Petitioner's conviction without his statement.  As noted earlier, *see supra* n.56, had Petitioner's trial counsel pursued a strategy involving expert forensic evidence, the State would have known about it before trial, given the trial court's order requiring pretrial disclosure of defense experts (and their reports).

[113]  She said her burglary conviction resulted from stealing three tamales.  (Docket No. 6-55, at 30 (Tr. 103).)  In arguing that Ms. Corona's testimony "became increasingly embellished," Petitioner noted her prior convictions for "forgery and unauthorized use of a motor vehicle." (Docket No. 1, at 23 (Br. 20).)  However, Petitioner is not in a good position to challenge Ms. Corona's credibility based on her criminal history.  Petitioner's own criminal history is, if anything, more troubling than hers. *See supra* n.8.

crime scene, Off. De La Rosa and Sgt. Guerrero, stated in their reports and trial testimony that Ms. Corona told them the perpetrator was a black man wearing a white shirt and a cap.[114]  One of the three witnesses who saw Petitioner fleeing from the scene, Olga Gomez, said that he was wearing a black cap.  (Docket No. 6-61, at 33 (Tr. 114).)  The other two witnesses who saw Petitioner run by, Manuel Nunez and Jose Octavio Garcia, did not mention seeing a cap.  (*See* Docket No. 6-57, at 19-23 (Trial Day 3 Tr. 59-76).)  Ms. Gomez was probably right.  Petitioner told the detectives that he was wearing his black cap at the crime scene.  (Docket No. 1-3, at 128 (Armstrong Tr. 15).)

However, Petitioner had put his black cap on the shelf in the bathroom at the bar while he was changing shirts.  When he was detained and taken outside the bar, the cap remained in the bathroom and was later collected as evidence.  When Ms. Corona was brought to the bar to see if she could identify the black man she had seen attacking the victim, Petitioner was in a different shirt (dark blue rather than white/gray), and he was not wearing a cap.  Off. De La Rosa testified that Ms. Corona identified Petitioner without hesitation, after she had first been shown a different black man who she stated was not the right man.  (*See* Docket No. 6-33 at 8 (Suppression Hrg. Tr. 14-15).)

In providing a written statement about two hours after the murder—and after she had identified Petitioner at the bar—Ms. Corona described what Petitioner was wearing when she saw him "hitting" Mr. Castelan.  (Docket No. 1-3, at 192 (Schultz Ex. 40).)  She again mentioned his white shirt and jeans, but said nothing about a cap; instead, she noted that he was almost "bald headed," with "very short hair."  (*Id.*)  Later at trial, Ms. Corona was sure that the man she saw attacking Mr. Castelan and fleeing up the alley was not wearing a cap.

---

[114] Off. De La Rosa said that Ms. Corona mentioned a white cap, while Sgt. Guerrero did not remember the color of the cap.  (*See* Docket No. 1-3 at 164 (Schultz Ex. 26) (De La Rosa report); Docket No. 1-3, at 176 (Schultz Ex. 33) (Guerrero report).)

The jury heard the conflicting testimony about what she said at the crime scene to the police officers and what she remembered at the time of trial.  Ms. Corona's confusion over whether Petitioner was wearing a cap is understandable.  It also serves to illustrate the well-researched, but not completely understood, limitations of human visual perception and memory.[115]  *See generally* National Research Council, *Identifying the Culprit: Assessing Eyewitness Identification*, 69 (2014) (summarizing "research that has led to important insights into how vision and memory work" and concluding "[m]emory is often far from a faithful record of what was perceived through the sense of sight").  After seeing Petitioner at the bar without a cap and recognizing him as the same man she had seen with Mr. Castelan at the crime scene, she likely concluded—consciously or subconsciously—that he had not been wearing a cap earlier.  What we do know—and what the jury knew—is that she correctly identified Petitioner.  He admitted in his statement that he was at the crime scene, saw the van, and fled up the alley.  It seems unlikely that the jury found it significant that Ms. Corona may have been mistaken about whether Petitioner was wearing a cap at the crime scene.[116]

---

[115] Federal courts typically address "the widely recognized problems with eyewitness testimony" in the context of deciding whether to exclude an eyewitness identification of a defendant because the identification procedures were so flawed that they violated due process.  *See United States v. Nolan*, 956 F.3d 71, 79-80 (2d Cir. 2020); *see also Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir.), *cert. denied*, 498 U.S. 925 (1990) (discussing the two-step process for determining the admissibility of identification evidence).  Here, there can be no dispute that Ms. Corona and Mr. Reyes correctly identified Petitioner as the person they saw with Mr. Castelan at the crime scene.

[116] Ms. Corona and Mr. Reyes were also mistaken in saying that Petitioner was wearing a white T-shirt at the crime scene.  But they were not alone in making that error.  All three of the witnesses who saw Petitioner fleeing up Seventh Street—Ms. Gomez, Mr. Nunez, and Mr. Garcia—also said that he was wearing a white T-shirt.  (*See, e.g.*, Docket No. 6-61, at 33 (Tr. 113-14) (Ms. Gomez testifying that Petitioner was wearing "[a] white shirt and a black pants and a black cap").)  In fact, Petitioner's shirt was light gray, as shown by the better-quality versions of State's exhibits 110 and 111 in the appendix submitted by respondent.  (*See* Docket Nos. 13, 14, 21, 23 (filing "Appendix with color prints of the crime scene photos," which the Clerk has placed in the exhibit vault).)  There is no doubt that all five witnesses saw Petitioner, even though they

i.  *Testimony regarding the "Prosecution's Theory"*

Petitioner suggests that discrepancies in the accounts of the two eyewitnesses went beyond mere details, arguing that their statements became "increasingly embellished" from the night of the murder to the trial.  (Docket No. 1, at 23-24 (Br. 20-21).)  Petitioner emphasizes Ms. Corona's trial testimony that she saw "Mr. Armstrong cut Mr. Castelan's neck and rifle through Mr. Castelan's pockets."  (*Id.*)  According to Petitioner, Ms. Corona did not say these things to police at the scene, in the 911 call, or a few hours later when she gave her initial statement.  (*Id.*)

This argument focuses on the specific part of the eyewitnesses' testimony that Petitioner refers to as the "prosecution's theory."  It relates to what Ms. Corona (in particular) said she saw Petitioner do after pulling Mr. Castelan away from the van and throwing him to the ground.  In her written affidavit signed about two hours after the murder, Ms. Corona described the events leading up to those final moments, including seeing Petitioner hitting Mr. Castelan and Mr. Castelan trying to get away.  (Docket No. 1-3, at 192 (Schultz Ex. 40).)  But she did not specifically state that she saw Petitioner bend over Mr. Castelan, search his pockets, and then cut his throat.  (*See id.*)  She did say that the "black man kept hitting Rafa on the stomach and then threw him to the ground."  (*Id.*)  She also stated that she called 911 after Petitioner ran away and "told the dispatcher that a black man had just stabbed Rafa."[117]  (*Id.*)

---

got the color of his shirt wrong, perhaps due to the nighttime lighting.  In addition, as noted earlier, of the three Seventh Street witnesses, Ms. Gomez was the only one who noticed that Petitioner was wearing a black cap.  And, while Ms. Gomez noticed the black cap, she did not say anything at trial about the blood stains on his shirt, which Messrs. Nunez and Garcia both noted.

[117] The English translation of the transcript of the 911 call shows that she did not use those precise words in speaking with the 911 operator.  (*See* Docket No. 6-61, at 20-21 (Trial Day 5 Tr. 63-68); Docket No. 6-73, at 9 (State's Ex. 189A).)  However, what she did say (while under the stress of just seeing her friend with his throat slashed) is consistent with her belief that the black man running away had killed Mr. Castelan.  A copy of the transcribed and translated 911 call is attached as Appendix 9 (which was admitted at trial as State's exhibit 189A).

In her video-recorded statement a few days later, Ms. Corona apparently stated, possibly for the first time, that she actually saw Petitioner go through Mr. Castelan's pockets and slash his throat.[118]   Consistent with her video statement, at trial Ms. Corona insisted that she had seen Petitioner search Mr. Castelan's pockets and cut his throat.  The difference between Ms. Corona's initial written statement and her trial testimony on this point is the primary basis for Petitioner's claim that she embellished her testimony.

There is nothing new about this argument.  At trial, Ms. Morales-Martinez cross-examined Ms. Corona at length about this very issue and then returned to it on re-cross.  (Docket No. 6-55, at 28-30, 33 (Trial Day 1 Tr. 96-102, 113-114).)  Petitioner's trial counsel also emphasized the same point during closing argument.  For example, Mr. Garza asked the jury why the video-recorded statements of the eyewitnesses were not shown during the trial: "You know why? Because the story got better and better, and it was not believable."  (Docket No. 6-63, at 11 (Trial Day 7 Tr. 30).)

Although Petitioner's argument is not new, he has offered new forensic evidence to cast further doubt on the credibility of Ms. Corona's testimony that she saw Petitioner search Mr. Castelan's pockets and cut his throat.

    *ii. New Forensic Evidence Regarding Mr. Castelan's Front Pockets*

Petitioner relies on FSA's report dated March 30, 2010 (Docket No. 1-5, at 239 (Zebot Ex. 34)), as forensic evidence that undercuts Ms. Corona's testimony:

> With respect to Mr. Castelan's shorts, SERI and FSA found no blood that originated inside of the pockets. (Zebot Decl. Ex. 34 at 67.) This subsequently

---

[118] As noted, *see supra* n.84, Ms. Corona gave her video statement in Spanish, and there does not appear to be an English translation in the record.  Det. Suarez explained that the video statement was recorded as a precaution in case Ms. Corona was unavailable at the time of trial. (Docket 6-56, at 31 (Trial Day 2 Tr. 106-07).)  She did appear at trial in response to a subpoena, and her video statement was not needed and not introduced in evidence at trial.

developed finding contradicts Ms. Corona's testimony that she saw Mr. Armstrong go through Mr. Castelan's pockets immediately after slashing his throat with a presumably bloody knife. Mr. Castelan's blood was found on currency in Mr. Armstrong's wallet. If Mr. Armstrong's hands were so bloody that he transferred blood to currency, one would certainly expect that he would have deposited blood on the inside of Mr. Castelan's . . . jeans pockets when he supposedly rifled them. Yet, no such evidence exists. (*Id.* at 67.)

(Docket No. 1, at 32-33 (Br. 29-30); footnote omitted.)[119]

Unlike Petitioner's argument about the absence of blood stains inside his own jeans pockets, *see supra* Part III.B.2.b.iv, the new forensic evidence does show that there were no blood stains originating from inside Mr. Castelan's front pockets.[120]  (*See* Docket No. 1-5, at 270, 273, 303 (Zebot Ex. 34, at 33, 36, 67).)  This fact suggests that Petitioner did not plunge a bloody hand into Mr. Castelan's front pockets, and thus it tends to undermine Ms. Corona's testimony that she saw Petitioner go through Mr. Castelan's pockets just before he fled up the alley.

However, this new evidence does not conclusively prove that Ms. Corona's testimony was wrong.  Petitioner might have put a hand in Mr. Castelan's front pockets that was not bloody, or he may have checked the pockets from the outside (which Ms. Corona mistook as reaching into

---

[119] Petitioner also argues that the absence of "deposited blood on the inside of Mr. Castelan's wallet" is probative evidence that he did not "rifle[]" through the wallet.  (Docket No. 1-5, at 33 (Br. 30).  This point is contradicted by Petitioner's own evidence.  FSA's report reflects that blood *was* found inside Mr. Castelan's wallet: "Several dark apparent blood stain deposits are present on the wallet outside *and inside* surfaces."  (Docket No. 1-5, at 251 (Rpt. 13); emphasis added.)  After testing two areas of the inside surface of the wallet, "[b]lood was detected in each of these areas."  (*Id.* at 252 (Rpt. 14).)   FSA's report also reflects SERI's DNA analysis of the wallet, but this does not help Petitioner either.  There can be little doubt that the murderer went through Mr. Castelan's wallet: the empty wallet was found near the red fence (more than 10 feet from his body), and the wallet's contents were strewn about the crime scene area.  SERI's DNA analysis reflects that only Mr. Castelan's DNA was found on his wallet.  (*Id.* at 300 (Rpt. 64).)  This simply shows that the murderer did not leave his DNA on Mr. Castelan's wallet, which is unsurprising.

[120] Because Mr. Castelan's back pockets were completely ripped off by his attacker, only his front pockets are relevant to Petitioner's argument.

the pockets).[121]  Even assuming this new evidence shows Ms. Corona got it wrong in saying that Petitioner put his hand in Mr. Castelan's pocket right before he fled, the issue becomes whether this would likely have caused one or more jurors to discount the rest of her testimony.  The answer to that may depend on whether they thought the error was an intentional falsehood and whether they found her testimony to be otherwise credible.

### iii.    Nature of the "Embellished" Testimony

If Ms. Corona embellished what she had seen, one explanation may be found in the transcript of her 911 call.  As the recording starts and before the 911 operator speaks, she is apparently addressing Mr. Reyes and asks: "He stabbed him? What'd he do? Ah! He cut him."[122] (Docket No. 6-73, at 9 (State's Ex. 189A).)  This might suggest that Ms. Corona had not actually seen Petitioner wielding a knife and cutting Mr. Castelan's throat.  Instead, after approaching the victim and seeing his throat cut, Ms. Corona made sense of what she witnessed by concluding— again, either consciously or subconsciously—that she had seen Petitioner cutting Mr. Castelan's throat.[123]

---

[121] For example, Petitioner may have been holding the box cutter knife in one hand, while reaching into Mr. Castelan's pocket with the other.  The hand wielding the knife would presumably have been bloody from the many times Mr. Castelan was cut, but the other hand could have been free of blood.  While Petitioner points to the fact that blood was on the money found in his possession when he was later arrested at the bar, this does not necessarily mean that blood must have been on both his hands as he bent over Mr. Castelan at the crime scene.

[122] The 911 transcript reflects that Ms. Corona had no doubt who had cut Mr. Castelan: "Here, in the alley, near the HEB, he's running. . . . The black guy is headed over there."  (Docket No. 6-73, at 9 (State's Ex. 189A).)

[123] The evidence at trial alerted the jury to the possibility that Ms. Corona had made such a connection.  On cross-examination, Ms. Corona stated that Petitioner "bent down and cut [Mr. Castelan's] neck[,] [a]nd he checked his pockets."  (*Id*. at 29 (Tr. 99).)  When reminded that she had said nothing in her written statement about seeing a knife, Ms. Corona responded: "Well, how is he going to cut him? . . . I'm telling you right there that he is cutting him."  (*Id*. at 33 (Tr. 114).)

But this would not necessarily help Petitioner. From the beginning, both Ms. Corona and Mr. Reyes insisted they saw Petitioner attacking Mr. Castelan, with Mr. Castelan trying to get away from him. Later, near the van, Ms. Corona may have seen Petitioner hovering over Mr. Castelan and striking out in a way that was consistent with the fact that Mr. Castelan's neck was slashed.[124] After Petitioner ran and she saw Mr. Castelan's personal items scattered on the ground, she may have also made the mental connection that she had seen Petitioner robbing him.

Importantly, the jury could have discounted the allegedly "embellished" parts of Ms. Corona's testimony and still found Petitioner guilty beyond a reasonable doubt. Was Petitioner trying to "help" Mr. Castelan or not? Ultimately, that was the key issue. Petitioner admitted he was there but claimed he was just "trying to help the man." If he was not just trying to help, then he is the murderer, as shown by all the other evidence. And on that issue the statements of Ms. Corona and Mr. Reyes remained consistent from the night of the murder until trial: Petitioner was not helping Mr. Castelan. To the contrary, they insisted from the beginning that they saw Petitioner attacking Mr. Castelan.

In that regard, the most significant evidence from the eyewitnesses is arguably not what Petitioner refers to as the "prosecution's theory." Rather, it is their consistent testimony about what happened leading up to that moment and, in particular, what happened when Mr. Castelan approached their van trying to get away from Petitioner. Mr. Castelan was near the rear passenger door of the van, as shown by the drops of his blood found on the door. Both Ms. Corona and Mr.

---

[124] As discussed earlier, *see supra* Part III.B.2.f.i, Mr. Castelan was cut many times. Both Ms. Corona and Mr. Reyes stated that Petitioner and Mr. Castelan were already covered with blood when they first saw them. Ms. Corona may have witnessed the last of the wounds Mr. Castelan received. Consistent with that possibility, there was a large pool of blood underneath Mr. Castelan's body at the spot where he died. Of course, that pool of blood could also have resulted from his many earlier wounds.

Reyes testified that Petitioner grabbed Mr. Castelan from behind, yanked him away from the van, and threw him violently to the ground.  Petitioner then stood near the van, staring at them with eyes "wide open."  This happened right in front of the eyewitnesses and involved conduct that was not subject to misinterpretation.  The jury would have been justified in concluding—as they undoubtedly did—that Petitioner was not "helping" Mr. Castelan; rather, he was robbing and killing him.

<em>iv.     Evidence Supporting the Eyewitness's Testimony</em>

In considering Petitioner's new evidence attempting to cast further doubt on credibility of the eyewitnesses, we must also take into account evidence in the record that supports their testimony, which includes the following:

- Ms. Corona's 911 call shows that, having just witnessed the events at the scene of the murder, she unequivocally believed that Mr. Castelan's killer was the "black guy" running up the alley.[125]  The man running up the alley was Petitioner.

- Off. De La Rosa was the first police officer at the crime scene.  When she arrived, Ms. Corona told Off. De La Rosa that when she and Mr. Reyes drove up, they saw a black male "beating up" Mr. Castelan.  Ms. Corona explained that she told Mr. Reyes to try to run over the black man with their van.  Off. De La Rosa recounted these facts in her contemporaneous police report.[126]

- In Ms. Corona's initial written statement, taken about two hours after the murder, she said that the black man was "hitting" Mr. Castelan, who was trying to run away but could not.  At one point, Mr. Castelan tried to open the door of the van, but the black man pulled him away and threw him on the ground.  Mr. Castelan was already covered with blood when he approached the van.[127]  Ms. Corona repeated this in her trial testimony.

- Mr. Reyes confirmed in his initial statement that Mr. Castelan was trying to get away from the black man and had run around a tree attempting to do so.[128]  Both

---

[125] *See* Docket No. 6-73, at 9 (State's Ex. 189A); *see also* Appendix 9.

[126] *See* Docket No. 1-3, at 164 (Schultz Ex. 26) (De La Rosa report)).

[127] *See* Docket No. 1-3, at 192 (Schultz Ex. 40 (Corona Aff.)).

[128] *See* Docket No. 1-3, at 195 (Schultz Ex. 42)).

the black man and Mr. Castelan were covered with blood. Mr. Reyes drove his van toward the black man to scare him away. Mr. Castelan came around the trash dumpster and tried to enter the van through the rear passenger door, but the black man grabbed him by the back of the neck and pulled him back. Mr. Reyes's testimony on these points did not change.

- Both Ms. Corona and Mr. Reyes testified that Mr. Castelan attempted to enter the rear passenger door of the van. Police found blood on the rear passenger door and testing confirmed it was Mr. Castelan's blood.[129]

- Both Ms. Corona and Mr. Reyes testified that Petitioner threw Mr. Castelan against the red fence. Police found blood on the red fence.[130]

- Both Ms. Corona and Mr. Reyes testified that Petitioner grabbed Mr. Castelan, yanked him back from the van, and threw him down so hard that they heard his head hit the ground. When Dr. Salinas performed the autopsy, he found an abrasion on the back of Mr. Castelan's head.[131]

- Ms. Corona testified that Petitioner stared directly at her with eyes wide open, making her think that he was high on drugs. Petitioner stated to detectives that he had his "head full of cocaine."[132]

- Police brought Ms. Corona and Mr. Reyes to the bar within half an hour of the murder. They were first shown Mr. Douglas and then Petitioner. Officer De La Rosa testified that Ms. Corona did not hesitate in stating that Mr. Douglas was not the man she saw and then positively identified Petitioner. Even though Petitioner had changed into a dark colored shirt and was not wearing his cap, Ms. Corona immediately recognized him.[133] Petitioner's statement to police confirms that she was correct.

Significantly, the credibility of Ms. Corona and Mr. Reyes—and their likely impact on the jury—is bolstered by the report and testimony of the investigator hired by trial counsel to assist in

---

[129] *See supra* Part III.B.2.f.v.

[130] *See supra* Part III.B.2.f.v.

[131] *See* Docket No. 6-62, at 26, 37-38 (Trial Day 6 Tr. 85, 132, 136).

[132] *See* Docket No. 6-55, at 29 (Trial Day 1 Tr. 99); Docket No. 1-3, at 134 (Armstrong Tr. 21).

[133] During the pretrial suppression, Off. De La Rosa testified that when Ms. Corona was shown Mr. Douglas, she said: "No, no, it is not him." (Docket No. 6-33 at 8 (Suppression Hrg. Tr. 15).) When she was shown Petitioner, Ms. Corona "was certain, as soon as she saw him." (*Id.* (Tr. 14).)

Petitioner's defense.  Mr. Tamez interviewed both witnesses before trial.  (Docket No. 7-24, at 18-23.)  He later testified about those interviews during the evidentiary hearing addressing Petitioner's state habeas application.

Mr. Tamez was well-qualified for his role as Petitioner's pretrial investigator.  He had been a police investigator with the McAllen Police Department for 15 years, including about five years as a homicide investigator.  (Docket No. 7-23, at 48.)  Mr. Tamez felt it was "very fortunate" for the defense team that he had been able to interview both the State's key witnesses, noting that, as a private investigator, they were not required to talk to him.  (*Id.* at 44.)  Somewhat surprisingly, Ms. Corona candidly gave Mr. Tamez detailed information about her criminal history, her abuse of crack cocaine, and the loss of custody of her children.  (Docket No. 7-24, at 21.)  Ms. Morales-Martinez later used this information at trial to impeach Ms. Corona.  But the eyewitnesses' statements to Mr. Tamez about what they saw the night of the murder was decidedly unhelpful to Petitioner.

Both interviews occurred about five months after the murder and about three and a half months before trial. Ms. Corona and Mr. Reyes were removed from the influence of the police, and they had apparently not yet met the prosecutor.[134]  Although Mr. Reyes and Ms. Corona had been living together for over a year at the time of the murder, they had broken up and were no longer together by the time Mr. Tamez interviewed them.  The change in their relationship had no apparent effect on their statements about what they saw that night or on their certainty that Petitioner had killed Mr. Castelan.

---

[134] There is no indication that they had had contact with anyone from the Donna Police Department since they had gone back to the police station five months earlier, on April 25, 2006, to give videotaped statements.  During Ms. Corona's trial testimony, on January 3, 2007, she stated that she had spoken to the prosecutor about two weeks before the trial.  (Docket No. 6-55, at 29 (Trial Day 1 Tr. 100).)

Ms. Corona and Mr. Reyes recounted to Mr. Tamez essentially the same thing that they had told the police five months earlier. Mr. Tamez interviewed Mr. Reyes first. Mr. Reyes stated that on the night of the murder they were driving north along the alley towards Silver Street when they saw an "altercation" between Mr. Castelan and the black man. The black man was "attacking Rafa"; Mr. Castelan was "trying to get away" but the man would not let him. (Docket No. 7-24, at 19.) Although Mr. Reyes revved up the van's engine and honked his horn, the black man "continued with his attack." (*Id.*) Mr. Reyes then tried driving his van towards the black man, but again this did phase him. Consistent with Mr. Reyes's earlier statement, he again described how Mr. Castelan was able to reach the van, only to be "yanked violently backwards by the black male," who was much larger than Mr. Castelan.[135] (*Id.*) Mr. Reyes was "certain the black man was not aiding the victim"; instead, "the black male was attacking the man violently." (*Id.* at 20.)

Ms. Corona's statements to Mr. Tamez were consistent with what Mr. Reyes had said and with her prior statements. She first noticed what appeared to be a "physical altercation." (*Id.* at 22.) After recognizing Mr. Castelan, she saw him attempting to get away from the black man "who was attacking him." (*Id.*) Both men were "very bloody." (*Id.* at 22-23.) She described how Mr. Castelan had approached the van and attempted to open the door, but "the black male yanked him back and threw him to the ground" so hard "she heard a thumping sound."[136] (*Id.* at 22.) Like

---

[135] The record shows that Petitioner outweighed Mr. Castelan by about 60 pounds, was about seven inches taller, and 25 years younger. *See supra* n.7.

[136] Ms. Corona's statements to Mr. Tamez further suggest that she did not actually see Petitioner going through Mr. Castelan's front pockets, but rather she surmised from what she saw that he had done so: "Laura said she did not see the black male rob the man, but Rafa's personal belongings were thrown on the ground as if they had been removed from his person." (Docket No. 7-24, at 22.) Mr. Tamez also questioned Ms. Corona about whether she saw Petitioner cut Mr. Castelan's throat: "She said she was unable to see the knife that the black male used but it appeared to be a small knife because she was not able to see to a point that she could describe it." (*Id.* at 23.) Petitioner's trial counsel received Mr. Tamez's report, and at trial Ms. Morales-Martinez cross-examined Ms. Corona regarding these points.

Mr. Reyes, Ms. Corona insisted to Mr. Tamez "there was no mistake that the black male was not helping the man but instead was killing him in front of them."[137]  (*Id*.)

Mr. Tamez shared his impressions from the interviews with Petitioner and his trial counsel. He "was bringing them news that [he] thought was gonna be very important for the outcome of this case."  (Docket No. 7-23, at 43-44 (St. Evidentiary Hr'g Tr.).)  The two witnesses "were pretty certain what they had seen."  (*Id*. at 38.)  When Petitioner's habeas counsel asked Mr. Tamez for his assessment of their credibility, he stated that he "was concerned" because he believed they would be "very good State witness[es], to be very frank."  (*Id*. at 39.)  Mr. Tamez felt that they were "pretty powerful witnesses" whose testimony would be "detrimental to Mr. Armstrong." (*Id*.)  When asked if their testimony would be "[k]ind of devastating," Mr. Tamez said he felt it "was going to be a very important piece in this case in the outcome."  (*Id*. at 40; *see also id*. at 55 (the eyewitness evidence against Petitioner was "strong").)  Mr. Tamez's assessment is telling, particularly given his experience as a homicide investigator.  As it turned out, he was right.

At trial, Ms. Corona was the State's first witness.  (Docket No. 6-55, at 16 (Trial Day 1 Tr. 46-47).)  During the prosecutor's initial closing argument, he began by reminding the jury that Ms. Corona was the first witness they heard: "She was an eyewitness to the crime.  An eyewitness." (Docket No. 6-63, at 7 (Trial Day 7 Tr. 16).)  Throughout his argument, the prosecutor emphasized the eyewitness testimony of Ms. Corona and Mr. Reyes and compared what they said to Petitioner's version of events.  (*See id*. at 7-10 (Tr. 16-25).)  He ended his initial argument where he had started: "You have two eyewitnesses. . . . It is straight out capital murder."  (*Id*. at 10 (Tr. 25).)

---

[137] Ms. Corona said she "has nothing against black people" and "was only planning to testify[] to what she witnessed" that night.  (Docket No. 7-24, at 23.)

This theme continued during the State's final closing argument. Again, the prosecutor emphasized the eyewitness testimony, arguing that Petitioner hoped the jury would "[i]gnore the two eyewitnesses." (Docket No. 6-63, at 16 (Tr. 50).) Near the end of his closing, the prosecutor played the recording of Ms. Corona's 911 call, which the jury had also heard earlier during the trial. (*See* Appendix 9 (transcription and translation of the 911 call).)[138] He then asked:

> Did that sound like someone made that up? Like she is faking it? Listen to how fast she is talking. Listen to what she is saying. She saw it. She saw the defendant do it. She witnessed it. That's why they don't want you to believe Laura Patricia Corona. They don't want you to believe Pillar Reyes. Ignore it.
>
> But you can't, because you have all the evidence in front of you.

(*Id*. at 18 (Tr. 57).)

The jury apparently did not ignore the testimony of the eyewitnesses, finding Petitioner guilty of capital murder beyond a reasonable doubt. Having had the opportunity to hear the irreconcilable versions of events related by Petitioner and the State's two eyewitnesses, the jury chose to credit the testimony of Ms. Corona and Mr. Reyes, as shown by their verdict.

Like the jury, the state trial judge also had the opportunity to assess the credibility of the State's eyewitnesses. In addition to presiding over the trial, Judge Gonzalez presided over Petitioner's state habeas application at the district court level. After conducting an evidentiary hearing, he recommended denial of Petitioner's claims relating to the guilt/innocence phase of trial. In doing so, the court concluded that the new "lay and expert evidence" did not meet the *Strickland* prejudice standard. (Docket No. 7-41, at 608 (Conclusions of Law at 579).) Implicit

---

[138] A communications officer for the Donna Police Department, Manuel Delgado, Jr., testified that he was on duty and received the 911 call from Ms. Corona. (Docket No. 6-61, at 20-21 (Trial Day 5 Tr. 63-65).) The recording of the 911 call was played during his testimony. (*Id*. at 21 (Tr. 65-68).) Ms. Corona spoke in Spanish during the call. As noted, a transcription and translation of the 911 call was admitted as State's Exhibit 189A and is attached to this report as Appendix 9. (*Id*. (Tr. 67); Docket No. 6-73, at 9 (State's Ex. 189A).)

in this conclusion is the finding that Petitioner's new evidence would have been insufficient to dissuade the jury from crediting the testimony of Ms. Corona and Mr. Reyes over Petitioner's version of events.

The AEDPA's presumption of correctness "applies not only to explicit findings of fact but 'also . . . to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.'" *Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th Cir. 2001)). "'The presumption is especially strong when the state habeas court and the trial court are one in the same,' as here." *Mays*, 757 F.3d at 214 (quoting *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir. 2000)).

Given the importance of the eyewitness evidence, it is understandable why Petitioner's habeas counsel went to enormous effort—over the course of several years—to develop evidence from lay and expert witnesses in attempting to discredit and undermine the testimony of Ms. Corona and Mr. Reyes.  Whether that effort was ultimately successful will be addressed next.

i.    The Cumulative Effect of the New Evidence

"The Supreme Court has never squarely held that the cumulative error doctrine governs ineffective assistance of counsel claims."[139]   *Hill v. Davis*, 781 F. App'x 277, 280–81 (5th Cir.), *cert. denied*, 140 S. Ct. 389 (2019).  As the Fifth Circuit reminded us in *Hill*, "a federal court

---

[139] In *Hill*, the Fifth Circuit also observed: "The most that can be said is that several of our sister circuits have recognized, to varying degrees, that relief can be had if the collective harm from multiple errors adversely affected the verdict." *Hill*, 781 F. App'x at 281 (citations omitted). While the Fifth Circuit has "employed a cumulative framework at times to assess ineffective assistance of counsel claims, there is no hard and fast rule governing its use, even as a matter of circuit precedent. On multiple occasions, [the Fifth Circuit] either declined to apply a cumulative prejudice analysis or questioned its relevance altogether." *Id.* at 281 n.2. (citations omitted).

may not grant habeas relief unless the state court decision is 'contrary to, or involved an unreasonable application of, clearly established federal law, *as determined by the Supreme Court*.'" *Id*. at 278 (quoting 28 U.S.C. § 2254(d)) (emphasis in original).

Applied here, this suggests that the state habeas court would not have unreasonably applied *Strickland* by considering separately each type of new evidence in deciding whether Petitioner has met his burden to show prejudice.  Nevertheless, in determining whether Petitioner has shown he was prejudiced by trial counsel's alleged deficiency in failing to develop and present additional evidence, it will be assumed that the cumulative effect of Petitioner's new evidence should be considered.  *See Hill*, 781 F. App'x at 278 (concluding in the alternative that "the alleged errors by counsel did not prejudice [petitioner], even if considered cumulatively").

Petitioner's habeas counsel has developed considerable new evidence in attempting to undermine the testimony of the State's two eyewitnesses and to support Petitioner's version of events.  Some of that evidence may have helped Petitioner had it been available at trial, including the following:

- The absence of blood stains inside the front pockets of Mr. Castelan's shorts tends to show that Ms. Corona was incorrect to the extent she suggested that Petitioner plunged his hand into those pockets.

- Petitioner's tracking expert states that there may be an impression from the sole of a shoe on Mr. Castelan's Medicaid card and, if so, that it does not match the shoes worn by either Mr. Castelan or Petitioner, suggesting that a third person may have been at the crime scene.

- Mr. Epstein's report describing contact blood stains on Petitioner's gray shirt lends support for Petitioner's claim that he was helping Mr. Castelan walk to the police station.

- Dr. Roe's report suggests that, due to Mr. Castelan's loss of blood, it is "unlikely" that he could have tried to get away from Petitioner in the way described by Ms. Corona and Mr. Reyes.

For the reasons discussed, the persuasive value of these points is not free from doubt when viewed in the context of the record.

Other points raised by Petitioner's new evidence are even less persuasive.  This is particularly true regarding the new evidence that Petitioner claims should have been the "cornerstone" of his defense: the Barrera/Guerra timeline alibi.  (*See* Docket No. 1, at 40, 44-45 (Br. 37, 41-42).)  That theory has minimal persuasive value, given inconsistencies in the two affidavits it is based on and other conflicting evidence in the record about the timing of the murder. In more than one instance, Petitioner's new evidence may have done him more harm than good (for example, the drug-hit theory).  As the state habeas court pointed out, many of Petitioner's "arguments rely heavily on information favorable to his position . . . while ignoring the evidence [to the] contrary."  (Docket No. 7-41, at 620.)

In arguing that he was prejudiced by trial counsel's failure to find and present new evidence, Petitioner points to the Fifth Circuit's decision in *Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004), as a "helpful comparison to this case."  (Docket No. 1, at 46 (Br. 43).)  In *Soffar*, one or more robbers had entered a closed bowling alley and shot four people in the head before absconding with about $1,000.  368 F.3d at 444.  Three of the four victims died.  The survivor and sole witness, Gregory Garner, underwent a lengthy surgery and ultimately lost an eye.  *Id*. at 448. Garner recovered sufficiently to provide several statements to the investigators.  *Id*. at 448-51. Later, Soffar confessed that he and another individual had committed the robbery-murders.  *Id*. at 452-56.

However, Soffar's account was inconsistent with what Garner said in significant ways, including the number of shots fired and positions of the victims at the time they were shot.  *Id*. at 456-57.  Other than Soffar's confession, no evidence linked him to the robbery-murders.  *Id*. at 478-79.  Soffar later repudiated his confession, explaining that he told officers what they wanted to hear and that he had confessed to other crimes he did not commit.  *Id*. at 457-59.

The Fifth Circuit held that Soffar's counsel rendered deficient performance by failing "to take the most elementary step of attempting to interview the single known eyewitness to the crime." *Id*. at 473-74.   Trial counsel should have been aware that Garner's statements were available in the prosecutor's open files, "except for their gross neglect or oversight." *Id*. at 474. Still, they made no use of Garner's statements at trial, even though they conflicted with Soffar's confession "in a number of significant ways." *Id*. at 474.   Counsel was also deficient "in not seeking out a ballistics expert when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case." *Id*. at 476.   Regarding prejudice, "defense counsel's failure to conduct an adequate pretrial investigation had a clear negative impact on the outcome of the trial." *Id*. at 478.   As the Fifth Circuit emphasized, "[t]his is absolutely not a case where there was clear objective evidence of Soffar's guilt." *Id*.   Among other things, "[n]o eyewitness testimony placed either Soffar [or his alleged associate] at the crime scene." *Id*.

In contrast, there is "clear objective evidence" of Petitioner's guilt in the instant case.  Two eyewitnesses testified that they saw him attack Mr. Castelan.   Evidence at the crime scene, including the blood found on the fence and on the van, is arguably inconsistent with Petitioner's story.   Had Petitioner denied that he was at the murder scene—as he initially tried to do— overwhelming evidence showed he was there, including the fact that Mr. Castelan's blood and Petitioner's DNA were found on the gray shirt Petitioner hid behind a trash bin in an alley.   In other words, this is not a case, like *Soffar*, where there was no evidence linking the defendant to the crime other than the defendant's own statement.   Here, Petitioner was positively identified by eyewitnesses before he admitted that he was at the crime scene.   Nonetheless, the distinction between this case and *Soffar* does not resolve whether Petitioner has shown prejudice.

Would Petitioner have had a better chance of acquittal if the new evidence developed by habeas counsel was available at trial?  Perhaps, but that is not the right question.  Would the result of Petitioner's trial have been different if the new evidence had been available at his trial?  Possibly, but probably not.  Put another way, if Petitioner's new evidence had been presented at trial, would it have convinced at least one juror to change his or her verdict?  Maybe, but again probably not.  *See Soffar*, 368 F.3d at 479 (finding prejudice where there was "a reasonable probability that at least one juror would have refused to return a verdict of guilty").

As the Fifth Circuit has emphasized:

> The Supreme Court has set the prejudice bar high . . . —and it has done so purposely.  Possibility does not equal "probability," which is what *Strickland* demands—"a probability sufficient to undermine confidence in the outcome."  Again, the likelihood of a [different result] "must be substantial, not just conceivable."

*Sanchez v. Davis*, 936 F.3d 300, 307 (5th Cir. 2019), *cert. denied*, 2020 WL 1325983 (Mar. 23, 2020) (footnotes omitted) (citing *Strickland*, 466 U.S. at 694, and *Richter*, 562 U.S. at 112).  Even with the new evidence developed by habeas counsel, the record strongly suggests that the jury's verdict would hinge on their view of who was telling the truth: Petitioner or the two eyewitnesses?  Petitioner would probably lose that credibility contest—just as he did at trial.  Petitioner's new evidence suggests that the jury's verdict "*might* have been different"; "[n]ot that it *likely* would have been different."  *Sanchez*, 936 F.3d at 307 (emphasis in original).

Still, some "fairminded jurists" might disagree with that assessment of the *Strickland* prejudice issue.  In other words, some judges might think that the state habeas court was wrong in ruling that Petitioner failed to show prejudice.  But that is only the first step in the analysis.  We must "[n]ow layer on top of that the habeas lens of 'reasonableness.'"  *Id.* at 306 (footnote omitted) (citing *Richter*, 562 U.S. at 100-01).

Even if it could be said that the state habeas court's prejudice ruling was wrong, Petitioner must also show that the court unreasonably applied *Strickland*:

> [H]e must show that the court's no-prejudice decision is "not only incorrect but 'objectively unreasonable.'" Put differently, [petitioner] must show that every reasonable jurist would conclude that it is reasonabl[y] likely that [he] would have fared better at trial had his counsel conducted a sufficient pretrial investigation. "It bears repeating," the Supreme Court emphasized in *Richter*, "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."

*Adekeye v. Davis*, 938 F.3d 678, 684 (5th Cir. 2019) (footnotes omitted) (citing *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010), and *Richter*, 562 U.S. at 102). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Petitioner Armstrong has not—and cannot—meet this stringent standard. The state habeas court did not unreasonably apply *Strickland* in concluding that Petitioner fails to show that but for trial counsel's alleged deficiency, there is a reasonable probability that the result of his trial would have been different. *Strickland*, 466 U.S. at 694. As shown by the discussion of Petitioner's new evidence in this report, the record supports the state habeas court's ruling. For this reason, Petitioner's ineffective assistance of counsel claim based on failure to investigate should be denied.

## IV.    FREESTANDING ACTUAL INNOCENCE CLAIM

Petitioner claims his new evidence proves he is "actually innocent of the offense for which he has been convicted." (Docket No. 1, at 47.) He relies on the same evidence offered in support of his ineffective-assistance claim. (Docket No. 11, at 22.) Respondent argues that "a separate and independent claim of 'actual innocence'" is not cognizable on federal habeas review. (Docket No. 8, at 23-24.) Respondent is correct.

Petitioner concedes that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent

constitutional violation occurring in the underlying state criminal proceedings." (Docket No. 11, at 20 (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)).) As Petitioner also points out, "the Supreme Court did not definitely reject the possibility that an actual innocence claim could be successfully asserted, and 'left open whether a truly persuasive actual innocence claim may establish a constitutional violation sufficient to state a claim for habeas relief.'" (Docket No. 11, at 20 (quoting *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003).)

It is true that the Supreme Court "has not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citing *Herrera*, 506 U.S. at 404–405). In the Fifth Circuit, however, "actual-innocence is *not* an independently cognizable federal-habeas claim." *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) (citing *Dowthitt v. Johnson,* 230 F.3d 733, 741-42 (5th Cir.2000), *cert. denied,* 532 U.S. 915 (2001)) (emphasis in original). The Fifth Circuit "does not consider *habeas* relief based on 'freestanding claims of actual innocence.'" *Floyd v. Vannoy*, 894 F.3d 143, 155 (5th Cir.), *cert. denied*, 139 S. Ct. 573 (2018) (citing *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009)).

Petitioner acknowledges that the law in the Fifth Circuit is contrary to his position, but he "respectfully requests this Court reconsider this position in light of the substantial evidence demonstrating his actual innocence." (Docket No. 11, at 22.) While it is appropriate for Petitioner to preserve this issue for appeal, the District Court is bound by Fifth Circuit precedent.

Even if the Supreme Court were to recognize a freestanding actual innocence claim, Petitioner has not made the necessary showing. Because the Supreme Court has not recognized such a claim, it also has not (for obvious reasons) articulated what standard would apply. But the Court has provided some guidance in the context of "gateway" actual innocence claims. "[A]ctual

innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (referring to *Schlup v. Delo*, 513 U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006)).

To support a "credible" gateway actual innocence claim, a prisoner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. But "the habeas court's analysis is not limited to such evidence." *House v. Bell*, 547 U.S. 518, 537 (2006). Rather, the "court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *Id*. at 538  (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. CHI. L. REV. 142, 160 (1970)).

"[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329). This standard will be satisfied only in "truly 'extraordinary'" cases. *Schlup* 513 U.S. at 327 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

If "tenable actual-innocence gateway pleas are rare" and "truly extraordinary," then tenable freestanding actual innocence claims would be rarer and even more extraordinary. In *House*, the Supreme Court found that a state prisoner had made the requisite showing for a gateway actual innocence claim (allowing him to overcome a state procedural default); however, the Court also noted that "whatever burden a hypothetical freestanding innocence claim would require, this

petitioner has not satisfied it."   547 U.S. at 554.  In other words, a freestanding actual innocence claim would require a stronger showing of innocence than is needed to support a gateway innocence claim.

Petitioner's new evidence falls far short of meeting the showing required for either an actual innocence gateway claim or a freestanding actual innocence claim.  As the Fifth Circuit noted in *Soffar*, to prevail on an ineffective-assistance claim, a "[petitioner] is not required to establish his innocence or even demonstrate 'that counsel's deficient conduct more likely than not altered the outcome in the case.'"  *Soffar*, 368 F.3d at 478–79 (quoting *Strickland*, 466 U.S. at 693).  For the reasons already discussed, Petitioner has not shown *Strickland* prejudice, let alone the far higher showing necessary to prove actual innocence.  Petitioner's freestanding actual innocence claim thus lacks merit even if it could be considered.

The analysis of Petitioner's freestanding actual innocence claim can stop there.  Nevertheless, it is also noteworthy that in evaluating such a claim, other evidence would be considered, even if it would have been inadmissible during the guilt/innocence phase of trial.  *House*, 547 U.S. at 537 ("the court must consider a 'all the evidence,'" regardless of admissibility).  Here, evidence that would have been inadmissible on the issue of Petitioner's guilt tends to further confirm that he has not shown his innocence.  One example of this is Petitioner's new mitigation evidence.

In the CCA's opinion finding that Petitioner was prejudiced by his defense team's inadequate mitigation investigation, the court summarized Petitioner's new evidence detailing the horrific conditions Petitioner suffered as a child, which included: physical abuse; sexual abuse; privation and neglect; and squalid and dangerous living conditions.  *Ex Parte Armstrong*, No. WR-78,106-01, 2017 WL 5483404, at *6-11 (Tex. Crim. App. Nov. 15, 2017).  As just one example,

Petitioner's sister explained that their mother was an alcoholic "and drank away all their money so they could not pay bills or buy food for the house." *Id*. at *8. Similarly, their father would "take all the money" the family had and "spend it on drugs and alcohol," so that the "children were close to starving and never had groceries in the house"; he would also "steal the family's food stamps but never bring food home." *Id*.

The new mitigation evidence showed that, as a defenseless child, Petitioner was subjected to almost unimaginable abuse and poverty, evoking deep sympathy and compassion for him. Perhaps not surprisingly, at a young age, Petitioner began committing crimes and abusing drugs. As an adult, while living with his sister, Petitioner "was using cocaine in powder and crack form, as well as methamphetamine." *Id*. at *11. In additional to engendering feelings of sympathy and sorrow, Mr. Armstrong's terrible sufferings as a child and young man tend to suggest how he (or anyone) could have murdered Mr. Castelan in such a shocking and brutal way.

As the CCA observed, this point was made in two expert reports addressing Petitioner's mental functioning and mental health. Dr. Phillip D. Harvey, a clinical psychologist, concluded that Petitioner had mental impairments that "included impairments in judgment, reasoning, problem-solving, attention, concentration, processing speed, and memory." *Id*. at *12. These impairments likely resulted from (or were exacerbated by) the physical abuse Petitioner suffered and his substance abuse. *Id*. Petitioner's "symptoms may have been even worse" at the time of the murder. *Id*.

Dr. Robert Lee Smith, a forensic psychologist and addiction specialist, diagnosed Petitioner as having a "dysthymic disorder," substance dependence, and a "personality disorder." *Id*. As described by the CCA, Dr. Smith explained how Petitioner's mental health issues affected his conduct at the time of the murder:

> [Petitioner's] precise mental health issues caused him to be highly reactive and impulsive, to lack judgment, to have difficulty coping with stressful decisions, and to be unable to weigh the consequences of taking a particular action. All of these qualities would have contributed to impair him psychologically from behaving appropriately *on the night of the offense*. According to Smith, individuals with [Petitioner's] history of "significant trauma," where they have been "physically abused and mistreated," tend to be suspicious, guarded, paranoid, and tend to overreact in situations where they perceive a risk. In addition, Smith opined, [Petitioner's] dysthymia also would have played a role in his mental state on the night of the murder by enhancing his sense of despair and entrapment, and causing him to believe he was being treated unfairly. [Petitioner's] history of alcohol and drug abuse would have multiplied the effects of these disorders on cognition, impulsivity, and judgment. He would have been "highly reactive, impulsive, demonstrating poor judgment," and would have "had difficulty coping" with the stress of the situation and with "making decisions about weighing the pros and cons and what would be the best action at the time." Smith's report concluded that "the culmination of each of these factors, individually and collectively, played a significant role" in the commission of the offense.

*Id*. at *13 (emphasis in original).

The CCA explained how Petitioner was prejudiced by trial counsel's failure to develop and present evidence regarding his mental health :

> The expert testimony that [Petitioner] could have presented after a complete mitigation investigation adds a significantly mitigating component because it explains the state of mind from which he could have perpetrated the brutal offense for which he was convicted. Had [Petitioner's] trial counsel conducted a more thorough mitigation investigation, they would have been able to present evidence to show, and to argue, that his borderline intelligence, his fronto-striatal damage and acquired dementia, his depression, the specific characteristics of his personality disorder, and, particularly, his inherited propensity for alcoholism and substance abuse, all combined to adversely impact his judgment and impulse control at the time of the offense. Thus, the propensity of this new psychological testimony to reduce Applicant's moral culpability for the offense was considerable.

*Id*. at *16.  The same psychological evidence that saved Petitioner's life, by enabling him to avoid the death penalty, also helps to explain what led him to kill Mr. Castelan.

In addition, to the extent that other evidence may have been inadmissible during the guilt/innocence phase of trial, that too would have further confirmed that Petitioner has failed to show actual innocence.  For example, it is telling that Petitioner possessed and often carried a blue

box cutter knife.  At the time of the murder, he also carried in his wallet the note from Ms. Losoya

ending their relationship due to his bad behavior, including stealing, cheating, and using drugs.

The note takes on added significance in light of the findings of Drs. Harvey and Smith.[140]

Both because Petitioner's actual innocence claim is not cognizable in the Fifth Circuit and

because Petitioner has not come close to meeting the standard that would be required to support

such a claim, his freestanding actual innocence claim should be denied.[141]

## V.  CONCLUSION

For the foregoing reasons, the undersigned recommends that Respondent's Motion for

Summary Judgment (Docket No. 8) be GRANTED, that Petitioner's Motion for Summary

Judgment (Docket No. 11) be DENIED, that the Petition for Writ of Habeas Corpus Pursuant to §

2254 (Docket No. 1) be DENIED, and that this action be DISMISSED.  For the reasons explained

below, it is further recommended that a certificate of appealability be granted as to Petitioner's

ineffective-assistance claim alleging failure to investigate and denied as to his other claims.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus

proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. §

2253(c)(1)(A).  A COA "may issue . . . only if the applicant has made a substantial showing of the

denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under §

---

[140] Sadly, on the day of the murder, Petitioner played out a version of the scenario he experienced as a child—spending his paycheck on alcohol and drugs, even though his girlfriend was expecting a child who he should help support (not to mention several other children he had fathered, *see supra* n.110).

[141] Petitioner has greatly benefitted from a habeas legal team that is diligent, talented, and well-intentioned.  As the record attests, they have expended considerable time and resources in developing evidence to challenge his conviction.  Petitioner's legal team seems to have looked in every corner and turned over every stone.  Notwithstanding these extraordinary efforts, if Petitioner is in fact innocent (as he insists), the available evidence does not prove it.

2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

To warrant a COA as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); s*ee also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* standard to a COA determination in the context of a habeas corpus proceeding).  An applicant may also satisfy this standard by showing that "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *see also Jones*, 287 F.3d at 329.  As to claims that a district court rejects solely on procedural grounds, the prisoner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.

Here, Petitioner's § 2254 claims should be dismissed on their merits for the reasons explained in this report.  However, as reflected by the detailed discussion of Petitioner's new evidence, reasonable jurists may find debatable the undersigned's assessment of Petitioner's claim alleging ineffective assistance of counsel based on failure to investigate.  As to Petitioner's other claims, reasonable jurists would not find debatable or wrong the conclusion that those claims lack merit, nor are they adequate to deserve encouragement to proceed further.

## **NOTICE TO THE PARTIES**

The Clerk shall send copies of this Report and Recommendation to counsel for the parties, who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file timely

written objections shall bar an aggrieved party from receiving a de novo review by the District

Court on an issue covered in this Report and, except upon grounds of plain error, from attacking

on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the

District Court.

DONE at McAllen, Texas on September 8, 2020.

_____
Peter E. Ormsby
UNITED STATES MAGISTRATE JUDGE

APPENDIX 1



APPENDIX 1 (cont. – pg. 2)



APPENDIX 2





Image capture: Jan 2008    © 2020 Google

Donna, Texas

APPENDIX 2 (cont. - pg. 2)



APPENDIX 2 (cont. - pg. 3)



APPENDIX 2 (cont. - pg. 4)



APPENDIX 3





APPENDIX 4



APPENDIX 5



# APPENDIX 6



APPENDIX 6 (cont. – pg. 2)



APPENDIX 7



Figure 59.  Armstrong denim jeans #7, Exhibit
            163 [Item 7], front outside surface.

APPENDIX 8



## APPENDIX 8 (cont.)



APPENDIX 9

| CALLER: | ¿Le picó?  ¿Qué hizo?  ¡Yh!  Lo cortó. | He stabbed him?  What'd he do?  Ah!  He cut him. |
|---|---|---|
| OPERATOR: | 911? | 911? |
| CALLER: | Oiga, ¿disculpe?  Aquí en el callejón, aquí por el HEB, va corriendo.  Va corriendo pa' allá.  Y, señor, aquí está tirado en el callejón.  Y lo picó un negro que va por allí.  Aquí va por el – por el – 'ire, viene siendo, aquí por aquí, derecho, y aquí en frente de Housing Authority, por favor.  Lo picarón en el cuello. | Hey listen, excuse me?  Here, in the alley, near the HEB, he's running.  Running over there.  And sir, he's laying here in the alley.  And a black guy he's headed over there.  He's going by the – by the—Look, it's like, here, around here, in front, and here in front of Housing Authority, please.  He was stabbed in the neck. |
| OPERATOR: | ¿Que – que es la dir- -- Dejeme mandar una ambulancia para allá. | What – what's the add- -- let me send an ambulance over there. |
| CALLER: | Aquí, en la – en la Authority.  El Negro va pa' allá, a rumbo a – | Here, at the – at the Authority.  The black guy is headed over there, towards… |
| OPERATOR: | ¿Cómo se llama la dirección?  ¿Dónde está la dirección, Señora? | What's the name of the address?  Where is this address, ma'am? |
| CALLER: | The Housing Authority, oiga, que segun esta cortado en el cuello. | The Housing Authority, hey listen, apparently his neck is cut. |
| OPERATOR: | Okay.  Ahorita mando a alguien para allá. | Okay.  I'll send someone over there right now. |
| CALLER: | ¡Corranle!  Apúrenle, por favor. | Run!  Hurry up, please. |



## APPENDIX 10

